# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

HEATHER WRIGHT, CAROLE STEWART, JEANETTE CHILDRESS, ROBERT JORDAN, SEAN HALBERT, DANA SKELTON, VANESSA RUGGLES and ROSE SOMERS, individually and on behalf of all others similarly situated,

        *Plaintiffs*,

    v.

NATIONSTAR MORTGAGE LLC, a Delaware limited liability company,

        *Defendant*.

Case No. 14-cv-10457

Hon. Edmond E. Chang

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR APPROVAL OF ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD**

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................1

II.    FACTUAL AND PROCEDURAL BACKGROUND..........................................3

     A.    Nature of the Case..................................................................................3

     B.    The Litigation and Work Performed for the Class's Benefit ..................4

     C.    Settlement Discussions and the Parties' Mediation Efforts ....................6

     D.    Preliminary Approval, Modifications to the Settlement, and Discussions with the Attorneys General ...............................................7

     E.    The Response to the Settlement to Date has Been Overwhelmingly Positive.......10

III.    CLASS COUNSEL'S REQUESTED ATTORNEYS' FEE AND EXPENSE AWARD IS REASONABLE, FALLS WITHIN THE MARKET RATE FOR SIMILAR SERVICES AND THUS, SHOULD BE APPROVED ....................................................10

     A.    The Base Rate in TCPA Cases Involving Similar Settlement Amounts—Before Taking Risk into Account—Is 30% .........................12

          1.    Class Counsel's contingency agreement with Plaintiff is 33% of any sum recovered ..................................................13

          2.    Similar TCPA cases confirm that the base rate for fee awards based on a percentage of the recovery analysis is 30%—excluding a risk adjustment—for the first $10 million recovered .............................13

     B.    The Risk Associated with the Litigation Justifies a Fee Award in Excess of 36% of the Net Benefit to the Settlement Class and Certainly One Third of the Total Settlement Fund, which Is a Lesser Amount .......................................................16

          1.    The issues in this case show that Class Counsel faced substantial risk ......17

          2.    The Settlement provides a greater benefit than settlements in similar cases..........................................................................21

IV.    PLAINTIFFS' REQUEST FOR $5,000 REPRESENTS A FAIR AND REASONABLE INCENTIVE AWARD..........................................................25

V.    CONCLUSION..................................................................................................25

## TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT CASES**

*Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740 (2012) ...................................................................2

**UNITED STATES CIRCUIT COURT OF APPEALS CASES**

*Americana Art China, Co., Inc. v. Foxfire Printing & Packaging, Inc.*,
    743 F.3d 243 (7th Cir. 2014) ..........................................................................................11

*Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998) ...........................................................11, 12, 14, 25

*Damasco v. Clearwire Corp.*, 662 F.3d 891 (7th Cir. 2011) .............................................................6

*In re Continental Illinois Securities Litigation*, 962 F.2d 566 (7th Cir. 1992) .......................11, 17

*In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001) ................................................... *passim*

*In re Synthroid Mktg. Litig.*, 325 F.3d 974 (7th Cir. 2003) .......................................................14, 15

*In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741 (7th Cir. 2011) ...................................17, 18

*Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014) ...................................................15, 16

*Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956 (7th Cir. 2013) ...........................................17

*Skelton v. Gen Motors Corp.*, 860 F.2d 250 (7th Cir. 1988) ..........................................................11

*Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637 (7th Cir. 2012) .........................................18

*Sutton v. Bernard*, 504 F.3d 688 (7th Cir. 2007) ....................................................................10, 11

*Taubenfeld v. Aon Corp.*, 415 F.3d 597 (7th Cir. 2005) .................................................................13

**UNITED STATES DISTRICT COURT CASES**

*Arthur v. Sallie Mae, Inc.*, No. C10-0198JLR, 2012 WL 90101 (W.D. Wash. Jan. 10, 2012) .....23

*Baird v. Sabre, Inc.*, 995 F. Supp. 2d 1100 (C.D. Cal. 2014) .......................................................22

*Craftwood Lumber Co. v. Interline Brands*, No. 11-cv-4462,
    2015 WL 2147679 (N.D. Ill. May 6, 2015) ......................................................................15

*Cruz v. Sky Chefs, Inc.*, No. C-12-02705 DMR,
    2014 WL 7247065 (N.D. Cal. Dec. 19, 2014) ..................................................................24

*Grant v. Commonwealth Edison Co.*, No. 13-cv-08310,
  dkts. 58, 68 (N.D. Ill. Sept. 11, 2015) (same) ...................................................22

*Greene v. DirecTV*, No. 10-cv-117,
  2010 WL 4628734 (N.D. Ill. Nov. 8, 2010) ...................................................19

*In re Capital One Tel. Consumer Prot. Act. Litig.*,
  80 F. Supp. 3d 781 (N.D. Ill. Feb. 12, 2015) ........................................... *passim*

*In re Jiffy Lube Int'l, Inc. Text Spam Litig.*,
  No. 11-md-2261, dkt. 97 (S.D. Cal. Feb. 20, 2013) .......................................23

*Kaplan v. Houlihan Smith & Co.*, No. 12-cv-5134,
  2014 WL 2808801 (N.D. Ill. June 20, 2014) ...................................................12

*Kazemi v. Payless Shoesource, Inc.*,
  No. 09-cv-5142, dkt. 94 (N.D. Cal. Apr. 2, 2012) ..........................................23

*Kolinek v. Walgreen Co.*, No. 13-cv-4806,
  2014 WL 3056813 (N.D. Ill. July 7, 2014) ...................................................19

*Kolinek v. Walgreen Co.*, 311 F.R.D. 483 (N.D. Ill. 2015) ................................... *passim*

*Kramer v. Autobytel, Inc.*, No. 10-cv-2722, dkt. 148 (N.D. Cal. Jan. 27, 2012) ..........................23

*Lozano v. Twentieth Century Fox Film Corp.*, No. 09-cv-6344,
  dkt. 65 (N.D. Ill. Apr. 15, 2011) ...................................................23

*Michaelson v. CBR Grp., Inc.*, No. 13-cv-50228,
  2015 WL 24490938 (N.D. Ill. May 21, 2015) ...................................................18

*McKinnie v. JP Morgan Chase Bank, N.A.*,
  678 F. Supp. 2d 806 (E.D. Wis. 2009) ...................................................14

*Roberts v. Paypal, Inc.*, 12-cv-622,
  2013 WL 2384242 (N.D. Cal. May 30, 2013) ...................................................19

*Ryabyshchuck v. Citibank (S.D.) N.A.*, No. 11-cv-1236,
  2012 WL 5379143 (S.D. Cal. Oct. 30, 2012) ...................................................19

*Satterfield v. Simon & Schuster, Inc., et al.,* No. 06-cv-2893,
  dkt. 132 (N.D. Cal. Aug. 6, 2010) ...................................................23

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011) ...................................................11

*Weinstein v. The Timberland Co., et al.*, No. 06-cv-00484, Dkt. 93 (N.D. Ill. Dec. 18, 2008).....23

*Wilkins v. HSBC Bank Nevada, N.A.*, No. 14-cv-190,
    2015 WL 890566 (N.D. Ill. Feb. 27, 2015) ............................................................ *passim*

*Williams v. Gen. Elec. Capital Auto Lease*, No. 94-cv-7410,
    1995 WL 765266 (N.D. Ill. Dec. 26, 1995)....................................................................13

**STATUTES AND RULES**

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,
18 FCC Rcd. 14014 (2003)..........................................................................................20

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,
23 FCC Rcd. 559 (2008)..........................................................................................18, 21

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30
FCC Rcd. 7961 (2015)..............................................................................................19

**STATUTES AND RULES**

47 U.S.C. § 227.................................................................................................. *passim*

Fed. R. Civ. P. 23 ......................................................................................................2

**MISCELLANEOUS**

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*,
    7 J. Empirical L. Stud. 811 (2010)..................................................................14

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: 1993–
2008*, 7 J. Empirical Legal Studies 265 (2010)................................................................22

## I.    INTRODUCTION

The Settlement[1] that forms the basis for Plaintiffs' instant request for attorneys' fees, expenses, and incentive award comes after multi-district litigation that included coordination and consolidation among five separate groups of plaintiffs from across the country, motion practice, extensive exchanges of discovery (both formal and informal), and years'-worth of settlement negotiations—including with the assistance of the Honorable Edward A. Infante (ret.) of JAMS during multiple mediation sessions. As explained at preliminary approval and further herein, the Settlement is a strong result for the Class—both in terms of the available monetary relief and the significant changes to Nationstar's telephone collection practices. It is consistent with (and in many cases exceeds) the relief obtained in other similar settlements that have been approved in cases in this District (and throughout the country) alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

As to the monetary relief, Nationstar has agreed to create a $12.1 million non-reversionary settlement fund from which all costs of the Settlement will be paid, including individual *pro rata* payments to claiming Class Members. Based on the size of the Class, the amount obtained is substantial and in line with other settlements reached in TCPA class actions. Equally important, Nationstar has agreed to create and implement procedures designed to the curb conduct that forms the basis of the Class's claims—i.e., making collection calls to the cellular telephones of individuals who have not consented (or revoked consent) to receive such calls. Such procedures include properly coding revocation requests into Nationstar's systems, and training agents and employees in how to properly honor such requests. Taken as a whole,

---

[1]    The terms "Settlement" and "Settlement Agreement" refer to the Class Action Settlement Agreement filed with this Court on October 12, 2015 (dkt. 56-1), as amended by the addendum to that agreement filed on January 22, 2016 (dkt. 67-2).

Plaintiffs and Class Counsel are confident that the relief available under the Settlement satisfies the primary goals of this litigation: to obtain appropriate monetary relief and ensure that Nationstar's alleged unlawful calling practices do not continue in the future. And, based upon the overwhelmingly positive response to date, it's clear that the Settlement Class Members agree.[2]

With that as the backdrop, Plaintiffs now move the Court to approve (i) the fee award to Class Counsel in the amount of $3,690,000 (representing approximately 36% of the net Settlement Fund, i.e., after excluding the anticipated costs of notice and administration and the proposed incentive award),[3] and (ii) an incentive award of $5,000 for each plaintiff in recognition of their efforts on behalf of the Settlement Class as Class Representatives. Both the requested fee award and incentive award are at or below the amounts approved in similar TCPA class action settlements, are consistent with the market rates for such awards, fairly compensate Class Counsel for the time and effort expended in the cases and to reach the proposed Settlement, and reflect the results achieved for the Settlement Class and the risks faced by Class Counsel in this litigation. For these reasons and as explained further below, pursuant to Federal Rule of Civil Procedure 23(h), Plaintiffs respectfully request that the Court approve the requested

---

[2] To date, the Settlement has received a Settlement Class participation rate that is even higher than anticipated, including the receipt of several thousand Revocation Requests. Notwithstanding, the Settlement Administrator is currently in the process of reviewing and analyzing the claims and Revocation Requests received to date—including, for example, confirming their completeness, identifying any duplicate submissions, and investigating any potential indicia of fraud in the process. Thus, although it is clear that there has been a significant (and positive) response from the Settlement Class, at this point the Parties are unable to provide exact total figures in that regard. Notwithstanding, the Parties will of course be prepared to update the Court with such figures at final approval.

[3] Again, Plaintiffs will update the Court as to the anticipated total cost of notice and administration (and any changes thereto) at final approval. Additionally, Plaintiffs' fee request of $3,690,000 (or 36% of the *net* settlement value to the class) represents substantially less than the $4,125,000 (or 34.1% of the *total* settlement fund) provided for by the Parties' settlement agreement, and specified in the Class notice materials. (*See* Dkt. 58 at 9 n.3; *see also*, *e.g.*, Dkt. 67-4 at 6.)

fee award and incentive award.

## II. FACTUAL AND PROCEDURAL BACKGROUND

A brief summary of the underlying facts and law involved in the litigation, which lends context to the reasonableness of the requested fee award and incentive awards, is outlined below.

### A. Nature of the Case.

In the operative Second Amended Complaint, Plaintiffs allege a single violation of the TCPA. (Dkt. 50.) Congress enacted the TCPA more than two decades ago in response to "[v]oluminous consumer complaints about abuses of telephone technology." *Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740, 744 (2012). In so doing, Congress specifically sought to prevent "intrusive nuisance calls" to consumers that it deemed "invasive of privacy," *id.*, and set statutory damages in the amount of $500 per violation in addition to providing for injunctive relief, *see* 47 U.S.C. § 227(b)(3)(A)–(C).

The TCPA specifically prohibits the use of equipment termed an "automatic telephone dialing system" to place calls to cellular phones, providing that:

> It shall be unlawful for any person within the United States . . . (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to any . . . cellular telephone service . . . .

47 U.S.C. § 227(b)(1)(A)(iii). As a defense to TCPA claims, a defendant may plead and prove that the calls were made with the "prior express consent" of the recipient. 47 U.S.C. § 227(b)(1)(A)(iii).

Here, Plaintiffs allege that Nationstar used an automatic telephone dialing system called the "Avaya Proactive Contact" system to place calls to mobile telephones. (Dkt. 50 ¶¶ 28–29.) Plaintiffs further allege that Nationstar made the calls without their consent, in violation of the TCPA. (*Id.* ¶¶ 29, 30, 35, 37, 67, 101, 104.) Nationstar maintains that the system is not an

automatic telephone dialing system, and that it only called consumers who had given consent. (Dkt. 61 at 9–11.)

**B.      The Litigation and Work Performed for the Class's Benefit.**

As explained at preliminary approval, the Parties' Settlement represents the culmination of what were, at one time, five separate putative class actions pending in various federal courts throughout the country. These originally separate actions were filed beginning on February 21, 2014, each alleging substantially similar violations of the TCPA. The actions were as follows:

(i)      *Jordan v. Nationstar Mortgage LLC*, 14-cv-787, filed on February 21, 2014 in the Northern District of California (the "*Jordan* Action");

(ii)     *Ruggles v. Nationstar Mortgage LLC*, 14-cv-363, filed on February 26, 2014 in the Central District of California (the "*Ruggles* Action");

(iii)    *Reed v. Nationstar Mortgage LLC*, 14-cv-1701, filed on August 4, 2014 in the Northern District of Ohio (the "*Reed* Action");

(iv)     *Doyle v. Nationstar Mortgage LLC*, 14-cv-679, filed on October 24, 2014 in the Eastern District of Texas (the "*Doyle* Action");

(v)      *Wright v. Nationstar Mortgage LLC*, 14-cv-10457, filed on December 30, 2014 in the Northern District of Illinois (the "*Wright* Action").

To be clear, the separate filings between the various firms involved were not coordinated in any way. (*See* dkt. 58 at 4.) Rather—and unsurprisingly, given the scope of Nationstar's alleged conduct—the actions were filed independently of each other, and it was only after each filing where coordination eventually took place. (*Id*.) In some instances, this involved firms renewing existing working relationships (as between counsel in the *Jordan* and *Ruggles* actions), while in others it involved otherwise competing firms working together for the first time, as was the case with counsel in the *Jordan* and *Reed* actions. (*Id*.)

In the *Jordan* Action, the Defendant answered Plaintiff's complaint, and Plaintiff Jordan timely moved to strike certain of Defendant's affirmative defenses. (*Jordan* dkts. 13, 20.)

4

Meanwhile, shortly after filing, the *Ruggles* Action was transferred to the Northern District of California and consolidated with the *Jordan* Action. (*Jordan*, dkts. 27, 29.) Thereafter, Plaintiffs in the consolidated *Jordan* and *Ruggles* Actions propounded discovery on Defendant, including a notice of Rule 30(b)(6) deposition, requests to produce documents, and interrogatories. (*See* Declaration of Rafey S. Balabanian ("Balabanian Decl."), filed contemporaneously herewith, ¶ 5.) Before Nationstar had responded to those requests, however, it filed a motion to stay the *Jordan* and *Ruggles* Actions pursuant to the primary jurisdiction doctrine. (*Jordan* dkt. 33.) The *Jordan* Court granted that motion on August 21, 2014, staying the matter while waiting for the FCC to take action that could potentially have affected several issues in the case. (*Id.*, dkt. 48.) Following the expiration of that stay, and after further briefing, the Court denied Nationstar's request to continue the stay, holding that (a) there was no indication that an FCC decision was impending, and (b) it was not clear that any decision would be determinative of the issues in *Jordan.* (*Id.*, dkt. 51.)[4]

Following that, and recognizing that the five actions all shared substantially identical factual and legal claims, Plaintiffs' counsel, amongst themselves and with defense counsel, met and conferred regarding the actions and whether any coordination could be reached. They ultimately determined to dismiss each of the separate actions in favor of refiling them as one consolidated case (the *Wright* action) in the Northern District of Illinois. (*See* Balabanian Decl. ¶ 6.)

---

[4]     Meanwhile, in the *Reed* Action, the Parties filed competing motions to transfer, Plaintiff seeking to transfer to the Eastern District of Texas, where the *Doyle* Action was then pending (*Reed* dkt. 15), and Defendant seeking to transfer to the Northern District of California, where *Jordan* was then pending. (*Id.*, dkt. 18.)

Following the filing of the amended complaint in the *Wright* matter (dkt. 15), Plaintiffs filed an amended motion for class certification, as well as a motion to appoint interim co-lead class counsel. (Dkts. 16, 17.) At the same time and with the benefit of their litigation activities in the previously pending actions—including the briefing on substantive motions and the service of discovery—the Parties began to discuss the potential for resolving the claims at issue without the need for further protracted litigation. (Balabanian Decl. ¶ 9.) As a result of those discussions, they ultimately determined to proceed with an initial private mediation before the Honorable Edward A. Infante (ret.) of JAMS (San Francisco) on March 4, 2015. (*Id.*)

On February 17, 2015 and pursuant to *Damasco v. Clearwire Corp.*, 662 F.3d 891, 896 (7th. Cir. 2011), the Court entered and continued the certification motion pending discovery. (Dkt. 21.) The Court also granted Plaintiffs' motion to appoint interim co-lead class counsel, finding Plaintiffs' Counsel at Edelson PC and Paradis Law Group, PLLC to be "exceptionally qualified and experienced in representing classes," and finding that "their arrangement of the mediation is itself a sign of their efforts on behalf of the class[es]." (*Id.*) In the same order, the Court also appointed an executive committee comprised of Douglas J. Campion, Michael Sousa, Matthew English, and Jack Landskroner, and urged the Parties to dedicate their efforts and resources to their upcoming mediation (as explained below). (*Id.*)

### C. Settlement Discussions and the Parties' Mediation Efforts.

On March 4, 2015 the Parties met for private mediation with Judge Infante (ret.) of JAMS (San Francisco). (Balabanian Decl. ¶¶ 9–10.) Through this mediation the parties began making important progress towards resolution and settlement, but certain significant issues remained unresolved. (*Id.*, ¶ 11.) While the Parties were unable to reach a resolution that day, they did agree to exchange information related to, *inter alia*, the number of putative class

members in question, the total number of calls made, and Nationstar's purported records of consent to make the calls, and to reconvene the mediation at a later date. (*Id.*) The Parties also agreed to a discovery schedule at that time, (dkt. 32), and at the next status hearing, the Court ordered discovery to proceed during the pendency of the second mediation, (dkt. 35.) The Parties continued discussions regarding the remaining unresolved issues, and eventually, in mid-June met again for a second all day mediation session, where core terms of the agreement were settled. (Balabanian Decl. ¶ 12.) Over the next three months the Parties continued working to finalize the remaining details of the settlement, finally resulting in the Settlement Agreement filed with the Court on October 2, 2015. (Dkt. 51.)

**D.  Preliminary Approval, Modifications to the Settlement, and Discussions with the Attorneys General.**

On October 14, 2015, and subject to certain modifications to the form of notice to be disseminated to the Settlement Class, the Court granted preliminary approval to the Parties' proposed class action settlement. (Dkt. 59.) Later, on October 20th, the Court further approved the Parties' proposed revisions to the notice documents. (Dkt. 62.) Thereafter, the Parties worked diligently with the Settlement Administrator to prepare and finalize the notice for dissemination to the Settlement Class. Notwithstanding, during that process the Parties conferred and agreed to seek the Court's approval to make one additional change to the content of the Claim Form and for a brief continuance of the previously scheduled notice deadlines in order to effectuate the requested change. (*See* Dkt. 65.)

At roughly the same time, however, the Parties received an inquiry regarding the Settlement from representatives of the offices of the Attorneys General for California, Illinois, Florida, Missouri, and Texas. (*Id.*, ¶ 3.) On November 23, 2015, the Parties participated in a telephone conference with the offices of the Attorneys General identified above regarding certain

non-monetary aspects of the settlement. (*Id.*, ¶ 4.) In light of that discussion, the Parties stated to the Attorneys General that they would delay the filing of any motion to modify the Claim Form and notice deadlines until after their discussions regarding the settlement had concluded. (*Id.*)

During the week after the Thanksgiving holiday, and throughout December, the Parties conferred and agreed amongst each other to make several changes to the Settlement Agreement, notice documents, and claim form based upon their discussions with the Attorneys General. (Dkt. 67, ¶ 4.) Each of those changes were intended to add further clarity to those documents, while also more accurately reflecting the Parties' original intent underlying the settlement and its terms. (*Id.*)

Later, in January, the Parties engaged in additional communications with the Attorneys General regarding those changes, and the reasoning behind them. (*Id.*, ¶ 5.) Although the Parties believed that their discussions with the Attorneys General were productive and that the changes to the settlement that resulted benefit the Settlement Class Members, the Attorneys General continued to reiterate that they were taking no position on the settlement, the changes to it, or any aspect thereof. (*Id.*)[5]

With respect to the changes themselves, the Parties agreed to:

- Modify the definition of "Telephone Calls" to ensure that the settlement specifically excludes any authorization for Nationstar to make telemarketing calls to Settlement Class Members' cellular telephones in the future. This amendment reflects the Parties' original intent, and the fact that Nationstar has not, and does not currently, make such telemarketing phone calls.

---

[5] Indeed, the Attorneys General made explicit that their discussions with the Parties should not be interpreted to suggest that they either approve or disapprove of any aspect of the Settlement taken as a whole. To the extent any of the Attorneys General choose to object to the Settlement, the Parties anticipate that they would do so formally through a filing with the Court. However, if they ultimately determine not to take further action on this case, no inference should be made that the decision not to object is a tacit approval of any aspect of the Settlement or the Settlement taken as a whole.

- Modify Sections 2.2(a) and 2.2(b) of the Settlement Agreement to allow Nationstar an additional fifteen (15) days to implement the policies and procedures for honoring Revocation Requests required under the Agreement, and to extend the submission deadline for Revocation Requests from the Claims Deadline to the Effective Date of the Settlement. These amendments will ensure that throughout the implementation of the Settlement, Class Members have a clearly defined process for revoking consent to be called, while also ensuring that Nationstar has the procedures in place to honor such requests.

- Modify the postcard and web notices to more clearly explain the operative deadlines, and to provide additional detail on the consent and revocation procedures established by the Settlement.

  - and -

- Revise the claim form to modify the "Class Member Affirmation" to include a representation that claiming Class Members did not consent to the receipt of the "non-emergency automated or artificial or prerecorded voice calls" at issue in this case, to better reflect the agreed definition of "Claim Form" found in Paragraph 1.3 of the Settlement Agreement.[6]

(*See* Dkt. 67, ¶¶ 6–9.)

On January 27, 2016, the Court approved the Parties' proposed modifications to the Settlement and related documents, and entered a revised schedule of notice and other deadlines. (Dkt. 68.) Thereafter, the Parties and Settlement Administrator disseminated notice of the Settlement to the Class consistent with the amended Settlement Agreement and the Court's Preliminary Approval Orders. (Balabanian Decl., ¶ 22.)

### E. The Response to the Settlement to Date has Been Overwhelmingly Positive.

The efforts described above produced what Plaintiffs' and Class Counsel believe is a strong, fair and reasonable Settlement. Indeed, as described at preliminary approval and further herein, the Settlement—both in terms of the available monetary relief and the significant changes

---

[6]     The Parties also agreed to the claim form modification because it was consistent with Plaintiffs' allegations that the calls at issue were made without the recipients' consent and thus, it's appropriate that Class Members affirm the same when making claims. (*See, e.g*., dkt. 50 ¶¶ 4, 23, 29, 35, 101.)

to Nationstar's telephone collection practices—is consistent with other similar settlements approved in cases in this District (and throughout the country) alleging violations of the TCPA, and is thus equally deserving of this Court's approval. Not surprisingly then, to date, the Settlement has received an even higher-than-anticipated participation rate by the Settlement Class, including the receipt of many thousands of claims and Revocation Requests. (Balabanian Decl., ¶ 25.) As indicated above, although the Settlement Administrator is currently in the process of reviewing and analyzing the claims and Revocation Requests received—to, *inter alia*, confirm their completeness, identify any duplicate submissions, and guard against any potential fraud in the process—it is clear that there has been a significant (and positive) response from the Settlement Class. (*See id.*)[7] By contrast, only a single "objection" to the Settlement has been raised thus far. And even that doesn't take issue with the substance of the relief available or any of the other actual terms of the Settlement, but rather, expresses a "philosophical" objection to these types of settlements generally. (*See* dkt. 69.)

## III. CLASS COUNSEL'S REQUESTED ATTORNEYS' FEE AND EXPENSE AWARD IS REASONABLE, FALLS WITHIN THE MARKET RATE FOR SIMILAR SERVICES, AND THUS, SHOULD BE APPROVED.

Turning to the relief requested in the instant motion, in common fund settlements like this one, the Seventh Circuit has "consistently directed district courts to do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007) (internal quotations omitted); *see also In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719 (7th Cir. 2001) ("*Synthroid I*") (cautioning that "any method other than looking to prevailing market rates

---

[7]       Again, the Parties will be prepared to update the Court with more accurate total figures regarding the number of valid claims and Revocation Requests submitted at final approval.

assures random and potentially perverse results"). "When attorneys' fees are deducted from the class damages, the district court must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys." *Synthroid I*, 658 F.3d at 718–19. In effect, "the object is to simulate the market where a direct market determination is infeasible." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 597 (N.D. Ill. 2011) (quoting *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir.1992)); *see also Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 500 (N.D. Ill. 2015) ("When determining whether a requested fee award is reasonable, a court 'must balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the interests of the class members in the fund.'") (quoting *Skelton v. Gen Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988)).

Although applicable law in the Seventh Circuit affords district courts the discretion to apply either the "percentage of the fund" or the "lodestar" method in awarding fees in a class action where a common fund is created, *see Americana Art China, Co., Inc. v. Foxfire Printing and Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014), "one common method of choosing between the percentage and lodestar approaches is to look to the calculation method most commonly used in the marketplace at the time such a negotiation would have occurred." *Kolinek*, 311 F.R.D. at 501 (citing *Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998)). "As other courts have observed, the normal practice in consumer class actions is to negotiate a fee arrangement based on a percentage of the plaintiffs' ultimate recovery." *Kolinek*, 311 F.R.D. at 501 (citing *In re Capital One Tel. Consumer Prot. Act. Litig*, 80 F. Supp. 3d 781, 795 (N.D. Ill. 2015)).

Here, as discussed below, Class Counsel's request for a fee award of $3,690,000, which represents approximately 36% of the net Settlement Fund (i.e. after deducting notice and

administration costs), is fair and reasonable under the Seventh Circuit's market approach.[8] The baseline rate in TCPA common fund cases is 30%, with a potential upward adjustment based upon the specific risks of the case (for example, in *Capital One*—another debt-collection case, with similar facts and many of the same risks to recovery—the adjustment was an additional 6%, *see* 80 F. Supp. 3d at 807). Based on this criteria, Class Counsel's requested fee is firmly in line with the market and thus, reasonable under the percentage of the fund approach.

###### A.     The Base Rate In TCPA Cases Involving Similar Settlement Amounts— Before Taking Risk Into Account—Is 30%.

To determine both the applicable market and corresponding market rate for attorneys' fees, even *ex post*, courts in the Seventh Circuit look at three factors: "(1) actual fee contracts between plaintiffs and their attorneys; (2) data from similar cases where fees were privately negotiated; and (3) information from class-counsel auctions." *Capital One*, 80 F. Supp. 3d at 796 (citing *Synthroid I*, 264 F.3d at 719); *see also Kaplan v. Houlihan Smith & Co.*, No. 12-cv-5134, 2014 WL 2808801, at *3 (N.D. Ill. June 20, 2014) ("This Court's task is to consider whether [the amount of attorneys' fees sought] is consistent with a hypothetical *ex ante* bargain for the attorneys' work on this case.") (citations omitted). In the TCPA class action market, the market rate of fees is well established. Application of the relevant factors shows that in a hypothetical *ex ante* bargain with Class Counsel the class members would have agreed to pay attorneys' fees as a percentage of the non-reversionary common fund, at a base rate of 30%, which would then be adjusted upwards for risk.

---

[8]     Although in common fund cases like this one, district courts have discretion to apply the lodestar or percentage standard, the Court need only apply one method for computing fees. *See Cook*, 142 F.3d at 1013 ("[W]e have never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach.").

### 1. Class Counsel's contingency agreement with Plaintiffs is 33% of any sum recovered.

The first factor looks to whether the plaintiff has an actual agreement with class counsel regarding payment of attorneys' fees. *Capital One*, 80 F. Supp. 3d at 796 (citing *Synthroid I*, 264 F.3d at 719). Here, Class Counsel's retainer agreements with Plaintiffs provide for a contingency fee of 33% of all monies recovered—including the costs of notice and administration—or, in the instant case, $3,993,000. (Balabanian Decl. ¶ 29; *see also* the Declaration of Paul Paradis ("Paradis Decl."), filed contemporaneously herewith, ¶ 18.) That said, while Class Counsel's agreements with Plaintiffs suggests the requested fee is reasonable, it is not dispositive of the issue, since it is not conclusive proof of what an *ex ante* negotiation with the class would have been. *Capital One*, 80 F. Supp. 3d at 796; *see also Kolinek*, 311 F.R.D. at 500. The analysis thus proceeds to a comparison of fee awards in similar TCPA cases.

### 2. Similar TCPA cases confirm that the base rate for fee awards based on a percentage of the recovery analysis is 30%—excluding a risk adjustment—for the first $10 million recovered.

Although the second and third factors contemplate analyzing fees determined *ex ante* or resulting from court-conducted class counsel auctions, such data is "non-existent" in the TCPA class action market, and the district courts have defined the market by looking to how fees were awarded at the end of similar class actions. *See Capital One*, 80 F. Supp. 3d at 796–97. *Kolinek*, 31 F.R.D. at 501 ("As the Seventh Circuit has held, attorney's fee awards in analogous class action settlements shed light on the market rate for legal services in similar cases.") (citing *Taubenfeld v. Aon Corp.*, 415 F.3d 597, 600 (7th Cir. 2005)). As a general principle, in common fund class actions, the market rate is computed "as a percentage of the benefit conferred upon the class." *Williams v. Gen. Elec. Capital Auto Lease*, No. 94-cv-7410, 1995 WL 765266, at *9 (N.D. Ill. Dec. 26, 1995); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements*

13

*and Their Fee Awards*, 7 J. Empirical L. Stud. 811, 814 (2010) ("Most federal judges choose to award fees by using the highly discretionary percentage-of-the-settlement method."); *Cook*, 142 F.3d at 1013 (noting that calculating attorneys' fees as a percentage is "more efficient for the court and more likely to yield an accurate approximation" of the market).

TCPA class actions are in accord. To determine the market rate for attorneys' fees when the client is a large class seeking minimal statutory damages, such as those provided under the TCPA, judges in this District have repeatedly used the percentage method, observing that a private market for such fees would apply "the compensation scheme that require[s] the least monitoring to align the incentives of the class and its counsel—the percentage method." *Capital One*, 80 F. Supp. 3d at 795; *see also Kolinek*, 311 F.R.D. at 501 ("As other courts have observed, the normal practice in consumer class actions is to negotiate a fee agreement based on a percentage of the plaintiffs' ultimate recovery.") (citing *Capital One*, 80 F. Supp. 3d at 795); *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 814–15 (E.D. Wis. 2009) (observing that the percentage method is more appropriate because in a private market, "a contingency fee arrangement . . . insulates the plaintiffs from any economic risk if their litigation is ultimately unsuccessful").

Recently, the Honorable James F. Holderman (ret.) performed an extensive analysis using data compiled from seventy-one post-2010 TCPA class action settlements to determine the appropriate market rate for the award of attorneys' fees in common-fund TCPA settlements. *Capital One*, 80 F. Supp. 3d at 798–804. This analysis showed that the market rate in a typical TCPA class action is a sliding-scale fee that is calculated based on a percentage of the common fund recovery achieved for the benefit of the settlement class. *Id.* at 804 n.16; s*ee also In re: Synthroid Mktg. Litig.*, 325 F.3d 974, 979 (7th Cir. 2003) ("*Synthroid II*") (providing class

counsel 30% of the first $10 million of recovery in a common fund case that then decreases because the market rate percentage of recovery "likely falls as the stakes increase"). The market rate (or sliding scale) for the award of fees in TCPA class actions, prior to accounting for the risks associated with a particular case, is as follows:

| Recovery | Fee Percentage (excluding risk adjustment) |
|---|---|
| First $10 million | 30% |
| Next $10 million | 25% |
| $20 - 45 million | 20% |
| Excess above $45 million | 15% |

*Capital One*, 80 F. Supp. 3d at 804 n.13 (citing *Synthroid II,* 325 F.3d at 979).

Judge Holderman's analysis has since been adopted by several other courts in this District. *See, e.g., Wilkins,* No. 14-cv-190, 2015 WL 890566, at *10 (applying the 30% market rate fee recovery to the first $10 million of a TCPA class action settlement, which then decreased on a sliding scale); *Kolinek*, 311 F.R.D. at 501–02; *Craftwood Lumber Co. v. Interline Brands*, No. 11-cv-4462, 2015 WL 2147679, at *4 (N.D. Ill. May 6, 2015) (St. Eve, J.) (adopting Judge Holderman's sliding scale). Most recently, in the *Kolinek v. Walgreens* matter Judge Kennelly awarded class counsel—the Edelson PC firm serving as Class Counsel here—attorneys' fees equal to "36% of the settlement fund less administrative costs and the incentive award . . . ." *See Kolinek,* 311 F.R.D. at 500–03. Agreeing with Judge Holderman's analysis, Judge Kennelly overruled certain objections to the proposed fee award and pointed out, *inter alia*, that the "[t]he hypothetical downward scaling fee agreement at which Judge Holderman arrived" had its origins in Seventh Circuit precedent. *Id.* at 501 (discussing how Judge Holderman's analysis "was based on the fee schedule estimated by the Seventh Circuit in *In re Synthroid Marketing Litigation*, 325 F.3d 974 (7th Cir.2003) (*Synthroid 2*), which held that a district court was within its discretion when it awarded class counsel 30% of the first $10 million recovered and a lesser percentage of

each additional $10 million recovered.").[9]

Once the appropriate market-rate method and percentage are determined, the Seventh Circuit instructs district courts to calculate the applicable attorneys' fee amount by comparing "the ratio of (1) the fee to (2) the fee plus what the class members received." *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014) (holding that fee awards should solely derive from the net benefit to the class). In other words, the notice costs and incentive awards are not considered as part of the actual benefit conferred to the class and "thus not part of" the calculation. *Capital One*, 80 F. Supp. 3d at 795 (quoting *Redman*, 768 F.3d at 630).

Here, the Parties reasonably anticipate notice costs will not exceed $1,700,000 (and may be lower)[10] and incentive awards total $40,000. (*See* Balabanian Decl. ¶ 23.) The Settlement Fund thus provides direct relief to the class in the amount of $10,360,000. Therefore, applying the formula here, a fair and reasonable baseline for attorneys' fees—exclusive of the risk adjustment—is $3,090,000 (i.e., 30% of the first $10 million plus 25% of the remaining $360,000).

> **B.**     **The Risk Associated with the Litigation Justifies a Fee Award in Excess of 36% of the Net Benefit to the Settlement Class and Certainly One Third of the Total Settlement Fund, which is a Lesser Amount.**

Analysis of a reasonable fee does not stop with the base market percentage. Another

---

[9]     Judge Kennelly also agreed (as discussed further below) that the risks typically associated with TCPA claims—such as the defendant's ability to establish the consent defense and the ever-changing regulatory landscape—justified a 6% risk enhancement to the overall fee. *Id.* at 503.

[10]     Again, the parties will not know the precise amount of notice and administration costs until all claims have been received by the class. Ultimately, it's conceivable that notice costs come in below the $1,700,000 maximum quoted in this brief, which would increase the net settlement fund to the class, and ostensibly allow Class Counsel to seek more in attorneys' fees (based on such an increase). Notwithstanding, even if the net settlement fund does turn out to be higher, Class Counsel will not be seeking any additional fees, and instead, will simply ask that the Court direct such monies to claiming class members.

factor to be considered in determining the reasonableness of a class action fee award is the risk of non-payment faced by class counsel, as the estimated magnitude of this risk necessarily affects the price at which class counsel would have been willing to offer their services in an *ex ante* negotiation. *Capital One*, 80 F. Supp. 3d at 805 (citing *Synthroid I*, 264 F.3d at 721). As the Seventh Circuit has observed, "the need for such an adjustment is particularly acute in class action suits" because "[t]he lawyers for the class receive no fee if the suit fails, so their entitlement to fees is inescapably contingent." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 569; *see also In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 746–48 (7th Cir. 2011) (criticizing the district court for failing to make an attempt to determine and quantify the level of risk faced by Class Counsel when the case was filed);[11] *Capital One*, 80 F. Supp. 3d at 805. Indeed, a risk premium is warranted because "[t]he greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel." *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013). To illustrate, "if the market-determined fee for a sure winner were $1 million the market-determined fee for handling a similar suit with only a 50 percent chance of a favorable outcome should be $2 million." *Trans Union*, 629 F.3d at 746. Ultimately, "a higher risk of loss does argue for a higher fee." *Id.*

### 1. The issues in the case show that Class Counsel faced substantial risk.

In this case, the requested attorneys' fees of $3,690,000 represents only a 6% increase over the 30% base suggested by the market rate. The increase can be attributed to the increased risk of not ultimately prevailing at class certification or on the merits, since succeeding in this litigation is far from certain. Moreover, based on the applicable law, it is clear that Class Counsel

---

[11] Risk of nonpayment is one of the factors courts evaluate in determining legal fees, along with the quality of the counsel's performance, the amount of work necessary to resolve the litigation, and the stakes of the case. *Synthroid I*, 264 F.3d at 721.

would be entitled to more than this amount, but nevertheless chose to limit its request to even less than the cap agreed to under the terms of the Settlement. In the end, the upward risk adjustment is both reasonable and entirely justified.

By way of example, Class Counsel faced the significant risk that Nationstar would ultimately be able to establish a consent defense. (*See* Balabanian Decl. ¶ 17.) Because this case relates to calls purportedly made to collect mortgage and fee payments, rather than calls from an unknown entity, it is a very real possibility that Nationstar obtained certain of the Plaintiffs' and Class Members' phone numbers called through legitimate means—e.g., on loan origination documents or the like. *See*, *e.g.*, *Michaelson v. CBE Grp., Inc.*, No. 13-cv-50228, 2015 WL 24490938, at *4 (N.D. Ill. May 21, 2015) ("Giving a creditor a cell phone number during the transaction that resulted in the debt owed is considered to be giving the creditor prior express consent to contact the cell phone subscriber at that number regarding the debt. *See Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 643 (7th Cir. 2012), *citing, In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559 ¶¶ 9, 10 (Jan. 4, 2008)."). Judge Holderman cited this same risk (i.e., risk of non-recovery due to consent issues) in awarding the risk premium in *In re Capital One*. *See* 80 F. Supp. 3d at 805 (noting risks posed by fact that "[s]ome customers provided Capital One with their cell phone numbers as their primary contact numbers, arguably waiving any right not to receive debt-collection calls on their cell phone from capital One," and that "at the outset of the litigation there was a serious question whether the Plaintiff's claims could meet Rule 23's manageability requirement given that Capital One would have to review its records to determine which class members provided consent through cardholder agreements, [and] which class members actually provided their cell phone numbers to Capital One . . . .").

18

Nationstar would also likely argue that the provision of Class Members' phone numbers in other contexts constituted consent as well. Although Plaintiffs are of the view that simply providing one's cell phone number, without more, does not constitute "prior express consent," *see Kolinek v. Walgreen Co.*, No. 13-cv-4806, 2014 WL 3056813, at *4 (N.D. Ill. July 7, 2014), the issue is an unsettled area of the law, and courts have reached differing results on similar facts. *See, e.g., Greene v. DirecTV*, No. 10-cv-117, 2010 WL 4628734, *3 (N.D. Ill. Nov. 8, 2010) (holding that provision of a cell phone number as a contact number constitutes prior express consent to be called); *Roberts v. Paypal, Inc.*, No. 12-cv-622, 2013 WL 2384242, at *4 (N.D. Cal. May 30, 2013) (holding that the prior provision of a cell phone number to the caller for any reason constitutes prior express consent to be called); *Ryabyshchuck v. Citibank (S.D.) N.A.*, No. 11-cv-1236, 2012 WL 5379143, at *3 (S.D. Cal. Oct. 30, 2012) (same). Indeed, although the FCC has recently (in July 2015) issued a declaratory ruling discussing issues of consent under the TCPA,[12] questions are still legion with respect to the boundaries of that order.

Similarly, in *Capital One*, Judge Holderman also noted that "[a]lthough the TCPA defines an autodialer as 'equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers,' 47 U.S.C. § 227(a)(1), the FCC has expanded the definition to cover [other types of dialing equipment.]" *In re Capital One*, 80 F. Supp. 3d at 791 (citing *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 18 FCC Rcd. 14014, 14091–93 (2003)). Nevertheless, the FCC has also continued to consider petitions that would exclude such equipment from the TCPA's definition of an ATDS with respect to certain types of telephone

---

[12]     *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015).

19

calls, including in the debt collection context at issue here. *Id.* As a result, the Class here ran the very real risk that FCC rulings could remove the types of calls at issue from the TCPA's purview and further undermine their claims.

Thus, at the time the first of the underlying actions was filed (February 2014), through the second mediation in this case (June 2015), and continuing to the present, a substantial risk existed in investigating and proceeding with this litigation given the ongoing regulatory uncertainty surrounding the meaning of "prior express consent" and the ability to make calls using automatic dialing equipment in the debt collection context. *See, e.g., Wilkins,* 2015 WL 890566 (noting that "alternative interpretations" of the FCC Orders "will continue to add significant risk to large TCPA litigation until the FCC clarifies the definition of 'prior express consent' under the TCPA") (citing *Capital One*, 80 F. Supp. 3d at 791). As Judges Kennelly and Holderman recognized, "the FCC frequently issues orders interpreting or reinterpreting the TCPA . . . the FCC's interpretations are binding on this Court . . . and prosecuting this litigation through discovery and a trial would only allow a greater opportunity for the FCC to issue" a ruling undermining Plaintiffs' and the Class's claims. *See Kolinek*, 311 F.R.D. at 494.

Further, pending litigation before the United States Supreme Court could also have had an effect on this case. On November 2, 2015, the Supreme Court heard oral argument in *Spokeo, Inc. v Robins*, No. 13-1339, which asks the Court to determine the extent to which Congress can confer Article III standing on plaintiffs. While Class Counsel maintains that the invasion of a particularized legal right—such as the right delineated in the TCPA—is sufficient to confer standing on a plaintiff, there is nevertheless a risk that the Supreme Court will issue an opinion holding that actual damages are required even where Congress has provided for statutory damages. And, although Plaintiffs contend that they suffered actual damages as well by way of

being charged for the calls, in light of unlimited calling plans, establishing a fixed amount of damage would be a challenge. Hence, the prospect of that decision adds significant uncertainty to this litigation.

When these sorts of risks faced by Class Counsel are compared to those faced by counsel in other similar TCPA actions, it becomes all the more apparent that a 6% increase to the base 30% market rate is warranted. *Capital One* establishes this point as well, as the class there faced many of the same obstacles to recovery present here, specifically as they relate to ongoing uncertainty regarding the FCC's interpretation of the TCPA's "prior express consent" language. *See Capital One*, 80 F. Supp. 3d at 790–91 (recognizing "split opinion among practitioners and the courts" as to meaning of FCC's TCPA orders, which "at least injects uncertainty into this litigation and will continue to warrant caution by plaintiffs and defendants until clearer guidance is provided.").[13] There, the attorneys requested fees in the amount of 30% of a more than $75 million settlement fund. *Capital One*, 80 F. Supp. 3d at 794. In analyzing the request and after an extensive analysis on similar fee awards in TCPA class actions, Judge Holderman determined that the case was "only slightly riskier than a typical TCPA class action." *Id.* at 806. Despite that fact, Judge Holderman held that the small risk merited a 6% increase from the base market fee,

---

[13]        Specifically, Judge Holderman recognized that while the FCC had held that "wireless numbers provided by the called party in connection with an existing debt are made with the 'prior express consent' of the called party," it had also stated (in the very same order) that "prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, *and* that such number was provided during the transaction that resulted in the debt owed.'" *Capital One*, 80 F. Supp. 3d at 790 (quoting *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, ¶¶ 9, 10 (2008)) (emphasis added). Ultimately, while Judge Holderman acknowledged plaintiffs' argument that the FCC's 2008 Order "mean[s] that the cell phone number must have been provided during the origination of the credit relationship, i.e., during the transaction," he also joined in the view that "the FCC's series of TCPA Orders are not 'model[s] of clarity.'" *Capital One*, 80 F. Supp. 3d at 791 (quoting *Baird v. Sabre, Inc.*, 995 F. Supp. 2d 1100, 1106 (C.D. Cal. 2014)).

21

meaning that class counsel could recover 36% of the first $10 million—instead of 30%—of the common fund benefit to the class. *Id.* at 806-07 (citing Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: 1993–2008*, 7 J. Empirical Legal Studies 265 (2010)). Other district courts have relied on *Capital One* to award a similar risk percentage in TCPA cases. *See, e.g.*, *Kolinek*, 311 F.R.D. at 502–03 (awarding 6% risk premium for total fee award of 36% of settlement fund); *Grant v. Commonwealth Edison Co.*, No. 13-cv-08310, dkts. 58, 68 (N.D. Ill. Sept. 11, 2015) (same).

Ultimately, given the risks associated with the litigation, especially when viewed in comparison to other similar actions, Class Counsel should be awarded a 6% increase on the first $10 million of the net settlement fund value for risk.

### 2. The Settlement provides a greater benefit than settlements in similar cases.

The risk enhancement is even more justified when comparing the benefit this settlement provides to the Settlement Class against the benefits of comparable TCPA settlements. As described in Plaintiff's Motion for Preliminary Approval, the Settlement—the monetary and injunctive relief alike—is a significant result for the Class, both in terms of what the class could have hoped to recover at trial, and in relation to other similar TCPA class action settlements. (*See* Dkt. 58 at 21–24.)

In the prototypical TCPA case—where individuals alleged they received unsolicited telemarketing calls from entities with which they have no connection or relationship—class members generally receive no more than $200. *See, e.g., Kramer v. Autobytel, Inc.*, No. 10-cv-2722, dkt. 148 (N.D. Cal. Jan. 27, 2012) (providing for a cash payment of $100 to each class member); *Weinstein v. The Timberland Co., et al.*, No. 06-cv-00484, dkt. 93 (N.D. Ill. Dec. 18, 2008) (providing for a cash payment of $150 to each class member); *Satterfield v. Simon &*

*Schuster, Inc., et al.,* No. 06-cv-2893, dkt. 132 (N.D. Cal. Aug. 6, 2010) (providing for a cash payment of $175 to each class member); *Lozano v. Twentieth Century Fox Film Corp.*, No. 09-cv-6344, dkt. 65 (N.D. Ill. Apr. 15, 2011) (providing for a cash payment of $200 to each class member). But cases like this one, where the person called voluntarily provided their cellular telephone number to the caller, generally result in coupon settlements or significantly smaller cash awards. *See, e.g.*, *Capital One.*, 80 F. Supp. 3d at 790 (providing a $34.60 recovery per claiming class member in debt collection case where class members had provided their phone numbers to the defendant); *Arthur v. Sallie Mae, Inc.*, No. C10-0198JLR, 2012 WL 90101, at *3 (W.D. Wash. Jan. 10, 2012) (approving a settlement in a debt collection case where class members were due to receive between $20 and $40); *Kazemi v. Payless Shoesource, Inc.*, No. 3:09-cv-05142, dkt. 94 (N.D. Cal. Apr. 2, 2012) (providing a $25 voucher to each class member); *In re Jiffy Lube Int'l, Inc. Text Spam Litig.*, No. 3:11-MD-02261, dkt. 97 (S.D. Cal. Feb. 20, 2013) (providing a $20 voucher, which could be redeemed for $15 cash after expiration of nine-month waiting period).

Here, although the individual *pro rata* payments to Class Members submitting valid claims is likely to be lower than the $140 originally estimated—as a result of higher participation by the Class—the monetary relief will still be fair and reasonable, and *at least* in the range of the other similar settlements in this space.[14] (*See* Balabanian Decl. ¶ 26.) And of course, despite the fact that it may ultimately lower the originally anticipated amount of individual payments, the high claims rate nonetheless indicates that Class Members have a generally positive view of the

---

[14]    As indicated above, once the Settlement Administrator has completed its review and analysis of the claims submitted, Plaintiffs will provide the Court a more detailed breakdown of the total number of valid claims and resulting amount of the *pro rata* payments to individual Class Members who have submitted valid claims.

proposed Settlement. *See, e.g.*, *Cruz v. Sky Chefs, Inc.*, No. C-12-02705 DMR, 2014 WL 7247065, at *5 (N.D. Cal. Dec. 19, 2014) (noting that a "robust" claims rate and a low number of opt-outs show a positive reaction on the part of the class).[15] Indeed, although the preliminary approval briefing provided an estimate of the potential individual payments, the notice documents approved by the Court and disseminated to the Class did not do so or make any other promises as to the potential amount of those payments. Instead, they expressly made clear that, "[a]s the number of valid claims submitted goes up, the amount of individual payments will go down." (*See, e.g.*, dkt. 67-4 at 4.) Nevertheless, many thousands of Class Members clearly still believe the Settlement provides sufficient relief such that their participation was worthwhile and warranted.

Ultimately, taken as a whole, this Settlement represents a strong result for the Class. And when the heightened risks of the action and awards in similar TCPA actions are considered, the requested risk enhancement of 6% is more than fair in this instance. *See Capital One*, 80 F. Supp. 3d at 806 (finding that a 6% increase—for a total percentage recovery of 36% of the first $10 million in the fund—was justified in a TCPA case that was only "slightly riskier" than a typical TCPA case with a more than $75 million settlement fund); *Kolinek*, 311 F.R.D. at 502–03 (relying on *Captial One* to grant a 30% fee award with a 6% risk adjustment). Accordingly, the market rate and risk factors assumed in this litigation confirms that an award of $3,690,000 to Class Counsel—a 6% risk adjustment increase—is both reasonable and justified.

---

[15]     The number of claiming class members and the exact amount of the *pro rata* shares are not yet available because class members can continue to submit claims until April 11. Class Counsel will provide final numbers at the Fairness Hearing on May 19.

## IV.  PLAINTIFFS' REQUEST FOR $5,000 EACH REPRESENTS A FAIR AND REASONABLE INCENTIVE AWARD.

The agreed-upon incentive award of $5,000 for serving as class representatives is also a fair and reasonable one. Because a plaintiff is essential to any class action, "[i]ncentive awards are justified when necessary to induce individuals to become named representatives." *Synthroid I*, 264 F.3d at 722–23. In deciding whether an incentive award is reasonable, factors relevant to the court's inquiry include the actions the plaintiff has taken to protect the interests of the class, the amount of time and effort the plaintiff expended in pursuing the litigation, and the degree to which the class has benefitted from those actions. *Cook*, 142 F.3d at 1016.

These factors are readily satisfied in the instant action. Each plaintiff has worked alongside Class Counsel and actively engaged in every stage of the litigation—reviewing the complaint and other documents, equipping Class Counsel with the information needed to pursue their (and the class's) claims, and responding to requests for additional information throughout the settlement process. (Balabanian Decl. ¶¶ 28–30.) Were it not for Plaintiffs' efforts and contributions to the litigation, the class would not have obtained the substantial benefit conferred by the Settlement. (Balabanian Decl. ¶ 30; Paradis Decl. ¶ 20.) Further, the proposed incentive awards of $5,000 are in line with those awards approved in similar class action settlements. *See Capital One*, 80 F. Supp. 3d at 809 (granting requested incentive awards of $5,000 for each named plaintiff in a TCPA class action settlement). Accordingly, the requested incentive awards are reasonable and should be approved.

## V.  CONCLUSION

For the reasons stated above, Plaintiffs respectfully requests that the Court approve the requested fee award in the amount of $3,690,000, approve the requested incentive award of

$5,000 to each Plaintiff, and award such other and further relief the Court deems equitable and just.

Respectfully submitted,

**HEATHER WRIGHT, CAROLE STEWART, JEANETTE CHILDRESS, ROBERT JORDAN, SEAN HALBERT, DANA SKELTON, VANESSA RUGGLES, and ROSE SOMERS**, individually and on behalf of a class of similarly situated individuals,

Dated: March 21, 2016

By: s/ Rafey S. Balabanian
　　　One of Plaintiff's Attorneys

Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com
J. Dominick Larry
nlarry@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60604
Tel: 312.589.6370
Fax: 312.589.6378

Paul O. Paradis (Admitted *pro hac vice*)
Gina M. Tufaro (Admitted *pro hac vice*)
PARADIS LAW GROUP, PLLC
570 Seventh Avenue, 20th Floor
New York, NY 10018
Tel: 212.986.4500
Fax: 212.986.4501

Jack Landskroner (Admitted *pro hac vice*)
LANDSKRONER GRIECO MERRIMAN LLC
1360 West 9th Street, Suite 200
Cleveland, Ohio 44113
Tel: 216.522.9000
Fax: 216.522.9007

Brant C. Martin (Admitted *pro hac vice*)

WICK PHILLIPS GOULD & MARTIN, LLP
100 Throckmorton Street, Suite 500
Fort Worth, Texas 76102
Tel: 817.332.7788
Fax: 817.332.7789

Michael P. Sousa (Admitted *pro hac vice*)
sousam@sbcglobal.net
LAW OFFICES OF MICHAEL P. SOUSA, APC
3232 Governor Dr., Suite A
San Diego, CA 92122
Tel: 858.453.6122, ext. 15

Douglas J. Campion (Admitted *pro hac vice*)
doug@djcampion.com
Law Offices of Douglas J. Campion, APC
17150 Via Del Campo, Suite 100
San Diego, CA 92127
Tel: 619.299.2901
Fax: 619.858.0034

*Counsel for Plaintiffs and the Class*