# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| HEATHER WRIGHT, CAROLE STEWART, JEANETTE CHILDRESS, ROBERT JORDAN, SEAN HALBERT, DANA SKELTON, VANESSA RUGGLES and ROSE SOMERS, individually and on behalf of all others similarly situated, | Case. No. 14-cv-10457 |
| *Plaintiffs*, | Hon. Edmond E. Chang |
| v. | |
| NATIONSTAR MORTGAGE LLC, a Delaware limited liability company, | |
| *Defendant*. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................ 1

II.     BACKGROUND ....................................................................................................... 4

     A.     The Facts, the Law, and the Litigation History ...................................... 4

     B.     The Mediation and the Settlement Agreement ...................................... 7

     C.     Preliminary Approval, Modifications to the Settlement, and Discussions with State Attorneys General ....................................................................... 8

     D.     The Response to the Settlement has Been Overwhelmingly Positive ................. 10

III.     THE TERMS OF THE SETTLEMENT ................................................................ 11

     A.     Class Definition .................................................................................. 11

     B.     Notice ................................................................................................. 11

     C.     Class Member Payments ..................................................................... 12

     D.     Prospective Relief .............................................................................. 12

     E.     Additional Relief ................................................................................ 12

         1.     *Payment of Notice and Settlement Administration Expenses* .................. 12

         2.     *Payment of Incentive Award for Class Representatives* .......................... 12

         3.     *Payment of Attorneys' Fees and Expenses* ............................... 13

     F.     The Release ......................................................................................... 13

IV.     The Implemented Notice Plan Comports with Due Process ............................... 13

V.     The Settlement is Deserving of Final Approval. ................................................. 14

     A.     The Value of the Settlement in Light of the Risks of Continuing the Litigation Favors Final Approval. ........................................................................... 15

     B.     The Likelihood of an Increase in the Complexity, Length, and Expense of Continued Litigation Validates Final Approval of the Settlement. ................. 22

     C.     The Opinion of Competent Counsel Favors Approval. ....................... 23

     D.     The Stage of the Proceedings and Amount of Discovery Completed Weigh in Favor of Final Approval. ....................................................................... 25

E.      The Settlement Is Not a Product of Collusion and There Are No "Red Flags" Present. .............................................................................................. 27

F.      The Lack of Opposition to the Settlement Weighs in Favor of Final Approval... 29

   1.   *The Two Non-Professional Objections Do Not Raise Any Issues that Warrant Disapproving the Settlement.* ...................................................... 31

   2.   *Objections that Fail to Comply with the Court's Order or Fail to Cite Pertinent Legal Authority Are Waived.* ...................................................... 32

   3.   *The Youngbloods' Objections to Notice, Handling of Unclaimed Funds, and Opt-Out Procedures Lack Citation to Legal Authority and Are Factually Incorrect in any Event.* .............................................................. 33

   4.   *The Class Meets the Ascertainability Requirement as set out in Mullins v. Direct Digital, LLC.* ................................................................................... 35

   5.   *Objectors' Opposition to the Amount of Class Members' Recovery Is Baseless, as the Settlement Provides Excellent Relief.* ............................. 36

   6.   *The Incentive Awards to the Named Plaintiffs Are not Excessive.* ........... 37

   7.   *Objections to the Requested Attorneys' Fees Have no Basis in Law or Fact.* ......................................................................................................... 38

       (a)  *The market rate analysis here involves calculating a percentage of the common fund.* .......................................................................... 39

       (b)  *Objections to the amount of work performed by Class Counsel cite no valid authority and misunderstand the posture of the case.* .... 42

   8.   *The Pentz, Youngblood, and Mitchell Objections Were All Filed in Bad Faith by Professional Objectors as an Attempt to Extort a Fee Payment from Class Counsel, not to Provide a Benefit to the Class.* ...................... 44

VI.     CONCLUSION ............................................................................................... 47

# TABLE OF AUTHORITIES

UNITED STATES SUPREME COURT CASES

*Cooper v. Fed. Reserve Bank of Richmond*,
    467 U.S. 867 (1984).........................................................................37

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974).........................................................................13

*Mims v. Arrow Fin. Servs. LLC*,
    132 S. Ct. 740 (2012).........................................................................5


UNITED STATES CIRCUIT COURT OF APPEALS CASES

*Americana Art China, Co., Inc. v. Foxfire Printing & Packaging, Inc.*,
    743 F.3d 243 (7th Cir. 2014) ...............................................42, 43, 44

*Armstrong v. Bd. of Sch. Directors of Milwaukee*,
    616 F.2d 305 (7th Cir. 1980) .........................................................25

*Burns v. Elrod*,
    757 F.2d 151 (7th Cir. 1985) .........................................................13

*Cook v. Niedert*,
    142 F.3d 1004 (7th Cir. 1998) ...................................................38, 44

*Damasco v. Clearwire Corp.*,
    662 F.3d 891 (7th. Cir. 2011) .........................................................7

*Estate of Moreland v. Dieter*,
    395 F.3d 747 (7th Cir. 2005) .........................................................32

*Eubank v. Pella Corp.*,
    753 F.3d 718 (7th Cir. 2014) ...........................................2, 15, 16, 28

*Freeman v. Berge*,
    68 F. App'x 738 (7th Cir. 2003) .....................................................31

*In re Southwest Airlines Voucher Litig.*,
    799 F.3d 701 (7th Cir. 2015) .........................................................41

*In re Synthroid Mktg. Litig.*,
    235 F.3d 974 (7th Cir. 2003) .........................................................39

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001) .........................................................39

*In re Trans Union Corp. Privacy Litig.*,
    629 F.3d 741 (7th Cir. 2011) ...................................................................... 40

*Isby v. Bayh*,
    75 F.3d 1191 (7th Cir. 1996) .............................................................. 14, 25

*Kolinek v. Walgreen Co.*,
    No. 15-3757 (7th Cir.) ...................................................................... 46

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015) .............................................................. 35, 36

*Roppo v. Travelers Cos.*,
    100 F. Supp. 3d 636 (N.D. Ill. 2015 ...................................................... 32

*Safeco Ins. Co. of Am. v. Am. Int'l Grp.*,
    710 F.3d 754 (7th Cir. 2013) .............................................................. 14

*Satterfield v. Simon & Schuster, Inc.*,
    569 F.3d 946 (9th Cir. 2009) .............................................................. 24

*Silverman v. Motorola Solutions, Inc.*,
    739 F.3d 956 (7th Cir. 2013) .............................................................. 40

*Soppet v. Enhanced Recovery Co., LLC*,
    679 F.3d 637 (7th Cir. 2012) .............................................................. 18

*Sterk v. Redbox Automated Retail, LLC*,
    770 F.3d 618 (7th Cir. 2014) .............................................................. 21

*Sutton v. Bernard*,
    504 F.3d 688 (7th Cir. 2007) .............................................................. 39, 42

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
    463 F.3d 646 (7th Cir. 2006) .............................................. 15, 16, 23, 25

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*,
    309 F.3d 978 (7th Cir. 2002) .............................................................. 15

*United States v. Useni*,
    516 F.3d 634 (7th Cir. 2008) .............................................................. 32, 37

*Vollmer v. Selden*,
    350 F.3d 656 (7th Cir. 2003) .............................................................. 3, 45

UNITED STATES DISTRICT COURT CASES

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
    2012 WL 651727 (N.D. Ill. Feb. 28 2012) ............................................................... *passim*

*Arthur v. Sallie Mae, Inc.*, No. C10-0198JLR,
    2012 WL 90101 (W.D. Wash. Jan. 10, 2012) .................................................... 17, 21, 37

*Baird v. Sabre, Inc.*,
    995 F. Supp. 2d 1100 (C.D. Cal. 2014) ......................................................................... 20

*Barnes v. Fleetboston Fin. Corp.*, No. CA 01-10395-NG,
    2006 WL 6916834 (D. Mass. Aug. 22, 2006) ....................................................... 3, 44, 45

*Bickel v. Sheriff of Whitley Cnty.*,
    2015 WL 1402018 (N.D. Ind. Mar. 26, 2015) ................................................................. 14

*Birchmeier v. Caribbean Cruise Line, Inc.*,
    302 F.R.D. 240 (N.D. Ill. 2014) .............................................................................. 24, 35

*Brandenburg v. Alliant Capital Management, LLC*,
    No. 15-cv-381 (W.D.N.Y. Feb. 8, 2016) ........................................................................ 47

*Butler v. Am. Cable & Tel., LLC*,
    2011 WL 2708399 (N.D. Ill. July 12, 2011) .................................................................. 27

*Chaudhri v. Osram Sylvania, Inc.*,
    No. 11-cv-05504 (D.N.J.) ................................................................................................ 46

*Craftwood Lumber Co. v. Interline Brands*, No. 11-cv-4462,
    2015 WL 2147679 (N.D. Ill. May 6, 2015) .............................................................. 39, 40

*Dunstan v. comScore*,
    No. 11-cv-5807 (N.D. Ill.) ............................................................................................... 23

*Ellison v. Steve Madden Ltd.*,
    No. 11-cv-5935 (C.D. Cal.) ............................................................................................. 24

*Gehrich v. Chase Bank USA, N.A.*,
    No. 12-cv-5510, 2016 WL 806549 (N.D. Ill. Mar. 2, 2016) ............................ 2, 17, 29, 41

*Grant v. Commonwealth Edison Co.*,
    No. 13-cv-08310 (N.D. Ill.) ...................................................................................... 40, 42

*Greene v. DirecTV*, No. 10-cv-117,
    2010 WL 4628734 (N.D. Ill. Nov. 8, 2010) .................................................................. 19

*Harrison v. National Recovery Solutions, LLC*,
    No. 15-cv-253 (W.D.N.Y.) ................................................................................ 47

*Hispanics United v. Vill. of Addison*,
    988 F. Supp. 1130 (N.D. Ill. 1997) .................................................................... 23

*Howeton v. Gargill, Inc.*, No. 13-cv-336,
    2014 WL 6976041 (D. Haw. Dec. 8, 2014) ...................................................... 34

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
    270 F.R.D. 330 (N.D. Ill. 2010) .................................................................. 16, 17

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
    789 F. Supp. 2d 935 (N.D. Ill. 2011) ...................................................... *passim*

*In re Capital One Telephone Consumer Protection Act Litig.*,
    80 F. Supp. 3d 781 (N.D. Ill. Feb. 12, 2015) ......................................... *passim*

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    281 F.R.D. 531 (N.D. Cal. 2012) ...................................................................... 30

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*, No. MDL 1361,
    2003 WL 22417252, at *2 n.3 (D. Me. Oct. 7, 2003 ........................................ 45

*In re Enfamil LIPIL Mktg. & Sales Practices Litig.*, MDL No. 2222,
    2012 WL 1189763 (S.D. Fla. Apr. 9, 2012) ................................................. 3, 46

*In re Facebook Privacy Litig.*,
    No. C 10-02389 (N.D. Cal.) ............................................................................. 23

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009) .............................................................. 45

*In re Jiffy Lube Int'l, Inc. Text Spam Litig.*,
    No. 3:11-MD-02261 (S.D. Cal.) ........................................................... 17, 21, 37

*In re Mexico Money Transfer Litig.*,
    164 F. Supp. 2d 1002 (N.D. Ill. 2000) ............................................................. 29

*In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196,
    2016 WL 1452005  (N.D. Ohio Apr. 13, 2016) ............................................... 30

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
    461 F. Supp. 2d 383 (D. Md. 2006) ................................................................. 45

*In re Southwest Airlines Voucher Litig.*, No. 11-cv-8176,
 2013 WL 4510197 (N.D. Ill. Aug. 26, 2013) ................................................................ 16

*In re TicketMaster Sales Practices Litig.*,
 No. 09-cv-912 (C.D. Cal.) ............................................................................................ 25

*In re Wal-Mart Wage & Hour Employment Practices Litig.*, No. 2:06CV00225-PMPPAL,
 2010 WL 786513 (D. Nev. Mar. 8, 2010) ...................................................................... 45

*Kacsuta v. Lenovo (United States) Inc.*,
 No. 13-cv-00316 (C.D. Cal.) ........................................................................................ 24

*Kazemi v. Payless Shoesource, Inc.*,
 No. 3:09-cv-05142 (N.D. Cal.) ......................................................................... 17, 21, 37

*Kolinek v. Walgreen Co.*,
 311 F.R.D. 483 (N.D. Ill. Nov. 23, 2015) .............................................................. *passim*

*Kolinek v. Walgreen Co.*,
 No. 13-cv-4806 (N.D. Ill.) ............................................................................................ 46

*Kolinek v. Walgreen Co.*, No. 13-cv-4806,
 2014 WL 3056813 (N.D. Ill. July 7, 2014) .................................................................. 19

*Lee v. Dynamic Recovery Solutions, LLC*,
 No. 6:15-cv-06090 (W.D.N.Y.) .................................................................................... 47

*Lozano v. Twentieth Cent. Fox. Film Corp.*,
 No. 09-cv-06344 (N.D. Ill.) .......................................................................................... 24

*Michaelson v. CBE Grp., Inc.*, No. 13-cv-50228,
 2015 WL 2449038 (N.D. Ill. May 21, 2015) ............................................................... 18

*Miller v. Red Bull N. Am., Inc.*,
 No. 12-cv-04961 (N.D. Ill.) .......................................................................................... 24

*Moore v. Penncro Associates*,
 No. 2:08-cv-02956 (E.D. Pa.) ...................................................................................... 47

*Olin v. M.R.S. Associates, Inc.*, No. CIV. 10-1380 NLH/KMW,
 2014 WL 631647 (D.N.J. Feb. 14, 2014) .................................................................... 47

*Roberts v. Paypal, Inc.*, No. 12-cv-622,
 2013 WL 2384242 (N.D. Cal. May 30, 2013) ............................................................. 19

*Rojas v. Career Education Corp.*,
    No. 10-cv-05260 (N.D. Ill.) ............................................................... 24

*Rose v. Bank of America,* Nos. 11-cv-02390, 12-cv-04009,
    2014 WL 4273358 (N.D. Cal. Aug. 29, 2014) ............................................... 41

*Ryabyshchuck v. Citibank (S.D.) N.A.*, No. 11-cv-1236,
    2012 WL 5379143 (S.D. Cal. Oct. 30, 2012) ................................................. 19

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011) ................................................ 13, 14, 22, 23

*Wilkins v. HSBC Bank Nevada, N.A.*, No. 14-cv-190,
    2015 WL 890566 (Feb. 27, 2015)................................................ 2, 20, 29, 40

*Williams v. Equifax Info. Servs., LLC*,
    No. 1:14-cv-08115 (D.N.J.) ............................................................... 47


F<small>EDERAL</small> R<small>ULES OF</small> C<small>IVIL</small> P<small>ROCEDURE</small>

Fed. R. Civ. P. 23(c)(2)(B) ......................................................................... 13

Fed. R. Civ. P. 23(e) ................................................................................ 14


S<small>TATUTORY</small> P<small>ROVISIONS</small>

18 U.S.C. § 1621 ...................................................................................... 36

47 U.S.C. § 227 ......................................................................................... 1

47 U.S.C. § 227(b)(1)(A)(iii) ......................................................................... 5

47 U.S.C. § 227(b)(3) ............................................................................. 5, 18


O<small>THER</small> A<small>UTHORITIES</small>

Federal Judicial Center, *Judges' Class Action Notice & Claims Process Checklist & Plain
    Language Guide* (2010) ............................................................... 13

Federal Judicial Center,
    Manual for Complex Litigation (Fourth) (2004) ............................................ 31

*In re Rules and Regulations Implementing the Telephone Consumer Prot. Act of 1991*,
    18 FCC Rcd. 14014 (July 3, 2003) ............................................................ 19

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,

23 FCC Rcd. 559 (Jan. 4, 2008)...................................................................... 18, 20

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,
30 FCC Rcd. 7961 (July 10, 2015) ................................................................ 19

John E. Loptaka & D. Brooks Smith, *Class Action Professional Objectors: What to Do About Them?*, 39 Fla. St. U.L. Rev. 865 (2012).......................................................... 44

Nationstar Mortgage Holdings Inc.,
*Wall St. J.*, http://quotes.wsj.com/NSM (last visited Apr. 26, 2016)............................... 37

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: 1993–2008*, 7 J. Empirical Legal Studies 248 (2010)................................................ 40

## I.       INTRODUCTION

The Settlement now before the Court seeks to resolve claims against Defendant

Nationstar Mortgage, LLC ("Nationstar" or "Defendant") asserting that it violated the Telephone

Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") by placing mortgage-related collection

Telephone Calls to consumers' cellular phones.[1] The Settlement was reached after the

consolidation of five separate actions pending in district courts throughout the country,

adversarial motion practice in those actions, formal and informal discovery, two mediations with

the Honorable Edward A. Infante (ret.) of JAMS (San Francisco), and numerous rounds of

arm's-length negotiations. If approved, it will provide significant monetary relief to the

Settlement Class in the form of a $12.1 million non-reversionary cash Settlement Fund and

requires Nationstar to implement meaningful prospective measures to ensure that the Telephone

Calls do not continue without the call recipients' consent. As detailed in Plaintiff's Motion for

Preliminary Approval, Fee Petition, and further below, the relief obtained under the Settlement is

on par with and, in many cases, greater than that secured in other similar TCPA settlements that

have been approved in this District, the Seventh Circuit, and throughout the country. In the end,

the Settlement represents a substantial recovery for the Class, and under the law is deserving of

this Court's final approval.

Perhaps the best way to assess the strength of the Settlement is by looking at the reaction

of the Settlement Class. That reaction has been overwhelmingly positive: just under 150,000

valid claims have been received and just 74 requests for exclusion have been submitted

---

[1]       All capitalized terms not defined herein shall have the meaning ascribed them in the Parties' Class Action Settlement Agreement and Addendum to Class Action Settlement, attached as Exhibits 2 and 3 to the Declaration of Rafey S. Balabanian ("Balabanian Decl."), filed contemporaneously herewith.

(0.00316% of the Class). Similarly, out of the nearly 2.4 million Class Members, just seven[2] objections have been raised (on behalf of eight people total or 0.00034% of the Class). Such an infinitesimal amount of opposition strongly favors approval of the Settlement, and is in line with other TCPA settlements recently approved in this District. *See Gehrich v. Chase Bank USA, N.A.*, No. 12-cv-5510, 2016 WL 806549 (N.D. Ill. Mar. 2, 2016) (granting final approval to settlement with 0.000697% opt-out rate and 0.0000557% objection rate); *Wilkins v. HSBC Bank Nevada, N.A.*, No. 14-cv-190, 2015 WL 890566, at *7 (Feb. 27, 2015) (granting final approval to settlement with 0.0003% opt-out rate and 0.0001% objection rate); *In re Capital One Telephone Consumer Protection Act Litig.*, 80 F. Supp. 3d 781, 792 (N.D. Ill. Feb. 12, 2015) (Holderman, J.) (0.0032% opt-out rate and 0.00008% objection rate); *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 495 (N.D. Ill. Nov. 23, 2015) (Kennelly, J.) (0.001668% opt-out rate and 0.0002209% objection rate).

None of the objections should stand in the way of final approval. Two of the objections have already been withdrawn. (Dkts. 84, 86.) Two others either don't actually address the terms of the Settlement, or express only "general" or "philosophical" concerns about the Settlement and class actions as a whole. (Dkts. 69, 93.) And the remaining three objections are raised by so-called "professional" objectors, each having long histories of asserting similar (largely baseless and almost always unsuccessful) objections to class action settlements. While these attorneys are all quick to point to the Seventh Circuit's lauding of the role of objectors in class settlements, *see, e.g., Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014), their conduct in

---

[2] To be clear, counsel for would-be objector Anton A. Fischer appeared in this Action and stated their intention to assert an objection on behalf of Fischer. (Dkts. 77, 78.) Notwithstanding, they did not ultimately file a formal objection and subsequently moved to withdraw from the case. (Dkt. 84.) For completeness in weighing opposition to the Settlement, Plaintiffs have included this "objection" in their overall analysis.

this case (as detailed previously and below) has been more aptly described by the Seventh Circuit as "extortion." *Vollmer v. Selden,* 350 F.3d 656, 660 (7th Cir. 2003) (describing the role of professional objectors as "intervening not to increase the value of the settlement, but in order to get paid to go away . . . . ").[3]

Here, a review of the professional objectors' submissions make clear that each asserts largely boilerplate arguments that mischaracterize the terms of the Settlement, the circumstances of the litigation, and controlling case law. The goal being to create issues for appeal in hopes of leveraging a payout for themselves, rather than advancing some principled position on behalf of the Class. Unfortunately, this is not a new phenomenon for these attorneys, as their careers of holding up settlements have been well documented in the courts. *See, e.g., Barnes v. Fleetboston Fin. Corp.*, No. CA 01-10395-NG, 2006 WL 6916834, at *1 (D. Mass. Aug. 22, 2006) (noting that "professional objectors," including attorney John J. Pentz (representing his mother here), "can levy what is effectively a tax on class action settlements . . . that has no benefit to anyone other than to the objectors."); *In re Enfamil LIPIL Mktg. & Sales Practices Litig.*, MDL No. 2222, 2012 WL 1189763, at *4 (S.D. Fla. Apr. 9, 2012) (noting attorney Allen McDonald's (representing objector Mitchell here) offer to withdraw appeal of class action settlement in exchange for $150,000 payout to "suggest[] that [his client's] objections [were] tied to her ability to garner a windfall for herself rather than ensuring an adequate settlement for the class."); *Kolinek v. Walgreen Co.*, 311 F.R.D. at 499 (noting attorney Brent Vullings's (representing the Youngblood objectors here) "misunderstanding of the proposed settlement agreement.").

---

[3]   It's also notable that *Pella* speaks nothing of the sorts of professional objectors here, let alone cast them in a positive light. Indeed, the objectors' attorney in *Pella* was a partner in one of the law firms appointed class counsel by the court at the certification stage, not a run of the mill serial objector. And his clients, the objectors, were four of the five original class representatives appointed by the court, not his mother or sister-in-law. *See Pella*, 753 F.3d at 722.

Ultimately, in the context of final approval, the Court's analysis starts with the relief provided under the Settlement relative to the risks Plaintiffs faced in the litigation; here, the relief is consistent with, and in many cases, exceeds that obtained in comparable cases. The next question, then, is what would become of the case absent the Settlement; undoubtedly, this complex class action would require the expenditure of vast resources by all Parties and the Court with no guaranteed outcome for either side, let alone an immediate recovery for the Class. Continuing on, because the Settlement was achieved only after adversarial motion practice, discovery, and months of arms'-length negotiations presided over by a former federal magistrate judge, the Court should take stock of Class Counsel's opinion that they had sufficient information to effectively negotiate the Settlement and that it's in the Class' best interest. Finally, given all of that, and the Class's overwhelmingly positive response, the Court should have no hesitation in finding that the Settlement is fair, adequate, and reasonable, and deserving of final approval.

## II.     BACKGROUND

### A.     The Facts, the Law, and the Litigation History

Nationstar is one of the nation's largest mortgage loan servicers. (Dkt. 50, ¶ 22.) In connection with its business, Nationstar has allegedly made automated and prerecorded telephone calls to consumers' cell phones nationwide, seeking to collect mortgage payments and other fees, without first obtaining the requisite prior express consent to do so and, thus, violating the TCPA. (*Id*. ¶¶ 24–27.) The TCPA specifically prohibits the use of equipment termed an "automatic telephone dialing system" to place calls to cellular phones without first obtaining the requisite consent to do so, providing that:

> It shall be unlawful for any person within the United States . . . (A) to make any call (other than a call made for emergency purposes or made with the prior express

consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to any . . . cellular telephone service . . . .

47 U.S.C. § 227(b)(1)(A)(iii). As a defense to TCPA claims, a defendant may plead and prove that the calls were made with the "prior express consent" of the recipient. *Id.*[4]

As detailed in Plaintiffs' memoranda in support of their Motions for Preliminary Approval and for Approval of Attorneys' Fees, Expenses and Incentive Award, (Dkts. 58, 72-1), this Settlement represents the end of what were, at one time, five separate putative class actions litigated in various federal courts throughout the country, each alleging substantially similar violations of the TCPA by Defendant.[5] These originally separate actions were filed beginning on February 21, 2014.

The separate filings between the various firms involved were not, however, coordinated in any way. (*See* dkt. 58 at 4.) Rather—and unsurprisingly, given the scope of Nationstar's alleged conduct—the actions were filed independently of each other, and it was only after each filing that coordination eventually took place. (*Id.*) In some instances, this involved firms renewing existing working relationships (as between counsel in the *Jordan* and *Ruggles* actions), while in others it involved otherwise competing firms working together for the first time, as was the case with counsel in the *Jordan* and *Reed* actions (i.e., Edelson PC and the Paradis Law

---

[4]       In passing the TCPA, Congress specifically sought to prevent "intrusive nuisance calls" to consumers that it deemed "invasive of privacy," *Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740, 744 (2012), and provided for statutory damages in the amount of $500 per violation (which may be trebled if the conduct is found willful) as well as injunctive relief. *See* 47 U.S.C. § 227(b)(3)(A)–(C).

[5]       These five separate actions include: (i) *Jordan v. Nationstar Mortgage LLC*, 14-cv-787, filed on February 21, 2014 in the Northern District of California (the "*Jordan* Action"); (ii) *Ruggles v. Nationstar Mortgage LLC*, 14-cv-363, filed on February 26, 2014 in the Central District of California (the "*Ruggles* Action"); (iii) *Reed v. Nationstar Mortgage LLC*, 14-cv-1701, filed on August 4, 2014 in the Northern District of Ohio (the "*Reed* Action"); (iv) *Doyle v. Nationstar Mortgage LLC*, 14-cv-679, filed on October 24, 2014 in the Eastern District of Texas (the "*Doyle* Action"); (v) *Wright v. Nationstar Mortgage LLC*, 14-cv-10457, filed on December 30, 2014 in the Northern District of Illinois (the "*Wright* Action").

Group, whose attorneys the Court ultimately appointed Interim Co-Lead Class Counsel and later, Settlement Class Counsel). (*Id.* at 6; *see also* dkt. 21 (finding Rafey S. Balabanian of Edelson PC and Paul O. Paradis of the Paradis Law Group to be "exceptionally qualified and experienced in representing classes.").)

In the *Jordan* Action, the Defendant answered Plaintiff's complaint, and Plaintiff Jordan timely moved to strike certain of Defendant's affirmative defenses. (*Jordan* dkts. 13, 20.) Meanwhile, shortly after filing, the *Ruggles* Action was transferred to the Northern District of California and consolidated with the *Jordan* Action. (*Jordan*, dkts. 27, 29.) Thereafter, Plaintiffs in the consolidated *Jordan* and *Ruggles* Actions propounded discovery on Defendant, including a notice of Rule 30(b)(6) deposition, requests to produce documents, and interrogatories. (*See* Balabanian Decl. ¶ 5.) Before Nationstar had responded to those requests, however, it filed a motion to stay the *Jordan* and *Ruggles* Actions pursuant to the primary jurisdiction doctrine. (*Jordan* dkt. 33.) The *Jordan* Court granted that motion on August 21, 2014, staying the matter while waiting for the FCC to take action that could potentially have affected several issues in the case. (*Id.* dkt. 48.) Following the expiration of that stay, and after further briefing, the Court denied Nationstar's request to continue the stay, holding that (a) there was no indication that an FCC decision was impending, and (b) it was not clear that any decision would be determinative of the issues in *Jordan.* (*Id.* dkt. 51.)[6]

Following that, and recognizing that the five actions shared substantially identical factual and legal claims, Plaintiffs' counsel, amongst themselves and with defense counsel, met and conferred regarding the Actions and whether any coordination could be had. They ultimately

---

[6]     Meanwhile, in the *Reed* Action, the Parties filed competing motions to transfer, Plaintiff seeking to transfer to the Eastern District of Texas, where the *Doyle* Action was then pending (*Reed* dkt. 15), and Defendant seeking to transfer to the Northern District of California, where *Jordan* was then pending. (*Id.* dkt. 18.)

determined to dismiss each of the separate actions in favor of refiling them as one consolidated case (the *Wright* action) in the Northern District of Illinois. (*See* Balabanian Decl. ¶ 7.)

Following the filing of the amended complaint in the *Wright* matter, (dkt. 15), Plaintiffs filed an amended motion for class certification, as well as a motion to appoint interim co-lead class counsel. (Dkts. 16, 17.)

### B.     The Mediation and the Settlement Agreement

At the same time and with the benefit of their litigation activities in the previously pending actions—including briefing on substantive motions and service of discovery—the Parties began to discuss the potential for resolving the claims at issue without the need for further protracted litigation. (Balabanian Decl. ¶ 10.) As a result of those discussions, they ultimately determined to proceed with an initial private mediation before the Honorable Edward A. Infante (ret.) of JAMS (San Francisco) on March 4, 2015. (*Id.*)

On February 17, 2015 and pursuant to *Damasco v. Clearwire Corp.*, 662 F.3d 891, 896 (7th. Cir. 2011), the Court entered and continued the certification motion pending discovery. (Dkt. 21.) The Court also granted Plaintiffs' motion to appoint interim co-lead class counsel, finding Plaintiffs' Counsel at Edelson PC and Paradis Law Group, PLLC to be "exceptionally qualified and experienced in representing classes," and finding that "their arrangement of the mediation is itself a sign of their efforts on behalf of the class[es]." (*Id.*) In the same order, the Court also appointed an executive committee comprised of Douglas J. Campion, Michael Sousa, Matthew English, and Jack Landskroner, and urged the Parties to dedicate their efforts and resources to their upcoming mediation (as explained below). (*Id.*)

On March 4, 2015 the Parties met for the private mediation with Judge Infante. (Balabanian Decl. ¶¶ 10–11.) Through this mediation the Parties began making important

progress towards resolution and settlement, but certain significant issues remained unresolved. (*Id.* ¶ 12.) While the Parties were unable to reach a resolution that day, they did agree to exchange information related to, *inter alia*, the number of putative class members in question, the total number of calls made, and Nationstar's purported records of consent to make the calls, and to reconvene the mediation at a later date. (*Id.*) The Parties also agreed to a discovery schedule at that time, (dkt. 32), and at the next status hearing, the Court ordered discovery to proceed during the pendency of the second mediation, (dkt. 35). The Parties continued discussions regarding the remaining unresolved issues, and eventually, in mid-June 2015 met again for a second all day mediation session, where core terms of the agreement were settled. (Balabanian Decl. ¶ 13.) Over the next three months the Parties continued working to finalize the remaining details of the Settlement, finally resulting in the Settlement Agreement filed with the Court on October 2, 2015. (Dkt. 51.)

### C. Preliminary Approval, Modifications to the Settlement, and Discussions with State Attorneys General

On October 14, 2015, and subject to certain modifications to the form of notice to be disseminated to the Settlement Class, the Court granted preliminary approval to the Parties' proposed Settlement. (Dkt. 59.) Later, on October 20, 2016, the Court approved certain proposed revisions to the notice documents. (Dkt. 64.) Thereafter, the Parties worked diligently with the Settlement Administrator to prepare and finalize the notice for dissemination to the Class.

Around that same time, the Parties received an inquiry regarding the Settlement from representatives of the offices of the Attorneys General for California, Illinois, Florida, Missouri, and Texas. (Dkt. 67 ¶ 2.) On November 23, 2015, the Parties participated in a telephone conference with the offices of the Attorneys General identified above regarding certain non-monetary aspects of the Settlement. (*Id.* ¶ 3.) In light of that discussion, the Parties stated to the

Attorneys General that they would delay the filing of any motion to modify the Claim Form and notice deadlines until after their discussions regarding the Settlement had concluded. (Dkt. 68 ¶ 4.)

During the week after the Thanksgiving holiday, and throughout December, the Parties conferred and agreed amongst each other to make several changes to the Settlement Agreement, notice documents, and Claim Form based upon their discussions with the Attorneys General. (Dkt. 67 ¶ 4.) Each of those changes were intended to add further clarity to the respective documents, while also more accurately reflecting the Parties' original intent underlying the Settlement and its terms. (*Id.*)

Later, in January, the Parties engaged in additional communications with the Attorneys General regarding those changes, and the reasoning behind them. (*Id.* ¶ 5.)[7] Although the Parties believed that their discussions with the Attorneys General were productive and that the changes to the Settlement that resulted would benefit the Settlement Class Members, the Attorneys

---

[7] With respect to the changes themselves, the Parties: (i) modified the definition of "Telephone Calls" to ensure that the settlement specifically excludes any authorization for Nationstar to make telemarketing calls to Settlement Class Members' cellular telephones in the future, reflecting the Parties' original intent, and the fact that Nationstar has not, and does not currently, make such telemarketing phone calls; (ii) modified Sections 2.2(a) and 2.2(b) of the Settlement Agreement to allow Nationstar an additional fifteen (15) days to implement the policies and procedures for honoring Revocation Requests required under the Agreement, and to extend the submission deadline for Revocation Requests from the Claims Deadline to the Effective Date of the Settlement, ensuring that throughout the implementation of the Settlement, Class Members have a clearly defined process for revoking consent to be called, while also ensuring that Nationstar has the procedures in place to honor such requests; (iii) modified the postcard and web notices to more clearly explain the operative deadlines, and to provide additional detail on the consent and revocation procedures established by the Settlement; and (iv) revised the Claim Form to modify the "Class Member Affirmation" to include a representation that claiming Class Members did not consent to the receipt of the "non-emergency automated or artificial or prerecorded voice calls" at issue in this case, to better reflect the agreed definition of "Claim Form" found in Paragraph 1.3 of the Settlement Agreement, making it consistent with Plaintiffs' allegations that the calls at issue were made without the recipients' consent. (*See* Dkt. 67 ¶¶ 6–9.)

General continued to reiterate that they were taking no position on the Settlement, the changes to it, or any aspect thereof. (*Id.*)[8]

On January 27, 2016, the Court approved the Parties' proposed modifications to the Settlement and related documents, and entered a revised schedule of notice and other deadlines. (Dkt. 68.) Thereafter, the Parties and the Settlement Administrator disseminated notice of the Settlement to the Class consistent with the amended Settlement Agreement and the Court's Preliminary Approval Orders. (*See* Declaration of Richard Bithell Regarding Notice Procedures, ("Bithell Decl."), Exhibit 1,[9] ¶ 2.)

### D.     The Response to the Settlement has Been Overwhelmingly Positive.

The efforts described above produced what Plaintiffs and Class Counsel believe is a strong, fair and reasonable Settlement. Indeed, as described in previous briefing, the Settlement—both in terms of the available monetary relief and the significant changes to Nationstar's telephone collection practices—is consistent with other similar settlements approved in cases in this District (and throughout the country) alleging violations of the TCPA, and is thus equally deserving of this Court's approval. Not surprisingly then (and although the Settlement Administrator is still in the process of evaluating the timely Claim Forms submitted), it is clear that the Settlement has received an even higher-than-anticipated participation rate by the Settlement Class, including the receipt of 147,476 validated Claim Forms to date. (*Id.* ¶¶ 14, 16.)[10] By contrast, only 74 opt-out requests have been submitted (0.00316% of the Class) have

---

[8]     The Attorneys General made explicit that their discussions with the Parties should not be interpreted to suggest that they either approve or disapprove of any aspect of the Settlement taken as a whole. Indeed, although they have not taken further action on this case, no inference should be made that the decision not to object is a tacit approval of any aspect of the Settlement or the Settlement taken as a whole.

[9]     All references to exhibits refer to the exhibits to the Balabanian Declaration.

[10]     Based upon the present analysis, as many as 150,000 Claim Forms may ultimately be validated for payment, and will likely result in a payment per Class member in excess of $45.00 after accounting

requested to opt-out, and only seven objections (on behalf of eight individuals) (representing 0.00034 % of the Class) have been raised—two of which do not address the substantive terms of the settlement, (*see* dkts. 69, 93), and three of which have been raised by serial objectors whose arguments, as detailed below, do not legitimately call into question the fairness, reasonableness, or adequacy of the Settlement whatsoever. (Dkts. 80, 82, 83.) The remaining two objectors have withdrawn. (*See* dkts. 84, 86.)

## III.    THE TERMS OF THE SETTLEMENT

The terms of the Settlement preliminarily approved by the Court are set forth in the Parties' Settlement Agreement and are briefly summarized below:

### A.    Class Definition

The Settlement Class consists of all Persons in the United States for whom Nationstar has in its records a cellular telephone number until the date that the Court enters an order preliminarily approving the Settlement Agreement. (Settlement Agreement, dkt. 56-1, ¶ 1.30.)

### B.    Notice

The notice plan, included: (1) direct postcard notice with a detachable Claim Form (return postage pre-paid), (2) a settlement website "www.automatedphonecallsettlement.com," which contains electronic versions of claim forms that can be submitted online, important court documents, and answers to frequently asked questions; (3) a toll-free telephone number where Settlement Class members could request a Claim Form and learn more about the Settlement; and (4) notice to the U.S. Attorney General and Attorneys General of each state pursuant 28 U.S.C. § 1715. (*Id.* ¶ 4.2)

---

for the costs of notice and administration and any attorneys' fees and incentive payments awarded by the Court. (*See* Balabanian Decl. ¶ 19.)

### C.     Class Member Payments

The Settlement provides for the establishment of a $12.1 million non-reversionary Settlement Fund, from which each member of the Settlement Class who submits an Approved Claim shall be entitled to a *pro rata* portion of the Settlement Fund after payment of all Settlement Administration Expenses, incentive award to the Class Representatives, and the Fee Award to Class Counsel. (*Id.* ¶ 2.1)

### D.     Prospective Relief

In addition to monetary relief, the Settlement Class members will be entitled to prospective relief to reduce the likelihood that Nationstar customers will be subjected to unlawful telephone calls in the future. (*Id.* ¶ 2.2)

### E.     Additional Relief

In addition to the individual monetary payments and the prospective relief discussed above, Nationstar has agreed to provide the following relief:

#### 1.     *Payment of Notice and Settlement Administration Expenses*

Nationstar has agreed to pay from the Settlement Fund the costs of effectuating the Court-approved notice plan, as well as all costs attendant with administration of the Settlement. (*Id.* ¶ 4.1.)

#### 2.     *Payment of Incentive Award for Class Representatives*

Nationstar has agreed to pay Plaintiffs, from the Settlement Fund, subject to Court approval, an incentive award of $5,000 each, in addition to what they will receive as claiming Class members. (*Id.* ¶ 8.3.)

3.      *Payment of Attorneys' Fees and Expenses*

Nationstar has agreed, subject to Court approval, to pay Class Counsel reasonable attorneys' fees and to reimburse litigation costs. (*Id.* ¶ 8.1.) On March 21, 2016, Plaintiffs submitted their fee petition, requesting attorneys' fees in the amount of $3,690,000. (Dkt. 72.)

**F.      The Release**

Should the Court grant final approval to the Settlement, Nationstar will receive a full release of Settlement Class members' claims related to the making of the Telephone Calls. (Dkt. 56-1 at ¶¶ 1.24, 3.)

**IV.     The Implemented Notice Plan Comports with Due Process.**

Prior to granting final approval to this Settlement, the Court must first consider whether the Notice to the Settlement Class is "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 595 (N.D. Ill. 2011). The "best notice practicable" does not require receipt of actual notice by all class members in order to comport with both Rule 23 and the requirements of due process, but it often includes (as in this case) direct notice to individuals who can be identified by regular mail. *See Burns v. Elrod*, 757 F.2d 151, 154 (7th Cir. 1985) (noting that "Rule 23 does not require defendants to exhaust every conceivable method of identification"). The Federal Judicial Center has concluded that a notice plan that reaches at least 70% of the class is reasonable. Federal Judicial Center, *Judges' Class Action Notice & Claims Process Checklist & Plain Language Guide* 3 (2010).

The multipart Notice plan approved by the Court in this case has been implemented by Court-approved Settlement Administrator, Epiq Systems, Inc., and included:

- Mailing over 2,344,000 direct postcard notices with detachable Claim Forms (return postage pre-paid) (Bithell Decl. ¶ 5);

- The establishment of a Settlement website— www.automatedcallsettlement.com—that provided the Notice, important Court documents, and the ability to download and submit Claim Forms online (*id.* ¶ 13);

- The maintenance of a toll-free telephone number where Settlement Class members could request a claim form and obtain more information about the Settlement (*id.* ¶ 12); and

- Notice to the U.S. Attorney General and the State Attorneys General of 50 states as required by CAFA (*id.* ¶ 4).

Through the individual postcard notices alone, the Court-approved Notice Plan has reached more than 98% of the total Settlement Class (*id.* ¶ 11), thus easily satisfying Rule 23's notice requirements and due process. *See, e.g.*, *Bickel v. Sheriff of Whitley Cnty.*, 2015 WL 1402018, at *3 (N.D. Ind. Mar. 26, 2015) (finding notice sufficient where direct notice is provided to at least 70% of the settlement class); *Schulte*, 805 F. Supp. 2d at 595–96 (finding notice sufficient where professional settlement administrator provided direct notice to 89.7% of the class, created a settlement website, and maintained a toll-free number that class members could call with questions).

## V.  The Settlement is Deserving of Final Approval.

Federal Rule of Civil Procedure 23(e) mandates that "claims, issues, or defenses of a certified class may be settled . . . only with the court's approval . . . after a hearing and finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e); *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, 2012 WL 651727, at *1 (N.D. Ill. Feb. 28 2012), *appeal dismissed*, *Safeco Ins. Co. of Am. v. Am. Int'l Grp.*, 710 F.3d 754 (7th Cir. 2013). Even so, "[f]ederal courts naturally favor the settlement of class action litigation." *Schulte*, 805 F. Supp. 2d at 578 (citing *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996)). Given this predisposition towards settlement, the

Court's approval inquiry "is limited to [consideration of] whether the proposed settlement is lawful, fair, reasonable and adequate." *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 986 (7th Cir. 2002).

The Seventh Circuit has identified five factors for district courts to consider in determining whether to approve a class action settlement: (i) the strength of a plaintiff's case compared to the amount of the defendant's settlement offer; (ii) an assessment of the likely complexity, length and expense of the litigation; (iii) an evaluation of the amount of opposition to the settlement among affected parties; (iv) the opinion of competent counsel; and (v) the stage of the proceedings and amount of discovery completed at the time of settlement. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (citation and internal quotations omitted); *accord In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 958 (N.D. Ill. 2011) (hereinafter "*In re AT&T II*"). In addition to these factors, courts in the Seventh Circuit should also consider whether the settlement is the product of collusion, or whether there are any "red flags" present in the settlement that would suggest it is unfair to the class. *Eubank.*, 753 F.3d at 723–29.

As explained below, these factors overwhelmingly weigh in favor of approving the Settlement in this case.

### A. The Value of the Settlement in Light of the Risks of Continuing the Litigation Favors Final Approval.

"The most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of plaintiff['s] case on the merits balanced against the amount offered in the settlement." *In re AT&T II*, 789 F. Supp. 2d at 958 (quoting *Synfuel*, 463 F.3d at 653) (internal quotations omitted). The strength of a plaintiff's case can be quantified by examining "the net expected value of continued litigation to the class" and then estimating "the range of

possible outcomes and ascrib[ing] a probability to each point on the range." *Am. Int'l Grp., Inc.*, 2012 WL 651727, at *2 (quoting *Synfuel*, 463 F.3d at 653); *see also Eubank*, 753 F.3d at 727 (finding that the district court should "estimate the likely outcome of a trial in order to evaluate the adequacy of the settlement"). However, "[t]he Seventh Circuit has recognized that valuing hypothetical continued litigation is necessarily speculative and therefore an inexact science," and courts need only "estimate and come to a ballpark valuation" of the class's claims. *Kolinek*, 311 F.R.D. at 503 (citation and internal quotations omitted); *see also In re Southwest Airlines Voucher Litig.*, No. 11-cv-8176, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013) ("In considering the strength of plaintiff[']s case, legal uncertainties at the time of settlement favor approval."). Ultimately, because a settlement is a compromise, "courts need not—and indeed should not—'reject a settlement solely because it does not provide a complete victory to the plaintiffs.'" *In re Capital One*, 80 F. Supp. 3d at 790 (quoting *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) (hereinafter "*In re AT&T I*")). The Parties' proposed Settlement—in terms of tangible monetary relief and Nationstar's improved consent and calling practices—warrants approval, both compared to other similar TCPA actions and when viewed in light of the risks of protracted litigation.

First, the monetary relief provided under the Settlement—a $12.1 million non-reversionary Settlement Fund and in excess of $45 per claiming Settlement Class Member—is consistent with (or better than) settlements in similar TCPA cases. As Plaintiffs have previously explained, in "direct relationship" TCPA cases, like this one, where the person called voluntarily provided their cellular telephone number to the caller, settlements have generally provided low-value coupons or less than $40 in cash to each claiming class member. *See, e.g.*, *In re Capital One*, 80 F. Supp. 3d at 790 (providing a $34.60 recovery per claiming class member in debt

16

collection case where class members had provided their phone numbers to the defendant); *Arthur v. Sallie Mae, Inc.*, No. C10-0198JLR, 2012 WL 90101, at *3 (W.D. Wash. Jan. 10, 2012) (approving a settlement in a debt collection case where class members were due to receive between $20 and $40); *Gehrich*, 2016 WL 806549, at *7 (approving settlement providing $52.50 per claiming class member in debt collection case); *see also Kolinek*, 311 F.R.D. at 493–94 (approving settlement where claiming class members received approximately $30 each after receiving prescription refill reminder calls); *Kazemi v. Payless Shoesource, Inc.*, No. 3:09-cv-05142, dkt. 94 (N.D. Cal. Apr. 2, 2012) (providing a $25 voucher to each class member related to unsolicited marketing text messages promoting the sales of defendants' products); *In re Jiffy Lube Int'l, Inc. Text Spam Litig.*, No. 3:11-MD-02261, dkt. 97 (S.D. Cal. Feb. 20, 2013) (providing a $20 voucher, which could be redeemed for $15 cash after expiration of nine-month waiting period in case involving unsolicited marketing text messages offering discounts on oil changes). The courts have consistently viewed that amount of relief appropriate in such cases because "a settlement is a compromise, and courts need not—and indeed should not—'reject a settlement solely because it does not provide a complete victory to plaintiffs.'" *In re Capital One*, 80 F. Supp. 3d at 790 (citing *In re AT&T I*, 270 F.R.D. at 347). "This is especially true when complete victory would most surely bankrupt the prospective judgment debtor." *Id.* (pointing out that in TCPA cases involving millions of class members and phone calls, potential TCPA liability often reaches into the billions if not trillions of dollars).[11]

---

[11] Even though the overwhelmingly positive response from the Class resulted in a higher rate of Class member participation than originally anticipated, it bears noting that the amount of individual Class member payments here is *still a higher percentage of the possible recovery* than in the typical TCPA case where class members had provided their cellular phone numbers to the defendant. *See, e.g.*, *In re Capital One*, 80 F. Supp. 3d at 790 (providing 7% of available statutory damages); *Arthur*, 2012 WL 90101, at *3 (providing between 4% and 8% of available statutory damages); *In re Jiffy Lube*, No. 3:11-MD-02261, dkt. 97 (providing a coupon worth 3% of statutory damages after a 6-month waiting period). And although the TCPA does allow for the possibility of treble damages upon a showing of willfulness, 47

With respect to the Parties' relationship here and Nationstar's defenses, this first factor weighs strongly in favor of approval. By way of example, the Class faced the significant risk that Nationstar would ultimately be able to establish a consent defense. As explained in Plaintiffs' previous briefing, because the Class's claims are based upon calls purportedly made to collect mortgage and fee payments, rather than pure telemarketing calls from an unknown entity (as in many TCPA actions), it is a very real possibility that Nationstar obtained certain of the Plaintiffs' and Class Members' phone numbers called through legitimate means—e.g., on loan origination documents or the like. *See*, *e.g.*, *Michaelson v. CBE Grp., Inc.*, No. 13-cv-50228, 2015 WL 2449038, at *4 (N.D. Ill. May 21, 2015) ("Giving a creditor a cell phone number during the transaction that resulted in the debt owed is considered to be giving the creditor prior express consent to contact the cell phone subscriber at that number regarding the debt."); *see also Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 643 (7th Cir. 2012) (citing *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 564–65 ¶¶ 9, 10 (Jan. 4, 2008) (hereinafter "2008 FCC Order"). Judge Holderman cited this same risk (i.e., risk of non-recovery due to consent issues) in approving the settlement in *In re Capital One*. 80 F. Supp. 3d at 805 (noting risks posed by fact that "[s]ome customers provided Capital One with their cell phone numbers as their primary contact numbers, arguably waiving any right not to receive debt-collection calls on their cell phone from capital One," and that "at the outset of the litigation there was a serious question whether the Plaintiff's claims could meet Rule 23's manageability requirement given that Capital One would have to review its records to

---

U.S.C. § 227(b)(3), Plaintiffs believe, given the facts of this case, such damages were exceedingly unlikely.

determine which class members provided consent through cardholder agreements, [and] which class members actually provided their cell phone numbers to Capital One . . . .").

Nationstar would also likely argue that the provision of Class Members' phone numbers in other contexts constituted consent as well. Although Plaintiffs are of the view that simply providing one's cell phone number, without more, does not constitute "prior express consent," *see Kolinek v. Walgreen Co.*, No. 13-cv-4806, 2014 WL 3056813, at *4 (N.D. Ill. July 7, 2014), the issue is somewhat unsettled, and courts have reached differing results on similar facts. *See, e.g., Greene v. DirecTV*, No. 10-cv-117, 2010 WL 4628734, *3 (N.D. Ill. Nov. 8, 2010) (holding that provision of a cell phone number as a contact number constitutes prior express consent to be called); *Roberts v. Paypal, Inc.*, No. 12-cv-622, 2013 WL 2384242, at *4 (N.D. Cal. May 30, 2013) (holding that the prior provision of a cell phone number to the caller for any reason constitutes prior express consent to be called); *Ryabyshchuck v. Citibank (S.D.) N.A.*, No. 11-cv-1236, 2012 WL 5379143, at *3 (S.D. Cal. Oct. 30, 2012) (same). Indeed, although the FCC has recently (in July 2015) issued a declaratory ruling discussing issues of consent under the TCPA,[12] questions are still legion with respect to the boundaries of that order.

Similarly, in *In re Capital One*, Judge Holderman noted that "[a]lthough the TCPA defines an autodialer as 'equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers,' 47 U.S.C. § 227(a)(1), the FCC has expanded the definition to cover [other types of dialing equipment.]" *In re Capital One*, 80 F. Supp. 3d at 791 (citing *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 18 FCC Rcd. 14014, 14091–93 (July 3, 2003)). Nevertheless, the FCC has also continued to consider petitions that would exclude such

---

[12]    *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (July 10, 2015).

equipment from the TCPA's definition of an ATDS with respect to certain types of telephone calls, including in the debt collection context at issue here. *Id.* As a result, the Class here ran the very real risk that FCC rulings could remove the types of calls at issue from the TCPA's purview and further undermine their claims.

Thus, at the time the first of the underlying actions was filed (February 2014), through the second mediation in this case (June 2015), and continuing to the present, a substantial risk existed in investigating and proceeding with this litigation given the ongoing regulatory uncertainty surrounding the meaning of "prior express consent" and the ability to make calls using automatic dialing equipment in the debt collection context. *See, e.g., Wilkins,* 2015 WL 890566, at *6 (noting that "alternative interpretations" of the FCC Orders "will continue to add significant risk to large TCPA litigation until the FCC clarifies the definition of 'prior express consent' under the TCPA") (citing *In re Capital One*, 80 F. Supp. 3d at 791). As Judges Holderman and Kennelly have recognized, "the FCC frequently issues orders interpreting or reinterpreting the TCPA . . . the FCC's interpretations are binding on this Court . . . and prosecuting this litigation through discovery and a trial would only allow a greater opportunity for the FCC to issue" a ruling undermining Plaintiffs' and the Class's claims. *See Kolinek*, 311 F.R.D. at 494.[13]

---

[13]     Judge Holderman also recognized that while the FCC had held that "wireless numbers provided by the called party in connection with an existing debt are made with the 'prior express consent' of the called party," it had also stated (in the very same order) that "prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, *and that such number was provided during the transaction that resulted in the debt owed.'" *In re Capital One*, 80 F. Supp. 3d at 790 (quoting 2008 FCC Order, 23 FCC Rcd. at 564–65 ¶¶ 9-10). Ultimately, while Judge Holderman acknowledged the argument that the FCC's 2008 Order "mean[s] that the cell phone number must have been provided during the origination of the credit relationship, i.e., during the transaction," he also joined in the view that "the FCC's series of TCPA Orders are not 'model[s] of clarity.'" *Id.* at 791 (quoting *Baird v. Sabre, Inc.*, 995 F. Supp. 2d 1100, 1106 (C.D. Cal. 2014)).

Further, pending litigation before the United States Supreme Court could also have had an effect on this case. On November 2, 2015, the Supreme Court heard oral argument in *Spokeo, Inc. v Robins*, No. 13-1339, which asks the Court to determine the extent to which Congress can confer Article III standing on plaintiffs. While Class Counsel maintains that the invasion of a particularized legal right—such as the right delineated in the TCPA—is sufficient to confer standing on a plaintiff, *see, e.g.*, *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014), there is nevertheless a risk that the Supreme Court will issue an opinion holding that actual damages are required even where Congress has provided for statutory damages. And, although Plaintiffs contend that they suffered actual damages by way of being charged for the calls, in light of unlimited calling plans, establishing a fixed amount of damage would be a challenge. Hence, the prospect of that decision adds significant uncertainty to this litigation.

Additionally, if the case proceeded to trial, other barriers—such as the need for additional discovery and expert testimony—would stand between the Settlement Class and ultimate recovery. (Balabanian Decl. ¶¶ 24–25.) And in light of the amount at stake and its reputational interests, Nationstar was nearly certain to appeal any judgment in favor of the Class, which would delay and further place in doubt any recovery. (*Id.* ¶ 25.) Despite these substantial uncertainties, the Settlement provides real and immediate cash relief—entitling each Settlement Class Member to a *pro rata* share of the $12.1 million Settlement Fund, which again, is consistent with the settlements approved by other courts under similar circumstances. *See In re Capital One*, 80 F. Supp. 3d at 790; *Arthur*, No. 2012 WL 90101, at *3; *see also Kolinek*, 311 F.R.D. at 493–94; *Kazemi.*, No. 3:09-cv-05142, dkt. 94; *In re Jiffy Lube*, No. 3:11-MD-02261, dkt. 97. As importantly, the Settlement provides meaningful prospective relief, including new (and costly) procedures to ensure that only those persons who provide prior express consent

receive the Telephone Calls in the future. *See Schulte*, 805 F. Supp. 2d at 599 ("Where a settlement includes substantial affirmative relief, such relief must be considered in evaluating the overall benefit to the class.").

Thus, given the substantial risks, expense, and delay that would accompany further protracted litigation, and in comparison to other TCPA class action settlements, the Settlement offers substantial value relative to the strength of Plaintiffs' and the Class's case. The first—and most important—*Synfuel* factor, therefore, strongly supports final approval.

### B. The Likelihood of an Increase in the Complexity, Length, and Expense of Continued Litigation Validates Final Approval of the Settlement.

Final approval is also favored in cases such as this where "[s]ettlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation." *Schulte*, 805 F. Supp. 2d at 586. As noted, should litigation proceed, further discovery will undoubtedly be needed to develop the case—e.g., highly technical discovery regarding the equipment used to make the calls at issue and related expert discovery—which will significantly drive up the cost of the litigation. *See In re AT & T II.*, 789 F. Supp. 2d at 964 (noting that "costs associated with discovery in complex class actions can be significant"). Likewise, significant additional motion practice will be needed related to any discovery disputes, adversarial class certification, and summary judgment. All of that is likely to be followed by a lengthy appeals process, given the Parties' respective stakes in the litigation. And, if class certification is ultimately granted and upheld on appeal, and neither side obtains complete victory at summary judgment, the case will be headed for an expensive and high-stakes trial. If anything, "this drawn-out, complex, and costly litigation process . . . would provide [Settlement] Class Members with either no in-court recovery or some recovery many years from now . . . ." *Id.* at 964.

22

The proposed Settlement, in contrast, avoids uncertainty, and instead provides immediate and guaranteed relief to the Settlement Class. As such, the second *Synfuel* factor also weighs in favor of final approval.

### C. The Opinion of Competent Counsel Favors Approval.

The next factor considered by courts is the opinion of competent counsel regarding the fairness, reasonableness and adequacy of the Settlement. *Synfuel*, 463 F.3d at 653; *see also Schulte*, 805 F. Supp. 2d at 586 ("The opinion of competent counsel is relevant to the question whether a settlement is fair, reasonable, and adequate under Rule 23."). This is especially true where class counsel are qualified, where discovery and settlement negotiations have taken place and where there is no indication of collusion. *Id.; see also Hispanics United v. Vill. of Addison*, 988 F. Supp. 1130, 1150 n.6 (N.D. Ill. 1997) (noting that a "strong initial presumption of fairness attaches" where the settlement is "the result of arm's length negotiations," and where plaintiff's counsel are "experienced and have engaged in adequate discovery").

Here, as the Court has twice recognized in this litigation, Class Counsel are experienced members of the plaintiff's class action bar who have built their practice litigating similarly complex consumer class actions and are capable of assessing the strengths and weaknesses of the Parties' respective positions. (Dkt. 21) (finding that Class Counsel "are exceptionally qualified and experienced in representing classes").

Indeed, attorneys at Edelson PC have been specifically recognized as "pioneers in the electronic privacy class action field, having litigated some of the largest consumer class actions in the country on this issue." *In re Facebook Privacy Litig.*, No. C 10-02389, dkt. 69 at 5 (N.D. Cal. Dec. 10, 2010); *see also Dunstan v. comScore*, No. 11-cv-5807, dkts. 186, 369 (N.D. Ill.) (securing adversarial certification of largest ever privacy class comprised of 10 million

consumers on claims arising under federal privacy statutes, and ultimately achieving a $14 million settlement, which resulted in claiming class members receiving approximately $500 each). With respect to TCPA class actions in particular, Edelson PC has extensive experience in similar complex litigation and have been appointed class counsel in numerous TCPA class actions, many of them in this District. *See, e.g.*, *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 256 (N.D. Ill. 2014) ("appoint[ing] Jay Edelson of Edelson PC . . . as class counsel"); *Kolinek*, 311 F.R.D. at 495 (noting that Edelson PC attorneys are "highly experienced class action litigators"); *Miller v. Red Bull N. Am., Inc.*, No. 12-cv-04961 (N.D. Ill.) (serving as lead counsel in $6 million text spam settlement); *Rojas v. Career Education Corp.*, No. 10-cv-05260 (N.D. Ill.) (serving as lead counsel in $20 million text spam settlement); *Lozano v. Twentieth Cent. Fox. Film Corp.*, No. 09-cv-06344 (N.D. Ill.) (serving as lead counsel in $16 million text spam settlement). They have also developed an in-depth understanding of the TCPA and have successfully litigated emerging issues that continue to redefine its boundaries. *See, e.g., Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951–52 (9th Cir. 2009) (securing landmark ruling applying the TCPA to text messages); *Ellison v. Steve Madden Ltd.*, No. 11-cv-5935, dkt 73 at 9 (C.D. Cal.) ("[Attorneys at Edelson PC] specialize in litigating consumer class actions and have pioneered the application of the TCPA to text-messaging technology, litigating some of the largest consumer class actions in the country on this issue.").

Attorneys from Paradis Law Group, PLLC have similarly devoted their practice to successfully prosecuting consumer class actions, particularly those that involve highly technical issues, such as this action. For example, Paradis Law Group, PLLC recently procured a consumer class action settlement valued at over $50 million in the action, *Kacsuta v. Lenovo (United States) Inc.*, No. 13-cv-00316 (C.D. Cal.), on behalf of purchasers of certain Lenovo-

manufactured laptops. *See also In re TicketMaster Sales Practices Litig.*, No. 09-cv-912 (C.D. Cal.) (Paradis Law Group, PLLC was appointed lead counsel, prosecuted and settled a large class action against Ticketmaster, LLC and its subsidiary TicketsNow.com, which was valued at over $16 million); *In re Bank of Am. Corp. Stockholder Derivative Litig.*, No. 4307-VCS (Del. Ch.) ("*BOA*") (efforts of attorneys from Paradis Law Group resulted in a settlement of $62.5 million). In commenting on the quality of representation provided by Paradis Law Group in *BOA*, the District Court stated in relevant part: "I must say from everything I've observed here, all counsel . . . have all acted in the utmost of good faith in a sincere effort to represent the best interests of their clients." *Id.*

This substantial and particularized experience has allowed Class Counsel to accurately weigh the merits of the Settlement Class's claims along with the risks and potential rewards of further litigation as compared to Settlement. Class Counsel ultimately believe that the Settlement provides significant relief for individuals who may otherwise be left without a remedy and thus, the opinion of Class Counsel favors final approval as well.

> **D.    The Stage of the Proceedings and Amount of Discovery Completed Weigh in Favor of Final Approval.**

The *Synfuel* factor related to the stage of the proceedings and amount of discovery completed at the time the settlement is reached also favors final approval here. *Synfuel*, 463 F.3d at 653. This factor is satisfied where "discovery and investigation conducted by class counsel prior to entering into settlement negotiations was extensive and thorough." *Isby*, 75 F.3d at 1200 (citation and internal quotations omitted). The case's procedural posture is significant because "it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Am. Int'l Grp., Inc.*, 2011 WL 3290302, at *8 (quoting *Armstrong v. Bd. of Sch. Directors of Milwaukee*, 616 F.2d 305, 325 (7th Cir. 1980) (internal quotations omitted)

*overruled on other grounds by* 134 F.3d 873). It is well settled that the courts and parties may be equipped with sufficient information even when only minimal (or even no) formal discovery has taken place if they have engaged in other adversarial litigation activities and informal discovery. *In re AT&T II.*, 789 F. Supp. 2d at 966.

The procedural posture of this Action further supports final approval, as the Parties have litigated the claims at issue for more than two years, in multiple actions, participated in both formal and informal discovery, and lengthy mediation and settlement discussions with the assistance of Judge Infante. Specifically, those efforts included (i) briefing on several substantive motions, (ii) service of formal discovery and responses, and an exchange of information through additional informal discovery, and (iii) the production and review of several thousand pages of documents related to, *inter alia*, the number of class members in question, the total number of calls made, and Nationstar's purported records of consent to make those calls. (Balabanian Decl. ¶ 14.)

With the benefit of the motion practice and argument on several substantive issues, having reviewed the documents produced and, based upon the informed, arms'-length negotiations that took place before a well-respected mediator, there can be no doubt that the Parties had the information and understanding necessary to negotiate the beneficial Settlement now before the Court. *See Am. Int'l. Group, Inc.*, 2011 WL 3290302, at *8 ("extensive discovery has undisputedly been completed . . . and it is impossible to say that the court and the parties are unable to evaluate the merits of this case. . . ."). As such, the stage of the proceedings and amount of discovery completed also weigh in favor of final approval.

**E.  The Settlement Is Not a Product of Collusion and There Are No "Red Flags" Present.**

Although not a factor specifically set forth in *Synfuel*, courts in the Seventh Circuit also consider whether a settlement is the product of collusion, and whether there are any "red flags" present in the settlement that would suggest it is unfair to settling class members. *Eubank*, 753 F.3d at 722–29. Some of the red flags include (i) the failure to properly establish the size of the fund and the total class recovery, (ii) the reversion of unawarded attorneys' fees to the defendant, (iii) substantial alterations to existing class definitions, (iv) the use of coupons, rather than cash payments, for class compensation, and (v) overly complicated claim forms. *See id.* Here, the Court should not hesitate to grant final approval to the Settlement because the Settlement was not the result of collusion, nor does it raise any of the "red flags" identified by the Seventh Circuit and other courts in analyzing class settlements.

First, there can be no doubt that this Settlement was not the result of collusion. As described above, the Parties engaged in two separate mediations with Judge Infante (ret.) of JAMS. During the first mediation, the Parties were unable to reach agreement, and the second occurred months later, after the Parties had participated in additional discovery. The timing of the mediations alone—e.g., that they occurred at the outset of the case and then after the Parties further developed their claims and defenses—is clear evidence that there was no collusion in the negotiations that ultimately led to the Settlement. *See Butler v. Am. Cable & Tel., LLC*, 2011 WL 2708399, at *8 (N.D. Ill. July 12, 2011) (noting that arm's-length negotiations facilitated by a neutral mediator is a factor that supports a finding that the Settlement was fair.)

Second, none of the "red flags" identified in *Eubank* are present here. First, with respect to knowledge of the size of the common fund and the amount of recovery to Settlement Class members, the Court here knows exactly how much money has been recovered (since it's a $12.1

non-reversionary Settlement Fund) and how it will be distributed (to claiming class members on a pro rata basis). And while the exact *pro rata* recovery available to claiming members of the Settlement Class has not yet been finally determined, based on the current analysis of the Claim Forms submitted, it appears the payments will be over $45 per Approved Claim. (Balabanian Decl. ¶ 19.) Thus, unlike in *Eubank*, the Court here knows how much the Settlement Class will recover in both the aggregate and on an individual class member basis.

The same is true for the remaining concerns identified in *Eubank*. Should the Court decide not to award the full attorneys' fees sought by Class Counsel, the remainder will not revert to Defendant (as it did in *Eubank*), but will remain in the Settlement Fund to be disbursed to Settlement Class Members with Approved Claims. (Dkt. 56-1 ¶ 1.32.)

Nor does the Settlement Class definition call into question the propriety of certification as it did in *Eubank*. There, the Seventh Circuit recognized adversity among several certified subclasses, thus rendering the settlement's provision of a single, unified class improper. *Eubank*, 753 F.3d at 721. Here, however, the Settlement Class Members' claims are materially indistinguishable from each other—they were all uniformly subjected to Nationstar's calling practices. As a result, there are no competing groups within the Class, and none of the diametrically opposed interests that rendered certification of a single, undivided class inappropriate in *Eubank* are present here. *See id.* (finding "the adversity among subgroups" precluded class certification of one large class for settlement purposes) (citation and internal quotations omitted).

And finally, unlike the *Eubank* settlement, which proposed providing only coupon payments to some class members through exceedingly long and difficult claim forms, *id.* at 725,

the instant Settlement allowed Class Members to claim a *cash* recovery by submission of an easy to complete Claim Form that required only a relatively minimal amount of contact information.

Given the absence of any red flags and the presence of only minimal opposition to the Settlement (as discussed further below), the Court should grant final approval to the Settlement.

### F. The Lack of Opposition to the Settlement Weighs in Favor of Final Approval.

Finally, the Court should consider the fact that there is very little opposition to the Settlement to be "strong circumstantial evidence favoring settlement." *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1020–21 (N.D. Ill. 2000) (finding that a settlement where "99.9% of class members have neither opted out nor filed objections . . . is strong circumstantial evidence in favor of the settlements"); *In re AT&T II*, 789 F. Supp. 2d at 965 (an exclusion or objection rate of 0.01% of class members was "remarkably low" and supported the settlement). Again, out of the nearly 2.4 million Settlement Class members, only seven objections (on behalf of eight class members) were raised (two of which have since been withdrawn) (0.00034%), and only 74 Exclusion Requests have been submitted (0.00316%). This infinitesimal amount of opposition to the Settlement strongly favors final approval. *See, e.g.*, *Wilkins*, 2015 WL 890566, at *7 (granting final approval where 27 (0.0003%) requests for exclusion and 9 objections (0.000001%) were submitted out of more than 9 million settlement class members); *In re Capital One*, 80 F. Supp. at 792 (granting final approval where 565 (0.0032%) requests for exclusion and 14 objections (0.0000008%) were submitted out of more than 17.5 million settlement class members); *Kolinek*, 311 F.R.D. at 495 (granting final approval where 20 individuals objected (0.0002209%) and 151 (0.001668%) opted out); *Gehrich*, 2016 WL 806549, at *9 (granting final approval where 18 class members objected (0.0000557%) and 225 (0.000697%) opted out).

29

The strength of the Settlement relative to its opposition is further highlighted by the substance of the objections and the persons pursuing them. In this case, seven objections have been filed, of which two have already been withdrawn. Of the five remaining objections, one offers only philosophical objections to class actions, one addresses another dispute that the *pro se* objector appears to have with Nationstar, and the remaining three were brought by professional objectors—an inevitable (though unfortunate) part of any large class action settlement. *See, e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012) (acknowledging that professional objectors object to "class action settlements . . . not [to] effectuate changes to settlements, but . . . for [their] own personal financial gain"); *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2016 WL 1452005, at *2 (N.D. Ohio Apr. 13, 2016) ("The serial objector's ultimate goal is extortion.")[14]

These serial objectors add nothing to the discussion, instead "seek[ing] to make a living simply by filing frivolous appeals and thereby slowing down the execution of settlements." *Id.* (citation and internal quotations omitted) (referring specifically to counsel for objector Pentz). True to form, the professional objectors here all rely on nearly the same boilerplate objections. As such, they each misunderstand the terms of the Parties' Settlement, the circumstances of the litigation, or controlling Seventh Circuit case law (or all three); two have—for added color— filed on behalf of their mother and sister-in-law; and each has either feigned an interest in providing additional information regarding their motivations here and the bases of their objections, only to fail to produce a shred of information, or simply refused to engage in a substantive discussion whatsoever.

---

[14] In addition, one of the objections withdrawn was prepared by serial objector Christopher Bandas. (Dkts. 79, 86); *see In re CRT*, 281 F.R.D. at 533 (noting that Bandas is a "professional" or "serial" objector).

In any event, to have any impact on final approval of the Settlement, the objections must "cast doubt upon the settlement's fairness, reasonableness, or adequacy." *Am. Int'l Grp., Inc.*, 2012 WL 651727, at *11 (overruling objections that failed to do so); *see also Freeman v. Berge*, 68 F. App'x 738, 743 (7th Cir. 2003) (affirming final approval of settlement and recognizing that objections must have merit to be considered); Federal Judicial Center, Manual for Complex Litigation (Fourth) § 21.643 (2004) ("Even a weak objection may have more influence than its merits justify in light of the inherent difficulties that surround review and approval of a class settlement"). They have all failed to meet that burden and thus, each should be overruled.

1.     *The Two Non-Professional Objections Do Not Raise Any Issues that Warrant Disapproving the Settlement.*

Only two of the five remaining objections were filed by class members not represented by attorneys who repeatedly object to class action settlements for their own personal gain. The first, Sandra Cooper, objects generally to class actions and class action settlements as a burden on the legal system. Ms. Cooper is certainly entitled to make that objection, but the law nevertheless "recognizes class actions as a legitimate part of the U.S. litigation system." *In re AT&T II.*, 789 F. Supp. 2d at 982.  Hence, philosophical objections of this sort do not warrant disturbing a settlement. *Kolinek*, 311 F.R.D. at 496–97. Accordingly, Ms. Cooper's *pro se* objection should be overruled. *See id.* at 497 (overruling objection based on class member's disapproval of the class action device and suggesting "that Rule 23 exists precisely as a means to support suits like this one, a lawsuit designed to hold a party accountable for numerous small violations of federal law").

Derrick W. Macon, also *pro se*, only discusses the subject matter of this litigation tangentially in his objection. (Dkt. 93.) The bulk of the objection relates to another dispute Mr.

31

Macon apparently has with Nationstar, involving a foreclosure proceeding in Maryland state court. Since the Court cannot address that proceeding here, the objection should be overruled.[15]

2. *Objections that Fail to Comply with the Court's Order or Fail to Cite Pertinent Legal Authority Are Waived.*

The three remaining objections were all filed by professional-objector attorneys. As an initial matter, all three of these objections should be stricken, at least in part, in light of the objectors' failure either to comply with the orders of this Court or to support their arguments with legal authority. The Court's Order granting preliminary approval of the Settlement Agreement specified the form of objections, including the requirement that any objection include a statement that the objector is a member of the Settlement Class, the cellular telephone number on which the objector received a Telephone Call from Nationstar, and the objector's signature. (Dkt. 60 ¶ 12.) The objection purportedly filed on behalf of William and Kerry Youngblood includes the signature of counsel, but it does not include the signature of either William or Kerry Youngblood. Accordingly, the Youngblood objection is deficient and should be stricken. (*Id.* ¶ 13.)

Further, all three objectors make a number of arguments that are not supported by any legal authority at all. The Seventh Circuit and this Court have "repeatedly warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *United States v. Useni*, 516 F.3d 634, 658 (7th Cir. 2008) (citation and internal quotations omitted); *see also Roppo v. Travelers Cos.*, 100 F. Supp. 3d 636, 647 n.7 (N.D. Ill. 2015) (Chang, J.) (citing *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005)). Thus, any argument that lacks citation to authority is waived and the objections should be overruled for that reason as well.

---

[15]     In addition, neither *pro se* objector states that they are members of the Settlement Class.

   3. *The Youngbloods' Objections to Notice, Handling of Unclaimed Funds,*
    *and Opt-Out Procedures Lack Citation to Legal Authority and Are*
    *Factually Incorrect in any Event.*

Turning to the substance of the objections, the Youngbloods first object to the form of the

Court-approved class notice, the procedure for handling unclaimed settlement funds, and the opt-

out procedure, all without citing any legal authority. Even though these arguments are waived,

there infirmities on the merits are addressed briefly here.

First, the Youngbloods appear to contend that the notice reached an insufficient number

of class members. (Dkt. 82 at 3–4.) To this end, they ask—twice in the same paragraph—"[w]hat

is the likelihood that the notice program will notify the majority of the class?" (*Id.* at 4.) The

answer to that question is readily available: the Settlement Administrator mailed over 2.3 million

postcards, of which more than 98% were successfully delivered. (*See* Bithell Decl., ¶¶ 11)

Notice, therefore, reached nearly every Class Member—an excellent result by any standard.

Second, as far as the distribution of unclaimed funds, the Youngbloods contend that the

Class should have, but didn't, get notice about how unclaimed funds will be used. (Dkt. 82 at 3.)

That's incorrect, as the notice explained this aspect of the Settlement. The notice, which the

Youngbloods go as far as to quote, describes the process in simple terms designed for non-

lawyers, as is required by Federal Rule of Civil Procedure 23(c)(2)(B). (Dkt. 67-4 at 4.) ("All

uncashed checks issued to Class Members and any unclaimed money in the Settlement Fund will

be equally redistributed to the other claiming Class Members if practical, or otherwise as

directed by the Court."). The Settlement Agreement itself, available in full on the settlement

website, also explains in detail that any uncashed checks will be distributed to claiming Class

members if that is practicable—e.g., so long as the amount of each individual check was less

than cost to mail the check. (Dkt. 56-1 ¶ 2.1(e).) If it isn't practicable, then Class Counsel will

apply to the Court to dispose of the funds in another manner and the Court will determine if that proposal (or another one) is fair. (*Id.*) This is the proper way to handle unclaimed funds. *See Kolinek.*, 311 F.R.D. at 499 (endorsing a nearly identical procedure).

Finally, the Youngbloods argue without citation to any authority that the process for requesting exclusion from the Settlement Class is "unreasonably burdensome" because it is not available electronically. (Dkt. 82 at 6–7.) They claim that "the current opt-out requirements harm the class insofar as class members incur out-of-pocket costs." (*Id.*) But 74 people actually opted-out without issue, suggesting that the procedure was reasonable. Moreover, given the number of exclusions received, it's likely that creating an online form to handle those opt-outs would have been significantly more expensive than simply asking people to write a letter. Finally, Class Counsel is unaware of any authority holding that requiring class members to opt-out via anything but electronic means is overly burdensome or otherwise improper and indeed, this Court endorsed that procedure here. (*See* dkt. 60.) *See also Howeton v. Gargill, Inc.*, No. 13-cv-336, 2014 WL 6976041, at *3 (D. Haw. Dec. 8, 2014) (rejecting objection and holding that "requiring opt-out by mail is not unduly financially burdensome"); *see also Philips Petroleum Co. v. Shutts*, 472 U.S. 797, 814 (1985) ("[T]he interests of absent plaintiff class members are sufficiently protected . . . when those plaintiffs are provided with a request for exclusion that can be returned within a reasonable time to the court.").

In sum, the Youngbloods' objections to the Court-approved notice and opt-out procedures, besides being waived for lacking legal support, are also factually inaccurate. Thus, the Court can appropriately overrule them.

4.     *The Class Meets the Ascertainability Requirement as set out in Mullins v. Direct Digital, LLC.*

Next, Objector Mitchell argues that the Settlement Class is inappropriately defined because "[c]lass members cannot make an independent determination as to whether they fit within it[.]" (Dkt. 83 at 5.) From the law that Mitchell cites, this appears to be a challenge to the ascertainability of the class. It is not well taken. As the Seventh Circuit recently held, as long as the class definition "identif[ies] a particular group, harmed during a particular time frame, in a particular location, in a particular way," does not rely on subjective criteria like "state of mind," and is not defined "in terms of success on the merits," it meets Rule 23's ascertainability requirement. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660 (7th Cir. 2015). Here, Nationstar allegedly called the cellular phone numbers in its records in an illegal manner, so the Class definition encompasses everyone whose cellular phone number was in its records as of a specific date. There is no subjective component to this definition, and it does not refer to the elements of a TCPA claim. Accordingly, it meets the ascertainability requirement.

The only arguments that Mitchell raises in opposition to the class definition contradict the settled law of this Circuit (and fail to address binding authority such as *Mullins*). First, Mitchell suggests that the class cannot be certified because of administrative difficulties, but the Seventh Circuit has squarely rejected the suggestion that administrative difficulties in determining who is a class member should have any bearing on the ascertainability analysis. *Id.* at 662. And in any event, it is extremely simple to determine who is a Class member, as that information can be found within Nationstar's records. (*See* Dkt. 56-1 ¶ 1.30); *Birchmeier*, 302 F.R.D. at 245 (N.D. Ill. 2014) (finding that a class is ascertainable when defined in-part based on defendants' calling records).

Mitchell also points out that people who never received an unlawful call might fall within the class definition. But the only possible way this could harm the Class would be if their *pro rata* share is diminished because people who did not receive calls nevertheless submit claims. Recognizing that potential issue, the Parties were careful to craft the Claim Form in such a way that Class Members cannot recover unless they *attest under penalty of perjury* that they received a Telephone Call from Nationstar. As the *Mullins* court correctly recognized, it is unlikely that many (if any) individuals would be willing to sign false affidavits before a federal court in order to obtain recovery in a class action. 795 F.3d at 667; *see also* 18 U.S.C. § 1621 (providing for a penalty of up to five years' imprisonment for perjury). Simply put, "the risk of dilution based on fraudulent or mistaken claims seems low, perhaps to the point of being negligible." *Mullins*, 795 F.3d at 667; *see also id.* at 669 (noting that the only "type of case in American law where the testimony of one witness is legally insufficient to prove a fact" is a prosecution for treason). Thus, the very slight possibility that someone would perjure themselves and risk criminal prosecution to get a share of this Settlement Fund does not render the Settlement Class uncertifiable.

The class definition is therefore sound and in line with Seventh Circuit precedent, and Mitchell's objection does not pose any barrier to approving the Settlement.

5.   *Objectors' Opposition to the Amount of Class Members' Recovery Is Baseless, as the Settlement Provides Excellent Relief.*

Mitchell and the Youngbloods also argue that the Settlement provides insufficient relief to Class Members. Even though Plaintiffs have explained in significant detail—in their Preliminary Approval Motion, Fee Petition, and now here (*see* Section V.A, *supra*)—how they valued the case and why the Parties ultimately came to the Fund amount they did, these objectors seek to substitute that analysis with blanket assertions about the TCPA's damages provisions and

their own subjective beliefs about what an appropriate settlement amount should be.[16] However, the reality is (as described above) that the instant Settlement and the monetary relief available to each claiming Settlement Class Member (to say nothing of the prospective relief) is greater than the relief provided to individual class members in other similar TCPA settlements involving debt collection (and more traditional telemarketing) phone calls. *See, e.g.*, *In re Capital One*, 80 F. Supp. 3d at 787 (finally approving settlement that provided for cash payment of $34.60 to each claiming class member); *Arthur*, 2012 WL 90101, at *3 (providing between $20 and $40 per claiming class member); *Kazemi*, No. 3:09-cv-05142, dkt. 94 (providing for a $25 voucher to each claiming class member); *In re Jiffy Lube*, No. 3:11-MD-02261, dkt. 97 (providing for a $20 voucher, which could be redeemed for $15 cash after expiration of nine month waiting period, to each claiming class member).[17]

### 6. The Incentive Awards to the Named Plaintiffs Are not Excessive.

Mitchell and the Youngbloods argue further that the proposed incentive awards to Plaintiffs as Class Representatives are excessive. Mitchell cites no legal authority at all, so she has waived her argument. (Dkt. 83 at 15); *see Useni*, 516 F.3d at 658. Similarly, most of the

---

[16]    Mitchell helpfully adds that compensating all of the class members fully would require a fund of $3 billion—more than double Nationstar's parent company's total market capitalization. *See* Nationstar Mortgage Holdings Inc., *Wall St. J.*, http://quotes.wsj.com/NSM (last visited Apr. 26, 2016). Even if the class were able to obtain a multi-billion dollar judgment, it would likely be suitable only for framing and in any event, that argument further bolsters the fairness and reasonableness of the Settlement here. *See In re Capital One*, 80 F. Supp. 3d at 790 (noting that a compromise is especially desirable where a complete victory would bankrupt the defendant).

[17]    The Youngbloods additionally argue that the relief obtained for the Class does not justify the scope of the release that the Class grants to Nationstar. They imply by creative abuse of ellipses that the Class releases *all* of their claims against Nationstar in any capacity. In fact, the release is limited to only claims "regarding the alleged making of Telephone Calls[.]" (Dkt. 56-1 ¶ 1.24.) This release results in the same *res judicata* effect as a trial, since the doctrine of issue preclusion would bar another suit arising out of the calls at issue in this case. *See Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984) (holding that "[b]asic principles of res judicata (merger and bar or claim preclusion) and collateral estoppel (issue preclusion) apply" in class actions). But of course, Class members who felt that they could obtain better relief under state law or otherwise were provided the opportunity to opt-out.

Youngbloods' arguments on this point also lack citation to authority and are waived as well. (Dkt. 82 at 4–5.) However, they do cite cases for two propositions: (i) that "[i]ncentive awards are appropriate if compensation would be necessary to induce an individual to become a named plaintiff in the suit[,]" and (ii) that "a lead plaintiff's participation must still justify the award request." (*Id.* at 4.) Both of these statements, while accurate, *see, e.g.*, *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998), actually support, rather than militate against, granting the requested incentive awards here.

That is, where a named plaintiff "attach[es] his name to [the] litigation[,] … participate[s] in pre-filing investigation and informal and formal discovery…work[s] with class counsel, approv[es] the settlement agreement and fee application, and volunteer[s] to play an active role if the parties continued litigating through trial," then a $5,000 incentive award is appropriate, even if it is more than claiming class members recover. *Kolinek*, 311 F.R.D. at 503. That's what the named Plaintiffs did in this case, (*see* Balabanian Decl. ¶ 15), and $5,000 incentive awards are therefore reasonable.

> 7. *Objections to the Requested Attorneys' Fees Have no Basis in Law or Fact.*

Next, all three of the professional objections question whether Class Counsel are entitled to fees and, if so, whether the fee request here is appropriate. (Dkts. 80, 82, 83.) The objections primarily ignore the Seventh Circuit's applicable market-rate analysis for determining reasonable attorneys' fees in common fund cases such as this, and suggest instead that a lodestar analysis is required. Similarly, each objector insists that the Court perform at least a lodestar "cross-check" to determine the reasonableness of fees. There is no authority to support either argument, and the objections with regard to Class Counsel's fees should be overruled as well.

> (a) *The market rate analysis here involves calculating a percentage of the common fund.*

In common fund settlements such as this, the Seventh Circuit has "consistently directed district courts to 'do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007) (quoting *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) (hereinafter "*Synthroid I*")); *see also Synthroid I*, 264 F.3d at 719 (cautioning that "any method other than looking to prevailing market rates assures random and potentially perverse results"). Most recently, the Honorable James F. Holderman (ret.) performed an extensive analysis using data compiled from seventy-one post-2010 TCPA class action settlements to determine the appropriate market rate for the award of attorneys' fees. *In re Capital One*, 80 F. Supp. 3d at 797. This analysis showed that "the market rate in a typical TCPA class action [is] a sliding-scale fee," that is calculated based on a percentage of the common fund recovery achieved for the benefit of the settlement class. *Craftwood Lumber Co. v. Interline Brands*, No. 11-cv-4462, 2015 WL 2147679, at *4 (N.D. Ill. May 6, 2015); s*ee also In re Synthroid Mktg. Litig.*, 235 F.3d 974, 975 (7th Cir. 2003) (hereinafter "*Synthroid II*") (providing class counsel 30% of the first $10 million of recovery in a common fund case that then decreases because the market rate percentage of recovery "likely falls as the stakes increase").

The market rate (or sliding scale) for the award of fees in TCPA class actions, prior to accounting for the risks associated with a particular case, is as follows:

| Recovery | Fee Percentage |
| --- | --- |
| First $10 million | 30% |
| $10 – 20 million | 25% |
| $20 - 45 million | 20% |
| Excess above $45 million | 15% |

*In re Capital One*, 80 F. Supp. 3d at 804 n.13; *see also Kolinek*, 311 F.R.D. at 502 (applying the 30% market rate to a TCPA settlement); *Wilkins,* 2015 WL 890566, at *1 (applying the 30% market rate fee recovery to the first $10 million of a TCPA class action settlement, which then decreased on a sliding scale); *Craftwood Lumber*, 2015 WL 2147679, at *4–5 (same).

From there, the analysis turns to the risk of non-payment that class counsel faced when they decided to take on the action. *In re Capital One*, 80 F. Supp. 3d at 803; *see also In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 746 (7th Cir. 2011) (same). A risk premium is warranted because "[t]he greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel." *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013). To illustrate this effect of risk on an attorney's willingness to undertake the litigation, "if the market-determined fee for a sure winner were $1 million the market-determined fee for handling a similar suit with only a 50 percent chance of a favorable outcome should be $2 million." *In re Trans Union*, 629 F.3d at 746. Ultimately, "a higher risk of loss does argue for a higher fee." *Id.* In fact, in his analysis Judge Holderman held that even just a small amount of risk merited a 6% increase from the base market fee, meaning that class counsel could recover 36% of the first $10 million—instead of 30%—of the common fund benefit to a class. *In re Capital One*, 80 F. Supp. 3d at 807 (citing Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: 1993–2008*, 7 J. Empirical Legal Studies 248, 265 (Tab. 8) (2010)); *see also Kolinek*, 311 F.R.D. at 502–03 (awarding 6% risk premium for total fee award of 36% of settlement fund); *Grant v. Commonwealth Edison Co.*, No. 13-cv-08310, dkts. 61, 68 (N.D. Ill. Sept. 11, 2015) (same).

The objectors entirely ignore this precedent, and instead cite cases that have little to nothing to do with the settlement at issue here. To start, objector Mitchell relies heavily on Judge

Davila's analysis in *Rose v. Bank of America,* Nos. 11-cv-02390, 12-cv-04009, 2014 WL 4273358 (N.D. Cal. Aug. 29, 2014), to suggest that the results achieved in this case are unremarkable and therefore, require the Court to award attorneys' fees far less than the market would otherwise suggest. (Dkt. 83 at 10–11.) Setting aside that she entirely fails to address controlling Seventh Circuit precedent, there are a number of issues with this approach. For one, *Rose* was decided in the Northern District of California and thus is not controlling in this Court. Second, any reliance on the percentage of the fund awarded there is inapposite given that, unlike in this Circuit, the benchmark attorneys' fee award in consumer class actions in the Ninth Circuit is 25%. (The same is true for several of the other cases the Mitchell objection references.)[18] Finally several objectors, including one represented by Mitchell's counsel, made the same objection just months ago in *Kolinek*, where the court squarely rejected it. 311 F.R.D. at 501–03.

Objector Pentz, too, mischaracterizes authority, arguing that *Gehrich*, 2016 WL 806549, at *16, supports "a downward adjustment to the percentage for the first $10 million of recovery." (Dkt. 80 at 2.) The *Gehrich* court said no such thing, and in fact awarded 30% of the first $10 million, finding that a risk multiplier was not required for such a large settlement (triple the size of the fund in this case). The rest of Pentz's argument—to the degree that it is supported by any authority at all—depends almost solely on an expert report prepared by University of Chicago Professor M. Todd Henderson and filed in *In re Capital One*. (Dkt. 80 at 4-5.) However, Professor Henderson's report was tailored specifically to that case, and neither his report, nor Objector Pentz in his use of it, accounts for Judge Holderman's exhaustive analysis, or its subsequent endorsement by several courts in this District. *See In re Capital One*, 80 F. Supp. 3d

---

[18]    Mitchell also relies on *In re Southwest Airlines Voucher Litig.*, 799 F.3d 701, 706-08 (7th Cir. 2015), a case so inapposite that it hardly needs to be addressed. (*See* dkt. 83 at 12.) The entire discussion about attorneys' fees in that case revolves around 27 U.S.C. § 1712, which relates to coupon settlements. Class members here will receive cash not coupons.

at 808 ("Unfortunately for Professor Henderson, his model is not among the methods accepted by the Seventh Circuit."); *see also Kolinek*, 311 F.R.D. at 500–03.

The Youngbloods, for their part, insist that "free market rates are not applicable" in a class action, a position directly at odds with Seventh Circuit law, which requires courts to undertake a market analysis. *See Sutton*, 504 F.3d at 692. They also cite *Americana Art China, Co., Inc. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014), for the proposition that "[i]f less than 10% of the class submits a valid claim form, the Court should apply a lodestar analysis and award a fee accordingly." (Dkt 82 at 6.) But in that case, most of the settlement "fund" reverted to the defendant if it wasn't claimed. *Americana*, 743 F.3d at 245. Here, by contrast, no portion of the $12.1 million fund will go back to Nationstar, meaning that the rationale in *Americana* simply does not apply.[19]

> *(b)*     *Objections to the amount of work performed by Class Counsel cite no valid authority and misunderstand the posture of the case.*

In addition to taking issue with the fee calculation method, Mitchell and Pentz also argue that the work performed by Class Counsel is insufficient to justify Plaintiffs' fee request. (Dkt. 80 at 4-7; dkt. 83 at 13-15.) Class Counsel has already explained in their fee brief the substantial amount of work they have done to secure an excellent result for the class. (*See* Dkt. 72-1 at 10–12, 23–24.) The objectors' arguments ignore that explanation, failing to recognize the months of motion practice and discovery that took place before the five separate lawsuits against Nationstar were re-filed in a consolidated form in this Court. (*See* dkt. 80 at 3; dkt. 83 at 13–14.)

---

[19]     All three objectors also contend that there is no basis for a risk adjustment in this case, but none of them cite any legal authority—not a single case—in support of that position. (*See* Dkt. 80 at 3-4; dkt 82 at 5-6; dkt. 83 at 13.) And again, this case is at least equally as risky as *In re Capital One* and similar cases, where again, Judge Holderman and numerous other courts have held that a 6% risk enhancement was warranted. *See, e.g., Capital One*, 80 F. Supp. 3d at 806 (awarding 6% risk premium to the first $10 million of settlement fund); *Kolinek*, 311 F.R.D. at 502–03 (same); *Grant*, No. 13-cv-08310, dkts. 61, 68 (same).

Worse, they largely substantiate their objections based on their (or their attorneys') personal views as to how Class Counsel should be paid. Pentz's argument entirely depends on the premise that Class Counsel should be paid by their lodestar, which is not the law in the Seventh Circuit. *See In re Capital One*, 80 F. Supp. 3d at 808 (noting that the model proposed by Professor Henderson "is not among the methods accepted by the Seventh Circuit"). Mitchell again cites no legal authority at all, and she further ignores the months of work that Class Counsel did on this case before the single action was filed in this Court. (Dkt. 83 at 13–15.) A market analysis—not objectors' policy proposals and unsubstantiated opinions on Class Counsel's work—must be the basis for the fee award.

### (c)     No lodestar cross check is required.

In addition to the baseless position that fees must be limited to Class Counsel's lodestar, each objector also demands that Class Counsel disclose their detailed billing records and contends that a lodestar cross-check is required before any attorneys' fees can be awarded. (*See* dkt 80 at 4–6; dkt 82. at 5–6; dkt. 83 at 11–12, 14.) Pentz even goes so far as to say, *ipse dixit*, that it is "Class Counsel's *burden* to . . . put[] in detailed records of their lodestar[.]" (Dkt. 80 at 4) (emphasis added). They are entirely mistaken.

"[N]o Seventh Circuit case law suggests that a percentage-of-the-fund approach will yield a reasonable result only where it satisfies a lodestar cross-check." *Kolinek*, 311 F.R.D. at 500. While the Court has the discretion to award attorneys' fees through a lodestar calculation if it so chooses, the market conclusively establishes that the percentage of the fund method is the near-exclusive means—and certainly the norm—for determining fees in a TCPA common fund case. *See Americana*, 743 F.3d at 247. Resort to lodestar is typically only appropriate where a settlement has a very low number of claims (which is not the case here) and any remaining funds

43

revert to the defendant (also not the case), thus resulting in the court believing the benefit actually conferred to the class is too low to justify use of a percentage. *Id.* Moreover, the Court need only apply one method of determining fees. *Cook*, 142 F.3d at 1013 ("[W]e have never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach.").

In sum, the percentage of the fund method best estimates the market rate, no authority supports requiring a lodestar cross-check, and the Plaintiffs' fee request is in line with the market for TCPA common fund settlements approved in the Seventh Circuit.

8. *The Pentz, Youngblood, and Mitchell Objections Were All Filed in Bad Faith by Professional Objectors as an Attempt to Extort a Fee Payment from Class Counsel, not to Provide a Benefit to the Class.*

Finally, the Court should also consider the source of the objections at issue. All of the objections were prepared by and on behalf of "professional" or "serial" objectors who (as alluded to above) each have long histories of raising similar, ultimately unavailing or improper objections to class action settlements. Professional objectors "levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors." *Barnes*, 2006 WL 6916834, at *1. *See also* John E. Loptaka & D. Brooks Smith, *Class Action Professional Objectors: What to Do About Them?*, 39 Fla. St. U.L. Rev. 865, 929 (2012) ("The business of professional objectors is to make insubstantial objections to class settlements on behalf of nonnamed class members, then threaten to appeal the judgment approving the settlement unless paid to desist. The business is extortion, and it is profitable because class counsel have a powerful incentive to avoid the costs that an appeal would impose.").

The modus operandi for professional objectors is easy to spot: (1) wait until the very last minute of the objection deadline; (2) file an objection that adds nothing to the court's analysis;

(3) on behalf of a client they can control (often a family member, friend, or colleague); and finally (4) file a frivolous appeal in the hopes that they can extract a payment of attorneys' fees in exchange for not delaying the class's relief. In other words, it's nothing more than an attempt to use the federal judiciary to run a protection racket. *See Vollmer*, 350 F.3d at 660. ("Extortion is the act or practice of obtaining something or compelling some action by illegal means, as by force or coercion. In the context of intervening in a class action settlement, extortion would mean intervening not to increase the value of the settlement, but in order to get paid to go away.").

Although Plaintiffs have not yet taken discovery from the objectors, the form of the objections and the actions of their counsel already strongly suggest that the objections were filed for the sole purpose of extorting a payment of attorneys' fees.[20] To start, the *Barnes* court's strong statement was, in fact, directed at counsel for one of the objectors in this case: Connie Pentz, who is represented by her son John Pentz. *See Barnes*, 2006 WL 6916834, at *1. Mr. Pentz has spent more than a decade filing frivolous, boilerplate objections to class action settlements in the hopes of extorting a payout in the appellate court. *See, e.g.*, *id.*; *In re Wal-Mart Wage & Hour Employment Practices Litig.*, No. 2:06CV00225-PMPPAL, 2010 WL 786513, at *2 (D. Nev. Mar. 8, 2010) (finding Mr. Pentz's appeal "frivolous" and requiring his clients to post a million dollars in bonds); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 497 n. 219 (S.D.N.Y. 2009) (collecting cases where Mr. Pentz has been "criticized by courts for his canned objections"); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 386 (D. Md. 2006) (referring to Mr. Pentz as a "professional and generally unsuccessful objector"); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, No. MDL 1361, 2003 WL 22417252, at *2 n.3 (D. Me. Oct. 7, 2003) (noting that Mr. Pentz "appears to be a repeat objector" and

---

[20]     Plaintiffs' Motion for Leave to Conduct Limited Discovery, (dkt. 99), contains a more detailed discussion of the attorneys representing the objectors and their conduct during this and other litigation.

requiring his wife to post an appeal bond). Mr. Pentz has also shown a persistent disregard for the rules of this Court, filing his mother's objection without being admitted to practice law in this District and missing the Court's deadline to respond to Plaintiffs' opposition to his *pro hac vice* motion. (*See* dkts. 90, 92, 98, 100.)

Objector Mitchell, too, is represented by a family member. In this case, it's her brother-in-law, serial objector W. Allen McDonald. Although McDonald's history is not as long as Mr. Pentz's, it is equally problematic. For example, a Florida district court was "troubled" by McDonald's offer to withdraw his sister's (and client's) appeal "in exchange for a payment of $150,000," which "suggests that [McDonald's sister's] objections are tied to her ability to garner a windfall for herself rather than ensuring an adequate settlement for the class." *In re Enfamil*, 2012 WL 1189763, at *4. And just months ago, after Judge Kennelly overruled all of McDonald's objections to another class action settlement, McDonald filed a notice of appeal that was dropped before any briefing occurred. *See Kolinek v. Walgreen Co.*, No. 13-cv-4806, dkts. 210, 238 (N.D. Ill. Feb. 1, 2016).

Brent Vullings, counsel for the Youngblood objectors, has a similar history of meritless objections to class action settlements. *See, e.g.*, Transcript of Fairness Hearing, *Chaudhri v. Osram Sylvania, Inc.*, No. 11-cv-05504, dkt. 104-2 at 5, 22–23 (D.N.J. March 20, 2015) (finding that Vullings has appeared as an objector in a class action settlement before, that he had acted in "complete disregard for our local rules and our rules of procedure," and that his client's objection was "without merit") In addition, he has refused to discuss the Youngbloods' objection with Class Counsel, repeatedly failing to return telephone calls and emails.[21] (*See* dkt. 99 at 8.) A

---

[21]    It appears that Vullings is no stranger to such dilatory conduct. District courts and appellate courts have issued many show cause orders against him and his clients for untimely filings and failure to prosecute cases. *See, e.g.*, *Kolinek v. Walgreen Co.*, No. 15-3757, dkt. 5 (7th Cir. Dec. 23, 2015) (rule to show cause for failure to file docketing statement); *Williams v. Equifax Info. Servs., LLC*, No. 1:14-cv-

good-faith objector's counsel would presumably be eager to speak to class counsel and discuss changes to the settlement that could assuage the objector's concerns. Vullings has displayed no interest in such a resolution.

At bottom, all three objectors here lodge generic, unsupported protests against the settlement that are entirely meritless. Further, all are represented by counsel known to be professional objectors, who do not seek to improve the settlement, but merely to profit by delaying the resolution of this case. The Court should overrule their objections.

## VI.    CONCLUSION

For the reasons addressed above, Plaintiffs respectfully request that the Court finally approve the Settlement as fair and reasonable.

<div style="margin-left: 40%;">

Respectfully submitted,

**HEATHER WRIGHT, CAROLE STEWART, JEANETTE CHILDRESS, ROBERT JORDAN, SEAN HALBERT, DANA SKELTON, VANESSA RUGGLES** and **ROSE SOMERS**, on behalf of all others similarly situated,

</div>

Dated: April 26, 2016            By: /s/ Rafey S. Balabanian
                                      One of Plaintiffs' Attorneys

<div style="margin-left: 40%;">

Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com

</div>

---

08115, dkt. 27 (D.N.J. Oct. 19, 2015) (show cause order for failure to file opposition to summary judgment motion); *Moore v. Penncro Associates*, No. 2:08-cv-02956, dkt. 29 (E.D. Pa. Sept. 20, 2010) (ordering Vullings to show cause why he should not be held in contempt for failure to file a status report); *Brandenburg v. Alliant Capital Management, LLC*, No. 15-cv-381, dkt. 3 (W.D.N.Y. Feb. 8, 2016) (show cause order against Vullings for failure to prosecute); *Harrison v. National Recovery Solutions, LLC*, No. 15-cv-253, dkt. 4 (W.D.N.Y. Feb. 8, 2016) (same); *Lee v. Dynamic Recovery Solutions, LLC*, No. 6:15-cv-06090, dkt. 4 (W.D.N.Y. Oct. 7, 2015) (same); *see also Olin v. M.R.S. Associates, Inc.*, No. CIV. 10-1380 NLH/KMW, 2014 WL 631647, at *1 (D.N.J. Feb. 14, 2014) (reducing Vullings's fee request by 25% for filing petition three months late).

J. Dominick Larry
nlarry@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Paul O. Paradis (Admitted *pro hac vice*)
Gina M. Tufaro (Admitted *pro hac vice*)
PARADIS LAW GROUP, PLLC
570 Seventh Avenue, 20th Floor
New York, NY 10018
Tel: 212.986.4500
Fax: 212.986.4501

Jack Landskroner (Admitted *pro hac vice*)
LANDSKRONER GRIECO MERRIMAN LLC
1360 West 9th Street, Suite 200
Cleveland, Ohio 44113
Tel: 216.522.9000
Fax: 216.522.9007

Brant C. Martin (Admitted *pro hac vice*)
WICK PHILLIPS GOULD & MARTIN, LLP
100 Throckmorton Street, Suite 500
Fort Worth, Texas 76102
Tel: 817.332.7788
Fax: 817.332.7789

Michael P. Sousa (Admitted *pro hac vice*)
sousam@sbcglobal.net
LAW OFFICES OF MICHAEL P. SOUSA, APC
3232 Governor Dr., Suite A
San Diego, CA 92122
Tel: 858.453.6122, ext. 15

Douglas J. Campion (Admitted *pro hac vice*)
doug@djcampion.com
Law Offices of Douglas J. Campion, APC
17150 Via Del Campo, Suite 1000
San Diego, CA 92127
Tel: 619.299.2901
Fax: 619.858.0034