UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HEATHER WRIGHT, *et al*., individually, | ) | |
| and on behalf of all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 14 C 10457 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| NATIONSTAR MORTGAGE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Heather Wright, Carole Stewart, Jeanette Childress, Robert Jordan, Sean Halbert, Dana Skelton, Vanessa Ruggles, and Rose Somers[1] filed this class action in December 2014, alleging that Nationstar Mortgage LLC called them and other class members in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.*[2] In October 2015, the Plaintiffs moved for preliminary approval of a settlement; the Court granted the motion and appointed a Settlement Administrator to notify the settlement class and process claims. The deadline for responding to the settlement notice passed in April 2016, and the Plaintiffs now move for final approval of the Settlement Agreement, attorneys' fees and expenses, and incentive awards for each of the eight class representatives. For the reasons explained below, the motion for fees is granted in part and denied in part. The Court approves a $5,000 incentive award for each class representative but reduces the attorneys' fees

---

[1]Ten named plaintiffs originally filed this class action, but two (Michael Doyle and Roger Reed) are no longer part of the litigation.

[2]The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331.

from 36% to 30% of the common fund, net of fees and expenses. The Settlement Agreement is adjusted to reflect the fee change, but is otherwise approved in its entirety.

## I. Background

Nationstar is a mortgage lender and servicer. R. 15, Am. Compl. ¶¶ 1, 24.[3] This means that in addition to making its own loans, Nationstar also handles the day-to-day tasks of managing loans for other lenders by sending bills, collecting and processing payments, managing escrow, and foreclosing. *Id.* ¶ 24. The Plaintiffs allege that they received prerecorded debt collection calls from Nationstar despite giving neither Nationstar nor third party lenders any consent to call. *Id.* ¶¶ 2, 4, 25, 39. In making the calls, Nationstar allegedly used an "automatic telephone dialing system." *Id.* ¶¶ 4, 28-32, 39. Commonly referred to as an autodialer, this system "has the capacity to generate and store random numbers, or receive and store lists of telephone numbers, and to dial those numbers, en masse, in an automated fashion without human intervention." *Id.* ¶ 28. These calls allegedly violated the TCPA, which makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A); Am. Compl. ¶¶ 4, 20, 28. Among other relief, the Plaintiffs sought

---

[3]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

statutory damages and an injunction on behalf of themselves and members of the proposed class. *Id.* at 27-28.

The Plaintiffs' lawsuit was one of five proposed TCPA class actions filed against Nationstar around the country. R. 107, Balabanian Decl. (Final Approval) ¶ 3. The parties in these separate cases ultimately coordinated efforts, filed an amended complaint in this consolidated action, and moved for class certification. *Id.* ¶¶ 7-8; R. 15; R. 17. The Court entered and continued the class-certification motion pending discovery and appointed Edelson PC and the Paradis Law Group as interim co-lead class counsel. R. 21. Shortly after, the parties began settlement talks and went to mediation twice. Balabanian Decl. (Final Approval) ¶ 10. Discovery proceeded throughout mediation, *id.* ¶ 14; R. 35, 4/27/15 Minute Entry, and paused when the parties informed the Court of a potential settlement, R. 38, 6/24/15 Minute Entry. After further negotiations, the parties presented an agreement to this Court for preliminary approval in October 2015. Balabanian Decl. (Final Approval) ¶ 13; R. 51, Pls.' Mot. for Preliminary Approval.

The Court preliminarily approved the settlement and certified the settlement class, which was defined as "[a]ll persons in the United States for whom Nationstar Mortgage, LLC had in its records a cellular telephone number as of the date of this Order [October 14, 2015]." R. 60, Preliminary Approval Order ¶ 3. Epiq Systems, Inc. was appointed as Settlement Administrator to notify the class and process responses. *Id.* ¶ 7. To carry out notice, Nationstar gave Epiq names and contact information for 3,160,291 potential class members. R. 107-1, Exh. 1, Bithell Decl. ¶

5. After updating addresses, removing duplicates, and eliminating incomplete records, Epiq sent postcard notices to 2,343,988 addresses. *Id.* ¶¶ 7-8. 28,045 postcards were undeliverable, which means that there was no forwarding address with the post office and no updated address on Lexis Nexis. *Id.* ¶ 9. In total, the postcard notices reached 98.8% of the settlement class. *Id.* ¶ 10.[4]

The postcard notices directed settlement class members to a settlement website (https://www.automatedphonecallsettlement.com/) where class members could submit claims, read the Settlement Agreement, and find additional information about the litigation. Bithell Decl. ¶ 12; R. 67-5, Exh. 4, Proposed Postcard Notice; R. 68, 1/27/16 Minute Entry (approving proposed postcard notice). The notice also directed class members to a toll-free number to ask questions, request a claim form to submit through regular mail, and learn more about the settlement. Bithell Decl. ¶ 11. Each class member who submitted a claim form in writing or though the website had to affirm that she "[was] the subscriber or primary user of the cellular telephone number(s) listed above and that [she] received one or more non-emergency automated or artificial or prerecorded voice calls from Nationstar … ." R. 67-3, Exh. 2, Proposed Claim Form; 1/27/16 Minute Entry (approving proposed claim form). The class could also submit a revocation request (to stop receiving calls from Nationstar) on the website, by mail, or by calling the toll-free number. Preliminary Approval Order ¶ 9. Class members could also mail a written request for exclusion to opt out of the settlement class. *Id.* ¶ 11. All opt-out requests had to be signed and include the individual's name, address,

---

[4]The declaration states 98.9%, Bithell Decl. ¶ 10, but the figure is actually 98.8%.

telephone number, case caption, and a statement that the individual is a class member wishing to opt-out. *Id.* In January, the Court extended the notice deadline to February 2016, and the deadline for exclusions, objections, and claim submissions to April 2016. 1/27/16 Minute Entry. Epiq had processed 82 requests for exclusion[5] from the settlement class as of August 1, 2016 and 147,476 validated claim forms as of April 4, 2016. Bithell Decl. ¶¶ 13-15. Six objections have been filed (on behalf of seven individuals), R. 69, 79, 80, 82, 83, 93, one of which has been withdrawn, R. 79, 86.

In April 2016, the Plaintiffs moved for final approval of the Settlement Agreement, R. 103, and for attorneys' fees, R. 70. The final Settlement Agreement provides for a $12.1 million fund. R. 107-2, Final Settlement Agreement ¶ 1.32. Each settlement class member with an approved claim[6] will receive a pro rata share of the fund after administration expenses, incentive awards, and attorneys' fees have been deducted. *Id.* ¶ 2.1(b). The Plaintiffs have requested a $5,000 incentive award for each of the eight class representatives, *id.* ¶ 8.3, and $3,690,000 in attorneys' fees, R. 116, Pls.' Fee Br. If the Settlement Agreement and fees are approved, the Plaintiffs estimate that each settlement class member with an

---

[5]At the time of the briefing, Epiq had only processed 74 valid requests for exclusion. Bithel Decl. ¶ 13. But the Plaintiffs' counsel updated the Court with new figures when it submitted a draft of its proposed order. That updated list is included with the Final Judgment Order filed separately to this Opinion.

[6]An "approved claim" means a settlement class member who has filed a claim form "that is (a) submitted timely and in accordance with the directions on the Claim Form and the provisions of the Settlement Agreement, (b) fully and truthfully completed and executed, with all of the information requested in the Claim Form, and (c) signed by the Settlement Class Member, physically or electronically, affirming that the Settlement Class Member received one or more Telephone Calls on his or her cell phone without his or her prior express consent." Final Settlement Agreement ¶ 1.2.

approved claim will receive around $45. R. 117, Pls.' Final Approval Br. at 10 n.10. Any remaining unclaimed funds or uncashed checks will be further distributed to the settlement class members. Final Settlement Agreement ¶ 2.1(e). In return, Nationstar will receive a full release of claims by settlement class members (that is, those who have not opted out, *id.* ¶ 1.31) for calls made by Nationstar (or any third party acting on its behalf) using an autodialer or prerecorded voice, *id.* ¶ 1.33.

## II. Analysis

### A. Settlement Class Certification

Before turning to the substance of the Settlement Agreement, the Court must certify the class for settlement purposes. *See* Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a *certified* class may be settled, voluntarily dismissed, or compromised only with the court's approval." (emphasis added)); Fed. R. Civ. P. 23(h) ("In a *certified* class action, the court may award reasonable attorney's fees and nontaxable costs … ." (emphasis added)).

A certified class must meet all the requirements of Rule 23(a): "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). If Rule 23(a) is satisfied, then the next question is whether the class falls into one of three categories under Rule 23(b). The pertinent category here is a damages action, where certification is appropriate if "the questions of law or fact common to

6

class members *predominate* over any questions affecting only individual members, and … a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3) (emphases added). Four factors relevant to predominance and superiority are "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

"Failure to meet any of the Rule's requirements precludes class certification." *Harper v. Sheriff of Cook Cnty.*, 581 F.3d 511, 513 (7th Cir. 2009) (quoting *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008)) (quotation marks omitted). In the context of certifying classes for settlement purposes only, the Supreme Court has held that certification must meet the usual requirements of Rule 23(a) and (b), *except for* the manageability prong of Rule 23(b)(3)(D). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619-20 (1997). Rule 23(a) and (b), which "focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives," are concerns at settlement just as they are at trial, *id.* at 621, but "a district court need not inquire whether the case, if tried, would present intractable management problems," *id.* at 620. The Court preliminarily certified the Settlement Agreement in October 2015. R. 59-60.

After considering Rule 23(a) and (b) again at the final approval stage, it now reaffirms that certification, as explained next.

### 1. Rule 23(a)

### i. Ascertainabilty

A threshold requirement of Rule 23(a) is ascertainability—whether a class is identifiable and definite. *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006) (citations omitted). This requirement is "implied in Rule 23(a)." *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977) (citations omitted); *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 495 (7th Cir. 2012) (definiteness means whether there is "[a] way to know or readily ascertain who is a member of the class" (citation omitted)). Indeed, each of the Rule 23(a) prerequisites for class-action certification refers to a "class," and thus each prerequisite cannot be evaluated if the class itself is not ascertainable. *See* Fed. R. Civ. P. 23(a)(1) (numerosity of the "class"), (a)(2) (law or fact questions common to the "class"), (a)(3) (typicality of the named plaintiff's claims or defenses compared to those of the "class"), (a)(4) (adequacy of the proposed class representatives to protect the interests of the "class"). There are three purposes of the ascertainability requirement: first, it prevents vagueness, which "is a problem because a court needs to be able to identify who will receive notice, who will share in any recovery, and who will be bound by a judgment." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660 (7th Cir. 2015) (citation omitted). So the class definition must "identify a particular group, harmed during a particular time frame, in a particular location, in a

8

particular way." *Id.* (citation omitted). Next, ascertainability requires that the class is defined by objective, rather than subjective criteria, or "in terms of conduct … rather than a state of mind." *Id.* (citation omitted). Finally, a class should not be "defined in terms of successes on the merits," where "a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Id.* (citation and quotation marks omitted). Defining a class this way "raises an obvious fairness problem for the defendant," who "is forced to defend against the class, but if a plaintiff loses, she drops out and can subject the defendant to another round of litigation" because she is not bound by the adverse judgment. *Id.* (citation omitted).

The settlement class here includes "all Persons in the United States for whom Nationstar Mortgage, LLC has in its records a cellular telephone number until the date that the Court enters an order preliminary approving the Settlement Agreement [October 14, 2015]." Final Settlement Agreement ¶ 1.30. This class definition meets all of the ascertainability concerns addressed by *Mullins*. It is not vague because it defines a particular group of individuals—those whose cell phone numbers are in Nationstar's database—who were harmed by receiving calls that violate the TCPA. Nor is the class "fail-safe" by being defined on the merits—for example, as individuals who received TCPA calls without their consent. The class is also objectively identifiable because "membership within it [can] be determined by application of precise, objective criteria." *Bridgeview Health Care Ctr. Ltd. v. Clark*, 2011 WL 4628744, at *2 (N.D. Ill. Sept. 30, 2011). Because members belong to the

class if they are on a list in Nationstar's records, it is possible to identify class members without any subjective criteria.

Mitchell, an objector, argues that the settlement class definition is "poorly defined" because "[c]lass members cannot make an independent determination as to whether they fit within it … [because] only Nationstar [] know[s] its scope." R. 83, Mitchell Objection at 5. In other words, the class members do not know whether they are in Nationstar's records. *Id.* But just because the phone numbers are in Nationstar's possession does not mean that determining class membership is a subjective inquiry that depends on Nationstar's state of mind. And as the Court explained during the final approval hearing, the ascertainability requirement does not require *class members themselves* to objectively know, without further information gathering, whether they are members of the class definition, but only that membership can be objectively determined in general. R. 128, 5/19/16 Fairness Hr'g Tr. at 32:2-14.

Mitchell also argues that the class definition is too broad because "persons who have never received a telephone call from Nationstar … logically fall within the definition of the Settlement Class." Mitchell Objection at 5; *see also* R. 125, Mitchell Objection Reply at 5-6. It is true that "[i]f … a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012) (citation omitted). But "determinations [of

10

overbreadth] are a matter of degree, and will turn on the facts as they appear from case to case." *Id.* at 825. Here, the class is not overbroad because it is likely that most of the phone numbers in Nationstar's records received a call. Nationstar explained that the majority of the numbers in its records were gathered from credit applications. 5/19/16 Fairness Hr'g Tr. 28:4-12 ("[B]ecause the number is in the system, we believe that there must have been a reason we got that number, and oftentimes, in the majority of cases, it will be through the credit application."). And the Plaintiffs allege that Nationstar routinely called customers for debt-collection purposes. Am. Compl. ¶¶ 25-26. They also allege that "[Nationstar's] records identify the exact date and time of each and every call made by Nationstar and whether the call was made by Nationstar's 'Avaya Proactive Contact' automated dialing system." *Id.* ¶ 32. So it is reasonable to believe that Nationstar entered a large number of phone numbers into its records for the purpose of making automated debt-collection calls, and did call many of these numbers. This definition is not so broad as to be unascertainable. *Cf. Oshana*, 472 F.3d at 509 (class of "[a]ll individuals who purchased … fountain Diet Coke in … Illinois" not ascertainable in action alleging that Coke tricked consumers about the ingredients of fountain Diet Coke). In addition, the Court explained during the fairness hearing that "the navigation that always has to occur in [defining a class] is to be objective enough to send notice to a class that is both ascertainable, but then will include those who have a meritorious case or claim." 5/19/16 Final Approval Tr. 32:6-9. The definition here—all individuals whose phone numbers were in Nationstar's records—is broad

enough to provide notice to all those with meritorious claims, but not so broad that it encompasses a significant number of individuals who did not receive a call, and thus could not suffer any TCPA violation.[7]

### ii. Numerosity

The Plaintiffs have demonstrated that their proposed class is sufficiently numerous for class treatment. To meet this requirement, a plaintiff must show that the proposed class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Because courts have held that 40 members generally suffice, the 2.3 million members in this class also meet numerosity. *E.g.*, *Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969) (a proposed class of 40 would be "a sufficiently large group to satisfy Rule 23(a)"); *CE Design Ltd. v. Cy's Crabhouse N., Inc.*, 259 F.R.D. 135, 140 (N.D. Ill. 2009) (numerosity met in TCPA class action because "[t]he joinder of potentially thousands of plaintiffs—or even hundreds of them—would be impracticable" (citation omitted)); *Oplchenski v. Parfums Givenchy, Inc.*, 254 F.R.D. 489, 495 (N.D. Ill. 2008) ("Generally, where class members number at least 40, joinder is considered impracticable and numerosity is satisfied." (citation omitted)).

### iii. Commonality

Next, Rule 23(a)(2) requires that "there are questions of law or fact common to the class." To establish commonality, class members must "have suffered the

---

[7]To the extent that Mitchell argues that the class definition permits those who did not suffer a TCPA violation to receive a payout, the claim form addresses this concern. To receive payment, a claimant must attest under penalty of perjury that she "received one or more non-emergency automated or artificial or prerecorded voice calls from Nationstar … ." Proposed Claim Form; 1/27/16 Minute Entry (approving proposed claim form).

same injury," which "does not mean merely that they have all suffered a violation of the same provision of law," but rather that the class members' "claims depend upon a common contention" that "is capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citations and quotation marks omitted). That, in turn, means "not [just] the raising of common questions—even in droves— but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (citation and quotation marks omitted) (emphasis in original); *see also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (commonality met because the claims "all derive from a single course of conduct by [defendant]: the marketing and packaging of [coffee]," so "the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members").

Commonality is met here, even under the heightened standards announced in *Wal-Mart*. Here, each class member suffered the same alleged TCPA injury from the same conduct—receiving an autodialed call from Nationstar without consenting to the call. Nationstar's defense—that class members consented to the calls—is a common question that can be resolved for the whole class. According to Nationstar, the majority of the class members' phone numbers came from credit applications with Nationstar or with third party lenders, and Nationstar believes that providing a phone number on a loan application is enough to constitute consent to be called. 5/19/16 Fairness Hr'g Tr. 28:4-12 ("[B]ecause the number is in the system, we believe that there must have been a reason we got that number, and oftentimes, in

the majority of cases, it will be through the credit application."). Thus, the legal question—whether providing a phone number on a credit application constitutes consent—is a common question that can be resolved for the majority of members at once. Another common question is whether Nationstar's dialing system is an autodialer within the meaning of the TCPA. The TCPA prohibits calls made by "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The Plaintiffs allege that all of Nationstar's calls were made using its Avaya phone system, Am. Compl. ¶¶ 30-32, so whether this system is an autodialer is also a common question for the whole class. Thus, class litigation "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350; *see also Kolinek*, 311 F.R.D. at 492-93 (common question of "whether, as a matter of law, providing a cellular telephone number for verification purposes constitutes prior express consent to receive prescription refill reminder calls"); *Hinman v. M & M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 807 (N.D. Ill. 2008) (common question of consent where "[defendant's] fax broadcasts were transmitted *en masse* based on the 'leads' list compiled several years earlier"); *Gehrich v. Chase Bank USA, N.A.*, — F.R.D. —, 2016 WL 806549, *4 (N.D. Ill. Mar. 2, 2016) (common question of consent in suit alleging that defendant sent automated debt-collection calls and texts).

### iv. Typicality

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (citation and quotation marks omitted). As discussed above, the success of the class's TCPA claims will hinge on questions of whether individuals consented to the calls because they provided their phone number on a credit application, and what constitutes an autodialer, and the claims of the eight class representatives depend on the same questions. Am. Compl. ¶¶ 41-113. Because the class representatives' claims "have the same essential characteristics as the claims of the class at large," *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 597 (7th Cir. 1993) (citation omitted), their claims are sufficiently typical.

### v. Adequacy

The last Rule 23(a) requirement assures that "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[A]dequacy of representation is composed of two parts: the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the class members." *Retired Chi. Police Ass'n*, 7 F.3d at 598 (citation and quotation marks omitted). To be an adequate representative, the class representatives must not have "antagonistic or conflicting

15

claims." *Id.*; *see also Spano v. The Boeing Co.*, 633 F.3d 574, 586-87 (7th Cir. 2011) ("[A]bsentee members of a class will not be bound by the final result if they were represented by someone who had a conflict of interest with them or who was otherwise inadequate."). In this case, the class representatives' claims are essentially identical to those of the proposed class members'. And there is no reason to doubt the competency and motives of class counsel. The adequacy requirement of Rule 23(a)(4) is satisfied.

## 2. Rule 23(b)(3)

In addition to meeting the Rule 23(a) requirements, the Plaintiffs must also show that "questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphases added). In assessing predominance and superiority, courts can consider "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

Although similar to commonality, "the predominance criterion is far more demanding." *Messner*, 669 F.3d at 814 (quoting *Amchem*, 521 U.S. at 623-24). The Court must compare the role of common issues of law and fact with the role of

16

individual issues, including whether the Court must examine individual transactions in adjudicating the claim. *Id.* at 815; *see also Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, 654 F.3d 728, 738 (7th Cir. 2011) (predominance not met "because the details of each customer's individual transactions would need to be examined to consider whether the claims for unjust enrichment or statutory deception were proven"). Here, the predominance requirement is met because the common legal questions described above—whether consent may be established from providing a phone number on a credit application, and whether Nationstar used an autodialer—"represent a significant aspect of [this] case and ... can be resolved for all members of [a] class in a single adjudication." *Messner*, 669 F.3d at 815 (citation omitted). For the same reason, litigating this case as a class action is superior than other methods, such as individual suits.

With regard to manageability: if this case had not settled, there indeed would have been significant manageability obstacles to class certification (the Court details the problems in a later section of the Opinion, *see infra* Section II.B.1). But the Supreme Court has explained that manageability need not be a consideration when certifying a class for settlement purposes. *Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D)."). Thus, those concerns do not affect the predominance analysis here. So because the requirements of Rule 23(a) and Rule 23(b)(3) are met, the class is certified for settlement purposes.

## B. Settlement Approval

Having certified the class for settlement, the Court turns next to evaluating the Settlement Agreement. Rule 23(e) requires courts to approve settlement agreements only after holding a hearing and determining that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Because courts do not benefit from a traditional adversarial presentation during settlement, and because "[t]he control of the class over its lawyers usually is attenuated, often to the point of nonexistence," *Eubank v. Pella Corp.*, 753 F.3d 718, 719 (7th Cir. 2014), courts must protect class members by "exercis[ing] the highest degree of vigilance in scrutinizing proposed settlements of class actions," *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (7th Cir. 2006) (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002)) (quotation marks omitted). Indeed, "[the Seventh Circuit] ha[s] gone so far as to characterize the court's role as akin to the high duty of care that the law requires of fiduciaries," *id.* at 652-53 (citation and quotation marks omitted), to ensure that the settlement does not just "enrich [the attorneys] [and] give scant reward to class members," *Thorogood v. Sears, Roebuck & Co.*, 627 F.3d 289, 293 (7th Cir. 2010). In evaluating fairness, courts consider: "the strength of plaintiffs' case compared to the amount of defendant's settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of

discovery completed at the time of settlement." *Synfuel*, 463 F.3d at 653 (quoting *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996)) (quotation marks omitted).

### 1. Strength of the Plaintiffs' Case Compared to Settlement

The first factor—strength of the plaintiffs' case compared to the defendant's settlement offer—is the most important, and courts should attempt to "quantify the net expected value of continued litigation to the class" by "estimating the range of possible outcomes and ascribing a probability to each point on the range." *Reynolds*, 288 F.3d at 285 (citation omitted). Although this is an imprecise exercise, courts should attempt a "ballpark valuation." *Id.* Further, "courts should not reject a settlement solely because it does not provide a complete victory to plaintiffs" because "[t]he essence of settlement is a compromise." *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) (quoting *Isby*, 75 F.3d at 1200; *Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985)) (quotation marks omitted). Even though class members receive less than they would if they prevail at trial, they "benefit by immediately resolving the litigation and receiving some measure of vindication for [their] position[s] while forgoing the opportunity to achieve an unmitigated victory." *Id.* (quoting *Hiram Walker*, 768 F.2d at 889) (quotation marks omitted); *Mars Steel Corp. v. Cont'l Ill. Nat. Bank & Trust Co. of Chicago*, 834 F.2d 677, 682 (7th Cir. 1987) (if class claims were worth $750 million, but there was a one percent chance of prevailing at trial where class would have to pay contingent fees of $10 million, then "the class would be better off settling for any amount greater than $7.4 million than taking its chances on a trial").

Here, the Plaintiffs estimate that each settlement class member with an approved claim will receive around $45; this is a pro rata share of the $12.1 million in settlement funds after administration fees, incentive awards, and attorneys' fees are deducted. Pls.' Final Approval Br. at 10 n.10. As some objectors point out, this figure is far below the TCPA's statutory damages of $500 for each negligent violation (and $1,500 for each willful violation), 47 U.S.C. § 227(b)(3), and also does not compensate class members on a per call basis. *See* R. 82, Youngblood Objection at 2-3; Mitchell Objection at 6-8. These objections are readily rejected. For one, "complete victory for Plaintiffs at $500 or $1,500 per class member," multiplied by the number of calls each class member received, "could bankrupt" Nationstar and would be near impossible for the Plaintiffs to collect and for Nationstar to pay. *Gehrich*, 2016 WL 806549, at *7 ("[A]ssuming … only one violation per class member … Chase would owe $16.1 billion, and $48.4 billion if the jury found that Chase's violations were knowing or willful. A $52.50 recovery in the hand is better than a $500 or $1,500 recovery that must be chased through the bankruptcy courts."). And the $45 recovery per claimant is also in line with other TCPA settlements. *E.g., id.* (approving $52.50 recovery); *In re Capital One*, 80 F. Supp. 3d at 790 (approving $34.60 recovery, which "does not seem so miniscule in light of the fact that class members did not suffer any actual damages beyond a few unpleasant phone calls"); *Kolinek*, 311 F.R.D. at 493-94 (approving $30 recovery); *Wilkins v. HSBC Bank Nev., N.A.*, 2015 WL 890566, at *7 (N.D. Ill. Feb. 27, 2015) (approving $93.22 recovery because "a settlement need not provide the plaintiffs a total victory,

20

especially where the plaintiffs have suffered no actual damages and total victory would threaten the defendant's ability to continue on as a viable entity"). More importantly, the recovery amount reflects a compromise—settlement class members "receive a payout without having suffered anything beyond a few unwanted calls …, they receive it (reasonably) quickly, and they receive it without the time, expense, and uncertainty of litigation." *Gehrich*, 2016 WL 806549, at *7. In return, Nationstar "buys peace and mitigates risk," *id.*, by reducing litigation costs and potential exposure, and by preventing settlement class members from asserting any related claims in the future, Final Settlement Agreement ¶¶ 1.24, 1.31, 3.1, 3.2.

The $45 recovery is also reasonable when considered in light of the concerns about the merits of the Plaintiffs' case, and the serious difficulties that they would have faced had they continued litigation—both at the class certification and merits stages. For example, the Plaintiffs would have had to overcome Nationstar's consent defense, because the TCPA only prohibits calls made without "the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A). *See* R. 30, Def.'s Answer at 43 (Nationstar asserting consent defense). Had litigation continued, Nationstar would have argued that the majority of class representatives consented to be called, because they provided their cell phone numbers on loan applications with Nationstar or with third-party lenders. 5/19/16 Fairness Hr'g Tr. 28:4-12 ("[B]ecause the number is in the system, we believe that there must have been a reason we got that number, and oftentimes, in the majority of cases, it will be through the credit application."). A number of rulings by the Federal

Communications Commission could have supported this defense. In 2008, the FCC addressed automated calls by debt collectors and "clarif[ied] that autodialed and prerecorded message calls to wireless numbers that are provided by the called party to a creditor in connection with an existing debt are permissible … ." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 568 (2008). More specifically, "the provision of a cell phone number to a creditor, *e.g.*, as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt." *Id.* at 564; *see also id.* at 564-65 ("[P]rior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed."). And in 2015, the FCC further explained that consent given as part of a credit application "is valid not only for calls made by the original creditor, but also for those made by a third party collector acting on behalf of that creditor." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 Am.*, 30 F.C.C. Rcd. 7961, 8028 (2015). Although there has been no definitive Seventh Circuit authority on the scope of this consent in the debt collection context,[8] the FCC rulings—which are binding on the district courts under the Hobbs Act, 28 U.S.C. § 2342(1)—are favorable for Nationstar. *E.g.*, *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 444 (7th Cir. 2010) (district court appropriately concluded that it lacked jurisdiction to consider validity of FCC ruling); *Toney v.*

---

[8]The Seventh Circuit referenced the 2008 FCC ruling in *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 643 (7th Cir. 2012), but was addressing the definition of a "called party."

*Quality Res., Inc.*, 75 F. Supp. 3d 727, 734 (N.D. Ill. 2014) (applying FCC definition of consent because "[u]nder the Hobbs Act, the court must apply a final FCC order if it governs the matter at issue"); *Thrasher-Lyon v. CCS Commercial, LLC*, 2012 WL 3835089, at *3 (N.D. Ill. Sept. 4, 2012) ("The Court acknowledges, and does not attempt to review or alter, the FCC's ruling that 'prior express consent' is provided when a debtor gives contact information to a creditor in the course of the transaction giving rise to the debt.").

Nationstar would also have argued that other class members who gave their cell phone numbers outside the loan application context also consented to the calls. A different FCC ruling, this one from 2002, explained that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary. Hence, telemarketers will not violate our rules by calling a number which was provided as one at which the called party wishes to be reached." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752 (1992). So Nationstar would have argued that a class member who provided her number in one context—say, to receive a fraud alert—would have consented in other contexts—such as to receive an advertising or debt-collection call. *See Greene v. DirecTv, Inc.*, 2010 WL 4628734, at *3 (N.D. Ill. Nov. 8, 2010) (plaintiff, who gave Equifax her phone number for a fraud alert, consented to an automated call made by defendant, a third party who received the phone number from Equifax).

This consent defense would have posed a serious obstacle to class certification, because the defense would have presented manageability concerns (remember, though, that unmanageability does not prevent the Court from certifying this settlement class, as explained above, *see supra* Section II.A.2; *Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D).").) Manageability, or "the likely difficulties in managing a class action," Fed. R. Civ. P. 23(b)(3)(D), can be problematic when there is a "significant number of individualized elements of proof." *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 495 (S.D. Ill. 1999) (manageability problem existed when plaintiffs, who alleged that defendants violated various tobacco statutes, would have to show liability under different state statutes and rebut different state defenses); *Zapka v. Coca-Cola Co.*, 2000 WL 1644539, at *4 (N.D. Ill. Oct. 27, 2000) (class was unmanageable "because of the multiple and different variables that would have to be proved as to each class member" where plaintiffs alleged violations of different consumer protection statutes). Manageability also requires an "on-the-ground assessment of whether the proposed efficiencies from a class action will outweigh the administrative problems and inefficiencies likely to ensue." *Hamilton v. O'Connor Chevrolet, Inc.*, 2006 WL 1697171, at *12 (N.D. Ill. June 12, 2006) (manageability not met when liability under Illinois Consumer Fraud Act "would require individualized assessments

along various factual axes—including the consideration of various putative oral representations and time-specific financing markets for any given buyer").

Here, had the case proceeded to trial, a factfinder might very well have been required to make individualized determinations about the context in which each class member gave her phone number to Nationstar, or to a third party, because not all phone numbers came from loan application forms. *See* Pls.' Final Approval Br. at 19 (explaining that class members may have provided their cell phone numbers in "other contexts" other than loan origination documents). And even for those class members who provided their phone numbers on credit applications, individualized inquiries probably would have been needed to determine each credit application's *scope* of consent. Because Nationstar is both a lender and mortgage servicer, Am. Compl. ¶¶ 1, 24, class members had loans with different lenders and signed different loan documents, potentially giving varying levels of consent. *See Kolinek v. Walgreen Co.*, 2014 WL 3056813, at *4 (N.D. Ill. July 7, 2014) ("[T]o the extent the FCC's orders establish a rule, it is that the scope of a consumer's consent depends on its context and the purpose for which it is given. Consent for one purpose does not equate to consent for all purposes."). As a result, the Court might have needed to certify different subclasses for each lender or each type of consent, making the case unwieldy (and even subclasses might not have taken care of the problem). *See In re Capital One*, 80 F. Supp. 3d at 791 (noting, in the final approval context, that "[i]dentifying consenting class members and the precise timing and nature of that consent would require Capital One to locate documents and analyze call recordings

for nearly all of the 17.5 million class members. These individual determinations do not always comport with Rule 23(b)(3)'s manageability requirement … ."); *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 107 (N.D. Ill. 2013) (predominance requirement problematic because "[the defendant] has introduced evidence that it elicited consent to call a large percentage of the potential class members on their cellphones," so "the Court would have to conduct a series of mini-trials to determine the population of the class and to determine liability"); *Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229, 237 (S.D. Ill. 2011) ("a myriad of individual inquiries will be necessary to arrive at a decision on the issue of liability, which renders this case unmanageable as a class action," because there is a "great[] likelihood … that the Casino's call list is not a list of homogeneously unconsenting recipients"); *G.M. Sign, Inc. v. Brink's Mfg. Co.*, 2011 WL 248511, at *8 (N.D. Ill. Jan. 25, 2011) (because defendant "introduced evidence that it elicited consent from every [fax] recipient," the court "would have to engage in a class-member-specific inquiry to determine whether each recipient did indeed give permission or have an established business relationship with Defendant at the pertinent time"). Similarly, had the Plaintiffs prevailed at class certification, they would have had to overcome the consent defense again on the merits, by showing that solely providing a number on a credit application did not constitute consent, that the scope of consent on the credit applications was limited, or that providing a phone number in other contexts (other than on a credit application) did not constitute consent to be called.

What's more, the Plaintiffs would have faced uncertainty surrounding the definition of an "automatic telephone dialing system" had the case proceeded in litigation. 47 U.S.C. § 227(b)(1)(A). Recall that Nationstar allegedly used an autodialer to make the prohibited calls. Am. Compl. ¶ 28. The TCPA defines an autodialer as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). In 2003, the FCC explained that while previous autodailers generated random numbers to call, "the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective." *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14092 (2003). So a predictive dialer, which "has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers," *id.* at 14091, "constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers," 23 F.C.C. Rcd. at 566. In other words, an autodialer "has the specified *capacity* to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 15391, 15932 n.5 (2012) (emphasis in original). These FCC decisions are favorable to the Plaintiffs because they expand the definition of an autodialer, and it is likely that Nationstar's telephone system randomly called numbers from a list. At the same time, there has been much

dispute over whether the agency's interpretation is appropriate in light of the TCPA's narrower definition of an autodialer, an issue that is now on appeal in the D.C. Circuit. *See ACA Int'l v. Fed. Commc'ns Comm'n*, Appeal No. 15-1211 (D.C. Circuit) (filed on Oct. 13, 2015); *Chamber of Commerce v. Fed. Commc'ns Comm'n*, Appeal No. 15-1306 (D.C. Circuit) (filed on Sept. 2, 2015). Further, "[t]he FCC is [also] considering petitions seeking to exclude from the TCPA predictive dialers used for non-telemarketing purposes, such as debt collection." *In re Capital One*, 80 F. Supp. 3d at 791 (citation omitted). So the longer this litigation goes on, the greater the risk that the D.C. Circuit, or another FCC ruling, will alter or weaken the class's legal position. *See id.* at 791-92 ("[W]ithout the prompt and final resolution a settlement provides, Plaintiffs run the risk that forthcoming FCC orders may extinguish their claims."); *Kolinek*, 311 F.R.D. at 494 (same).

In sum, the settlement value is fair because the Plaintiffs' ability to "win[] at trial and secur[e] complete recovery for all [2.3] million class members is but one potentiality, and it is a dubious one at that." *Kolinek*, 311 F.R.D. at 494. In light of the potential difficulties at class certification and on the merits due to the consent and autodialer issues, the time and extent of protracted litigation, and the potential of recovering nothing, the relief provided to class members in the Settlement Agreement represents a reasonable compromise.

### 2. Complexity, Length, and Expense of Litigation

The next factor is "the likely complexity, length and expense of the litigation." *Synfuel*, 463 F.3d at 653. When litigation will be costly and lengthy, settlement is

especially favored because "the present lawsuit will come to an end and Class Members will realize both immediate and future benefits as a result." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011). This factor also favors approval of this Settlement Agreement. Although the legal TCPA issues are not particularly complex, the administration of the case would be, as explained above. And although the parties have, to date, "produced and reviewed thousands of pages of documents" during two months of limited discovery, Balabanian Decl. (Final Approval) ¶ 14, they would have to continue extensive discovery on class certification and on the merits of the claims if the Court disapproves of the settlement. Class certification would be vigorously contested; and given the manageability challenges explained above, an evidentiary hearing would be required (on top of briefing) to determine whether liability and defense theories can be resolved with common proof. Summary judgment would also be contested, if the Plaintiffs make it past certification, or there would be an appeal, if the Plaintiffs do not. All of these proceedings would increase time and expense while reducing the possibility of recovery. *E.g.*, *Gehrich*, 2016 WL 806549, at *9 (the parties would have "to retain experts, analyze an enormous quantity of data, and engage in substantial motion practice, which could have resulted in reducing or negating, and certainly would have delayed, any judgment in favor of Plaintiffs, even putting aside the near certainty of appeal"); *In re Capital One*, 80 F. Supp. 3d at 792 (same); *Kolinek*, 311 F.R.D. at 495 (same); *Schulte*, 805 F. Supp. 2d at 586 (without settlement, there would be a motion to dismiss, discovery, contested class certification and a possible

appeal, summary judgment, and a trial on damages). Defense counsel put it best: "[I]f this case doesn't settle, this litigation will be a war." 5/19/16 Fairness Hr'g Tr. 26:18-19. So this factor also favors settlement.

### 3. Amount of Opposition

Because there is a low "amount of opposition to settlement among affected parties," *Synfuel*, 463 F.3d at 653, this factor also favors settlement. Out of 2,343,988 individuals notified in this case, there have only been 82 requests for exclusion, or .003498% of the settlement class. And only six objections have been filed, on behalf of seven individuals, or 0.000299% of the settlement class. This factor should not be overstated, however, because it is common for TCPA actions to have low opt-out and objection rates because of the relatively low individual stakes. *E.g.*, *In re Capital One*, 80 F. Supp. 3d at 792 (0.0032% opt-out rate); *Kolinek*, 311 F.R.D. at 495 (0.001668% opt out rate and 0.0002209% objection rate); *Gehrich*, 2016 WL 806549, at *9 (.000697% opt-out rate and .000056% objection rate); *Wilkins*, 2015 WL 890566, at *7 (.0003% opt-out rate and .0001% objection rate).

### 4. Opinion of Competent Counsel

Next, the Court considers "the opinion of competent counsel." *Synfuel*, 463 F.3d at 653. "Even though Class Counsel may be considered biased because they stand to benefit from approval … this factor weighs in favor of approval." *In re Capital One*, 80 F. Supp. 3d at 792. The Court has previously said that class counsel are "exceptionally qualified and experienced in representing classes," R. 21, 2/17/15 Minute Entry, and thus are capable of assessing the strengths and weaknesses of

the parties' positions. There is also no evidence of collusion between class counsel and Nationstar, in which "[c]lass counsel and defendants … generate a settlement that extinguishes the claims against the defendant and enriches class counsel and the class representatives with large awards, but does not provide commensurate or adequate benefit for the class." *Gehrich*, 2016 WL 806549, at *10 (citing *Redman*, 768 F.3d at 629; *Eubank*, 753 F.3d at 720). Nothing in the record shows any sort of unfairness or collusion here; the parties have vigorously defended their positions throughout the litigation, participated in two prior mediations, and engaged in discovery. The result appears to be an arms' length agreement rather than one that primarily benefits Nationstar or class counsel. *Cf. CE Design Ltd. v. King Supply Co.*, 791 F.3d 722, 725 (7th Cir. 2015) (a settlement could be collusive where class counsel gets large fees but settlement is "virtually harmless to the defendant" because the award is paid by insurance).

### 5. Stage of Litigation and Amount of Discovery

The final factor, "the stage of the proceedings at which settlement is reached[,] is important because it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *In re AT&T*, 270 F.R.D. at 350 (citation omitted). In this case, the parties conducted two months of discovery and participated in two mediation sessions before finalizing their agreement. In March 2015, after the first mediation session, the parties agreed to "an early exchange of information." R. 32, 4/22/15 Status Report at 3. Rather than staying discovery during the mediations, the Court ordered discovery to proceed and set deadlines.

4/27/15 Minute Entry. Although discovery was later suspended when the parties informed the Court that they were nearing settlement, 6/24/15 Minute Entry, the parties had been able to "produce[] and review[] thousands of pages of documents related to … the number of class members in question, the total number of calls made, and Nationstar's purported records of consent to make those calls," Balabanian Decl. (Final Approval) ¶ 14. So "the parties have completed a sufficient amount of discovery to be able to place value on their respective positions in this case." *Gehrich*, 2016 WL 806549, at *9 (factor favored settlement when there was "confirmatory discovery" for the purposes of settlement); *In re Capital One*, 80 F. Supp. 3d at 792-93 (factor favored settlement where parties had completed settlement-related discovery and mediation). And "the [C]ourt is not convinced that extensive formal discovery, when measured against the cost that would be incurred, would place the parties in a proportionally better position than they are now to determine an appropriate settlement value of this litigation." *In re Capital One*, 80 F. Supp. 3d at 793.

### 6. Objections to the Settlement

The circumstances of this case—both the underlying substantive merits and the procedural posture of the litigation—show that the Settlement Agreement is fair, reasonable, and adequate under Rule 23(e), and none of the objections undermine that conclusion. The Court has addressed several objections in other sections of this Opinion on class certification and attorneys' fees. The Court now addresses, and overrules, the remaining objections.

First, some objectors believe that the Settlement Agreement is unfair because the scope of the release is too broad and does not compensate class members for their waiver of all state and federal claims, including ones that were not brought in this action. Youngblood Objection at 2. It is true that the release covers *all* claims "arising from the use of automatic telephone dialing systems or an artificial or prerecorded voice." Final Settlement Agreement ¶ 1.24. But "[i]t is not at all uncommon for settlements to include a global release of all claims past, present, and future." *Williams v. Gen. Elec. Capital Auto Lease, Inc.*, 159 F.3d 266, 274 (7th Cir. 1998) (citing *Fair v. Int'l Flavors & Fragrances, Inc.*, 905 F.2d 1114, 1115-16 (7th Cir. 1990)). And in fact the release here is *not* a "global" release, but is tied to the specific factual predicate of "the use of automatic telephone dialing systems or an artificial or prerecorded voice." Final Settlement Agreement ¶ 1.24. Settlements "may release not only those claims alleged in the complaint, but also a claim based on the identical factual predicate ... even though the claim was not presented and might not have been presentable in the class action." *Williams*, 159 F.3d at 273-74 (citation and quotation marks omitted). Aside from the TCPA (which the Plaintiffs of course did invoke), it is not at all clear what other claims a plaintiff could successfully premise on "the use of automatic telephone dialing systems or an artificial or prerecorded voice." Final Settlement Agreement ¶ 1.24. And even if there were such a claim, it is not clear whether that claim would be more successful (or lead to a more generous remedy) than a claim under the TCPA. As the Court explained above, *see supra* Section II.B.1, settlement agreements are compromises,

33

and there would be "little incentive to negotiate class settlements if [defendants] could not secure a broad release generally insulating themselves from further litigation by those who participate in the settlement." *Schulte*, 2012 WL 2254197, at *4 (citation and quotation marks omitted); *see also Oswald v. McGarr*, 620 F.2d 1190, 1198 (7th Cir. 1980) ("[I]t is entirely proper for the offer to include a release for claims not yet adjudicated. A settlement offer is a compromise and may include a release of claims not before the court."); *Smith v. Spring Commc'ns Co.*, 2003 WL 103010, at *2 (N.D. Ill. Jan. 10, 2003) ("[A]llowing for the broad release of related claims is in accord with the general policy in favor of the settlement of class litigation."); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1996 WL 167347, at *2 (N.D. Ill. Apr. 4, 1996) (a release of all "claims which have been asserted or could have been asserted in any litigation" is not too broad because "[f]or the settling defendants, the essential element of the Settlement Agreement is the release of all claims, asserted and unasserted, which arise out of the [conduct] that ha[s] been the subject of this class action"). So the Settlement Agreement's release is not overbroad.

Moving on, the next objection that the notice procedures were inadequate, Youngblood Objection at 3-4, is also rejected. Nationstar provided a list of 3,160,291 potential class members to Epiq. Bithell Decl. ¶ 5. Epiq removed incomplete addresses and updated other addresses using the National Change of Address database, sending a total of 2,343,988 postcard notices. *Id.* ¶¶ 5-8. Epiq then checked for a forwarding address with the post office or an updated address on

Lexis Nexis for all of the undeliverable notices. *Id.* ¶ 9. The postcard notices were effective because they reached more than 98% of the settlement class, *id.* ¶ 10, and thus provided "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," Fed. R. Civ. P. 23(c)(2)(B). Youngblood also contends that the exclusion process was burdensome because requests had to be submitted by mail rather than through the website. Youngblood Objection at 6-7. But the opt-out requirements were minimal: the request had to be signed, and include the individual's name, address, telephone number, case caption, and a statement that the individual is a class member who wishes to opt-out. Preliminary Approval Order ¶ 11. Gathering these documents and paying for postage requires minimal time and financial burden, and courts have approved even more cumbersome requirements, including submitting proof of class membership. *See In re Mexico Money Transfer Litig. (W. Union & Valuta)*, 164 F. Supp. 2d 1002, 1032 (N.D. Ill. 2000) (proof of class membership was a "minimal reporting requirement [that] is not burdensome and is a reasonable safeguard against manipulation of the process by non-class members"), *aff'd*, 267 F.3d 743 (7th Cir. 2001). In addition, given the important legal consequences of an opt-out to Nationstar, it was reasonable for requests to be signed and in writing. Finally, Youngblood argues that notice was inadequate because it did not include information about how unclaimed funds would be used, Youngblood Objection at 3, but the postcard notice directed class members to the website, which in turn states that "[a]ll uncashed checks issued to Class Members and any unclaimed money in

35

the Settlement Fund will be equally redistributed to the other claiming Class Members if practical, or otherwise as directed by the Court." R. 67-4, Exh. 3, Proposed Website Notice at 3; 1/27/16 Minute Entry (approving proposed website notice). The settlement website also includes a copy of the Settlement Agreement, which contains the same provision about unclaimed funds. Final Settlement Agreement ¶ 2.1(e). Thus, class members were adequately informed of what would happen to unclaimed funds.

Another objection, this one by Sandra Cooper, argues that consumers who have provided their cell phone numbers to Nationstar on a loan application have waived their right to sue the company for using those numbers for marketing purposes, and that the class-action device should not be used for such "trivial matters." R. 69, Cooper Objection. This "objection" sounds more like a defense argument than a reason why a class member thinks the Settlement Agreement is not good enough. In any event, "the law recognizes class actions as a legitimate part of the U.S. litigation system," as does Rule 23. *In re AT&T*, 789 F. Supp. 2d at 982 (citing cases) (rejecting "a sustained critique of the class-action device generally"); *Kolinek*, 311 F.R.D. at 497 (class actions achieve the purposes of the TCPA; without them, "recovering so small a bounty is unlikely to incentivize many individual plaintiffs to hold defendants accountable for their violations of federal law"). Cooper's objections do not undermine the merits of this specific Settlement Agreement.

The remaining objection, advanced by Derrick Macon, also does not go to the terms of the Settlement Agreement; instead, it appears to be a challenge to a separate foreclosure action involving Nationstar. R. 93, Macon Objection. In sum, none of the objections alter the Court's determination that the Agreement is fair and reasonable.

## C. Attorneys' Fees and Incentive Awards

### 1. Attorneys' Fees

The Plaintiffs also move for approval of $3,690,000 in attorneys' fees and costs, representing approximately 36% of the $12.1 common fund net of administration fees and incentive fees. R. 70. As explained below, the Court awards class counsel 30% of the net settlement fund, but declines to add what the Plaintiffs characterize as a risk enhancer to get up to the proposed 36%.

The default rule is that parties bear their own litigation expenses, absent some sort of legal authority (like a statute) allowing the prevailing party to recover fees. *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 562 (7th Cir. 1994). Another exception is "[i]n a certified class action, [where] the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). When a class action "results in the creation of a common fund for the benefit of the plaintiff class," a court can exercise its equitable discretion to shift fees. *Florin*, 34 F.3d at 563. The court "determines the amount of attorney's fees that plaintiffs' counsel may recover from this fund, thereby diminishing the amount of money that ultimately will be distributed to the plaintiff

class. The common fund doctrine is based on the notion that not one plaintiff, but all those who have benefitted from litigation should share its costs." *Id.* (citation and quotation marks omitted). When evaluating the propriety of fees, "[t]he district court must balance the competing goals of fairly compensating attorneys for their services … and of protecting the interests of the class members … ." *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988) (citation omitted). Like reviewing any other part of the Settlement Agreement, the court must vigilantly safeguard the interests of the class when reviewing the request for attorneys' fees.

A fee award should "approximate the market rate that prevails between willing buyers and willing sellers of legal services." *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 957 (7th Cir. 2013) (citations omitted). In other words, a court should attempt to "recreate the market" and determine what the parties would have agreed to ex ante by considering "actual fee contracts that were privately negotiated for similar litigation, information from other cases, and data from class-counsel auctions." *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005) (citation omitted). There are two approaches used to calculate attorneys' fees: the lodestar method, which multiplies the number of hours by a reasonable hourly rate, and the percentage-of-recovery method, which is what its name sounds like—a percentage of the common fund. *Florin*, 34 F.3d at 562. Choosing which method to use is at the court's discretion, and the circumstances will inform which of the methods is more appropriate. *Id.* at 566 ("We therefore restate the law of this circuit that in common fund cases, the decision whether to use a percentage method or a lodestar method

38

remains in the discretion of the district court."); *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 974-95 (7th Cir. 1991) (same); *In re Abbott Labs. Sec. Litig.*, 1995 WL 792083, at *3 (N.D. Ill. July 3, 1995) ("Because there is no precise rule or formula for making attorney fee determinations, a district court necessarily has discretion in choosing among the various alternatives …[,] [s]o long as the method selected is not arbitrary and is likely to arrive at a fair fee." (citations omitted)). If the fee requested by class counsel is too high, "[t]he simple and obvious way for the judge to correct [the problem] is to increase the share of the settlement received by the class, at the expense of class counsel." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 786 (7th Cir. 2014) (quoting *Redman*, 768 F.3d 622, 632 (7th Cir. 2014)) (quotation marks omitted).

Here, class counsel proposes a percentage-of-recovery approach and requests $3,690,000 in attorneys' fees and costs, or around 36% of $10,250,000.[9] Pls.' Fee Br. at 2. The latter figure is the $12.1 million settlement fund net of administration fees and incentive awards.[10] The Court agrees with the Plaintiffs that a percentage-of-recovery method is proper, because when considering the market rate for counsel's services in an ex ante position, "the normal practice in consumer class actions" is to "negotiate[] a fee arrangement based on a percentage of the recovery." *In re Capital One*, 80 F. Supp. 3d at 795. "This is so because fee arrangements based on the lodestar method require plaintiffs to monitor counsel and ensure that counsel are

---

[9]The Plaintiffs say that 36% of the net settlement fund is $3,690,000. This means that the net settlement fund is roughly $10,250,000 ($3,690,000 / 0.36).

[10]"The ratio that is relevant to assessing the reasonableness of the attorneys' fee … [is] (1) the fee to (2) the fee plus what the class members receive[]," the latter of which does not include administration costs and incentive awards. *Redman*, 768 F.3d at 630.

working efficiently on an hourly basis, something a class of [several] million lightly-injured plaintiffs likely would not be interested in doing." *Kolinek*, 311 F.R.D. at 501. Similarly, because of the coordination problems with so many plaintiffs, it is unlikely that class members would want to pay attorneys' fees in advance.

The Court also agrees with the Plaintiffs that "the baseline rate in TCPA common fund cases is 30%" of the first $10 million of recovery. Pls.' Fee Br. at 12. In *Synthroid*'s pharmaceutical class action, the Seventh Circuit approved fees of 30% of the first $10 million of the settlement, 25% of the next $10 million, 22% for the next $26 million, and 15% for the rest. *In re Synthroid Mktg. Litig.*, 325 F.3d 974, 980 (7th Cir. 2003). A downward-trending sliding scale was proper because counsel does not need to put in the same effort to achieve each level of recovery; the highest rate should be afforded for the first band of recovery, because "[m]uch of the expense must be devoted to determining liability, which does not depend on the amount of damages." *Silverman*, 739 F.3d at 959. So "[a]warding counsel a decreasing percentage of the higher tiers of recovery enables them to recover the principal costs of litigation from the first bands of the award, while allowing the clients to reap more of the benefit at the margin (yet still preserving some incentive for lawyers to strive for these higher awards)." *Id.*; *see also In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744-45 (7th Cir. 2011) ("The average award declined in percentage terms as the size of the settlement increased, in recognition of the fixed-cost component of a lawyer's activity in a case—there is an irreducible minimum of

lawyer activity that must be undertaken if the client is to have a reasonable chance of prevailing, no matter how small the stakes in the case.").

In addition, although "data from pre-suit negotiations and class-counsel auctions in TCPA class actions are basically non-existent," courts have looked at fee awards in comparable settlements to determine that 30% is a reasonable and common rate in consumer class actions with up to a $10 million recovery. *Kolinek*, 311 F.R.D. at 501 (citing, e.g., *Taubenfeld*, 415 F.3d at 598-600 (holding that district court was within its discretion to award 30% of a $7.25 million settlement fund in securities action); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 572 (explaining that "in large commercial litigation with prospects of multimillion dollar recoveries the percentage … might be 33 percent of the first million"); *Bridgeview Health Care Ctr., Ltd. v. Jerryclark*, 2015 WL 4498741, at *2 (N.D. Ill. July 23, 2015) (awarding one-third of common fund in TCPA class action); *see also Gehrich*, 2016 WL 806549, at *17 (awarding 30% of the first $10 million of the settlement, 25% of the second $10 million, and 20% of the remaining amount up to $28.79 million in TCPA case); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 2147679, at *1 (N.D. Ill. May 6, 2015) (awarding 30% of the first $10 million of the settlement, 25% of the second $10 million, and 20% of the remaining amount up to $40 million in TCPA case). The 30% rate is also close to the 33% figure in class counsel's actual retainer agreements with the class representatives, R. 74, Balabanian Decl. (Fees) ¶ 29, even though the Court acknowledges that "retainer agreements are [often] of little value to determining the market rate because named plaintiffs are less often

41

sophisticated buyers of legal services" and do not have "a sufficient stake to drive a hard—or any—bargain with the lawyer[s]." *In re Capital One*, 80 F. Supp. 3d at 796 (citations and quotation marks omitted); *see also In re Trans Union Corp.*, 629 F.3d at 744 ("[N]amed plaintiffs are usually cat's paws of the class lawyers."). In sum, 30% is an appropriate fee recovery in this case, where the net settlement fund is around $10 million.

The Court rejects the Plaintiffs' request, however, for an "upward adjustment based on the specific risks of this case," which would increase the percentage from 30% to 36% (put another way, a 20% increase[11] in fees). Pls.' Fee Br. at 12. Although the risk enhancer is proper in *lodestar* cases, it does not reflect market forces in a percentage-of-recovery case. Some background on the purposes of the risk multiplier explains why. Generally, a risk multiplier, as the name suggests, "reflect[s] the risky character of [an attorney's] undertaking." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 569. When a court uses the lodestar approach, a risk multiplier is necessary because the lodestar does not adequately compensate an attorney for the risks of taking on a consumer class action on a contingency basis. *Id.* The Seventh Circuit provided this example:

> Suppose a lawyer can get all the work he wants at $200 an hour regardless of the outcome of the case, and he is asked to handle on a contingent basis a case that he estimates he has only a 50 percent chance of winning. Then if (as under the lodestar method) he is still to be paid on an hourly basis, he will charge (if risk neutral) $400 an hour for his work on the case in order that his expected fee will be $200, his normal billing rate. If the fee award is to simulate market compensation, therefore, the lawyer in this example is entitled to a risk multiplier of 2 (2 x $200 = $400).

[11] 6 / 30 = 0.2.

*In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 569; *Florin*, 34 F.3d at 565 ("[A] risk multiplier is not merely available in a common fund case but mandated, if the court finds that counsel had no sure source of compensation for their services." (citation and quotation marks omitted)). In class action settlements where the lodestar is used, "[t]he need for such an adjustment is particularly acute" because "[t]he lawyers for the class receive no fee if the suit fails, so their entitlement to fees is inescapably contingent." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 569; *see also Americana Art China Co. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 246 (7th Cir. 2014) (affirming enhancement of the lodestar by 1.5); *Cook v. Niedert*, 142 F.3d 1004, 1015 (7th Cir. 1998) (same); *Skelton*, 860 F.2d at 255 ("In current practice, the court … first calculate[es] the lodestar, taking into consideration [the] number of hours and how they were spent and the value of each attorney's services to the class. … Next, the court may adjust the lodestar to reflect the contingent nature of the attorney's undertaking." (citation and quotation marks omitted)).

The risk multiplier does *not* sensibly apply to percentage-of-recovery cases, however, because the latter approach already incorporates the risks of the lawsuit. In other words, the ex ante market contingency rate in consumer class actions *necessarily* encompasses risk because it is the rate that an attorney would set after assessing and quantifying the possibility that she could recover nothing for her time and effort. The riskier the case, the higher the contingency rate will be. So because the Court has already explained that a 30% rate reflects a fair ex ante agreement in a TCPA action, no risk multiplier is necessary. As a practical matter, this approach

also makes sense because adding a risk multiplier to percentage-of-recovery rates would encourage attorneys to bring less meritorious cases than they would otherwise bring if only market forces were at play. Suppose, for example, that a case is so weak on the merits that an attorney would not bring the case, not even at a 50% contingency rate. She might, however, decide to take that case given the added incentive that she would receive some enhanced fees by an *additional* multiplier if she prevails. *See City of Burlington v. Dague*, 505 U.S. 557, 563 (1992) ("[T]he consequence of awarding [an] enhancement to take account of this 'merits' factor would be to provide attorneys with the same incentive to bring relatively meritless claims as relatively meritorious ones.").[12] Fee multipliers on top of contingency rates would encourage attorneys to bring weaker cases—and courts should not encourage that litigation.

Plaintiffs' counsel cites two TCPA cases—*In re Capital One* and *Kolinek*— where the district court gave an extra 6% in fees for a risk multiplier as part of a percentage-of-recovery approach for the first $10 million of recovery. Pls.' Fee Br. at 21-22.[13] But neither of those cases discussed the applicability of the risk multiplier in lodestar versus percentage-of-recovery cases or held that a risk multiplier is *always* proper in percentage cases. In addition, although *In re Capital One* and

---

[12]It is true that *Dague*, which held that reasonable attorneys' fees under fee-shifting *statutes* cannot include a risk multiplier on top of the lodestar, does not directly apply to common fund cases. *See Florin*, 34 F.3d at 564-65 (citing *Dague*, 505 U.S. at 563). But there is still a sensible policy consideration that carries over from the fee-shifting cases, namely, that using risk multipliers with percentage-contingencies, the latter of which *already* factor in risk, would encourage lawyers to bring less meritorious cases.

[13]The Plaintiffs cite a third case, *Grant v. Commonwealth Edison Co.*, No. 13-CV-08310 (N.D. Ill. Sept. 11, 2015), ECF 58, 68, but there is no written decision.

*Kolinek* framed the fee increase as a "risk adjustment" or "risk multiplier," the cases actually seemed to conclude that these were riskier-than-usual TCPA cases, so the ex ante contingency rate would have been more than the 30% baseline. In *In re Capital One*, for example, the class had 17.5 million people and the recovery was around $75 million. 80 F. Supp. 3d at 789. The large class size presented more acute manageability problems, and the consent defense was especially strong because "[the defendant] argue[d] that it obtained consent to call from each class member because every version of [the] standard cardholder agreement contained provisions expressing that Plaintiffs consented to receive calls through an autodialing technology." *Id.* at 790. What's more, the parties "had engaged in substantial motion practice and discovery in two of the individual class actions" before those actions were transferred and consolidated, and had also done six months of class-wide discovery during mediation. *Id.* at 794-75. And in *Kolinek*, the district court based its decision to award 36% of the net settlement fund partially on "the fact that [it] dismissed [the plaintiff's] suit with prejudice before reversing course on his motion to reconsider," which "demonstrate[d] that the risks ... were real and significant ... ." 311 F.R.D at 502. The legal argument at the dismissal stage was whether giving Walgreen's a cell phone number for identity-validation purposes constituted consent to receive prescription reminder calls, *id.* at 488, an issue that is not as directly addressed by the FCC guidelines as the debt-collection scenarios.

Here, in contrast, although the Court explained that the Plaintiffs faced risks from the consent and autodialer issues, the quantum of the risks in this case are

typical of a run-of-the-mill TCPA action against debt collectors. The size of the class, number of issues, and relatively short length of litigation before settlement are typical of a standard TCPA case. So the 30% baseline appropriately reflects the market rate in this case, and no adjustment is justified, especially not one that increases the fee award by 20%. Thus, the Court reduces the attorneys' fees from 36% to 30% of the net settlement fund. Although that currently amounts to around $3,075,000,[14] this figure will likely change because the total administrative expenses have not yet been finalized.

### 2. Fee Objections

Although the Court sustains the fee-related objections to the extent that they argue that a risk multiplier is inappropriate (indeed, even before the objections were filed, the Court had identified the multiplier as a problem), *see* R. 80, Pentz Objection at 3 ("The risk of non-recovery for the first $10 million is *already* reflected in the market rate, otherwise it would not be the market rate, which is determined primarily by risk."), Mitchell Objection at 13, none of the remaining objections render the 30% award unreasonable. First, some objectors argue that the lodestar method is proper here, *see e.g.*, Mitchell Objection at 11-12, but the Court has already explained that it has the discretion to choose between the lodestar or percentage-of-recovery approaches, and that the latter approach better simulates the ex ante contingency arrangement that would have been agreed-to in this consumer class action. *See supra*. Nor is a lodestar cross-check required, which compares the recovery in a percentage-of-recovery method with the lodestar. *See*

---

[14]0.3 x $10,250,000 = $3,075,000.

Mitchell Objection at 11. Although courts have the discretion to do a cross-check, "consideration of [the check] is not an issue of required methodology." *Williams v. Rohm & Haas Pension Plan*, 658 F.3d at 629, 636 (7th Cir. 2011) (citing *Cook*, 142 F.3d at 1013 ("[W]e have never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach.")). Courts choose not to put too much weight into this check or skip it entirely, cautioning that "[t]he use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive." *Will v. Gen. Dynamics Corp.*, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22, 2010) (citation omitted). For one, it "may be both difficult and misleading," because class counsel will continue to spend time administering the settlement after it is approved. *In re AT&T*, 792 F. Supp. 2d at 1040. Nor is the lodestar an accurate representation of the hypothetical market agreement between the Plaintiffs and their attorneys; in a contingency fee arrangement, "[t]he client cares about the outcome alone," so "inefficient conduct of the litigation [] does not afford any reason to reduce class counsel's percentage of the fund that their work produced." *In re Synthroid Mktg. Litig.*, 325 F.3d at 979-80. Thus, the Court need not rely on a cross-check.

Two objectors, Pentz and Mitchell, also argue that the risk in this action, which they think is low, mandates a downward fee adjustment to 20% or 25%, but none of their cited authorities are persuasive. Pentz Objection at 2; Mitchell Objection at 10. Pentz first argues that *Gehrich* supports the reduction—but in that case, the district court affirmed the 30% baseline for TCPA actions, and awarded

sliding-scale fees of 30% of the first $10 million, 25% of the second $10 million, and 20% of the remaining amount up to $28.79 million. 2016 WL 806549, at *17. Pentz and Mitchell also cite out-of-circuit cases, mostly from the Ninth Circuit, *see* Pentz Objection at 3, Mitchell Objection at 10-11, and to law professor Todd Henderson, whose report was tailored to the specific facts, pleadings, and settlement agreement in a *different* TCPA case, *see* Pentz Objection at 2 (citing R. 80-2, Henderson Report). (And the district court in that case actually ended up granting a 6% upward adjustment in fees, rather than a decrease. *In re Capital One*, 80 F. Supp. 3d at 806.) So none of those authorities undermine the finding that a 30% baseline fee for the first $10 million in recovery is reasonable in TCPA actions in this circuit.

### 3. Incentive Awards

Finally, the Plaintiffs also move to give each of the ten class representatives a $5,000 incentive award. R. 70. The Court agrees that this amount is reasonable.

"Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit." *Cook*, 142 F.3d at 1016 (citing *In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 571); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001) ("Incentive awards are justified when necessary to induce individuals to become named representatives."). In deciding whether and how much to award, courts can consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Id.* (citation omitted).

Here, the class representatives participated in the litigation by reviewing the complaint, responding to requests for information, and participating in the settlement process. Balabanian Decl. (Fees) ¶ 31; Pls.' Fee Br. at 25. Although this case settled before the first phases of discovery were complete, the class representatives nevertheless "attached their names to this litigation and participated in pre-filing investigation and informal and formal discovery." *Gehrich*, 2016 WL 806549, at \*18. And an early settlement does not necessarily preclude an award when "the Class Representatives' roles were largely prospective in that they were committed to go through discovery as necessary, to be a part of any trial that would follow." *In re AT&T*, 792 F. Supp. 2d at 1041. Despite some objectors' arguments that the incentive award is excessive, *see, e.g.*, Youngblood Objection at 4-5; Mitchell Objection at 15, $5,000 is in line with other cases where there were similar levels of participation by class representatives. *Gehrich*, 2016 WL 806549, at \*19 (noting that "[c]ourts in this District have recently and routinely granted $5,000 incentive awards to named plaintiffs in TCPA cases" and approving a $1,500 award (citing *Kolinek*, 311 F.R.D. at 503 (approving $5,000 award); *In re Capital One*, 80 F. Supp. 3d at 809 (same)); *see also In re AT&T*, 792 F. Supp. 2d at 1041 (same). Thus, the Court awards a $5,000 incentive award to each of the eight class representatives: Heather Wright, Carole Stewart, Jeanette Childress, Robert Jordan, Sean Halbert, Dana Skelton, Vanessa Ruggles, and Rose Somers.

### III. Conclusion

For the reasons explained above, the Court grants in part and denies in part the Plaintiffs' motion for fees, R. 70, allowing a $5,000 incentive award for each class representative but reducing attorneys' fees from 36% to 30% of the net settlement fund. The motion for final approval of the Settlement Agreement, R. 103, is denied as to the 36% fee award, but is otherwise approved in its entirety. A final judgment order shall be entered separately.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 29, 2016